**No. 26-1373**

**IN THE**
**UNITED STATES COURT OF APPEALS**
**FOR THE THIRD CIRCUIT**

---

**UNITED STATES OF AMERICA,**
**Appellant**

**v.**

**CHRISTOPHER KYLE JOHNSTON and**
**TRENT BROCKMEIER**

**Appeal from an Order Vacating Counts of Conviction of the United States District Court for the District of New Jersey (Crim. No. 20-800). Sat Below: Honorable Edward S. Kiel, U.S.D.J.**

---

# BRIEF AND VOLUME I OF THE APPENDIX (pp. 1-68) FOR APPELLANT THE UNITED STATES OF AMERICA

---

**ROBERT FRAZER**
**United States Attorney**
**970 Broad Street**
**Newark, New Jersey 07102-2535**
**(973) 645-2700**

**On the Brief:**

**JOHN F. ROMANO**
**Assistant U.S. Attorney**
**(973) 645-2866**

## FED. R. APP. P. 26.1(b) STATEMENT

Based on information currently available, the following organizational victims sustained losses in excess of $20,000 as a result of the criminal activity in this case:

A P W U HEALTH PLAN
AETNA-PPO
AFFILIATED PHYSICIANS & EMPLOYERS HEALTH PLAN
AMERIHEALTH
ARMSTRONG GROUP OF COMPANIES
AT&T INC.
BBA AVIATION
BERGEN CTY SS VO SCH DIS
BLUE CROSS BLUE SHIELD OF NEW JERSEY
BOILERMAKERS NATIONAL HLT
BRICK TOWNSHIP BOARD OF EDUCATION
CELGENE
CENTRAL STATES HLTH FND
CF NASCO MD NOHMO RSK
CF-(NASCO) ASO-SPREAD PRC
CHARTER COMMUNICATIONS
CHERRY HILL PUBLIC SCHOOL
COOPER HEALTH SYSTEM
COUNTY OF BERGEN
COUNTY OF BURLINGTON NJ
COUNTY OF MOMMOUTH
DEPARTMENT OF DEFENSE
FEDEX CORPORATION
GE STCOB
GEORGIA DCH STATE HEALTH
GOLDMAN SACHS & CO. LLC
GOVERNMENT EMPLOYEES HEALTH ASSOCIATION
HORIZON BLUE CROSS BLUE SHIELD NJ DIRECT/OF NEW JERSEY
HOSPITAL CORP AMERICA-PPO
HOWELL TOWNSHIP BOARD OF EDUCATION
HPD CLIENT CONF COMM ASO
LA-Z-BOY, INC
LOCKHEED MARTIN CORPORATION
MAIL HANDLERS BENEFIT PLN

MANHATTAN ASSOCIATES
MCMASTER-CARR SUPPLY COMPANY
MERCK & CO. INC.
MIDDLESEX COUNTY HEALTH
MSD LLC
NEW JERSEY TRANSIT
NOVARTIS PHARMACEUTICALS
NOVO NORDISK
PATERSON PUBLIC SCHOOLS
PEARSON INC
PLUMBERS AND STEAMFIT 322
PUBLIC SERVICE ENTERPRISE GROUP (PSEG)
RAILROAD WORKERS
RALPH LAUREN CORPORATION
RXBENEFITS INC
SANOFI-AVENTIS
SODEXO
SONIC AUTOMOTIVE
STATE OF NEW JERSEY
STATE OF NEW JERSEY EGWP
THE CITY OF JERSEY CITY
TOWNSHIP OF WINSLOW
TRS CARE
UNITED HEALTHCARE
UNITED PARCEL SERVICE
UNIVERSITY OF PENN
UNUM
US AIRWAYS INC
US XPRESS
VERIZON
VERIZON EGWP
VERIZON WIRELESS
VIRTUA
VOLKSWAGEN OF AMER INC
WINDSTREAM SERVICES, LLC

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................... iv

TABLE OF ABBREVIATIONS .................... xi

JURISDICTIONAL STATEMENT .................... 1

STATEMENT OF THE ISSUES .................... 1

STATEMENT OF RELATED CASES AND PROCEEDINGS .................... 2

STATEMENT OF THE CASE .................... 2

SUMMARY OF ARGUMENT .................... 23

ARGUMENT .................... 25

I. THE DISTRICT COURT ERRED BY GRANTING A JUDGMENT OF ACQUITTAL ON ALL THREE COUNTS OF CONVICTION. .................... 25

A. Rule 29 Standard. .................... 25

B. There Was Ample Evidence For A Rational Jury To Find Defendants Guilty On All Three Counts. .................... 26

C. Numerous Errors Plagued The Court's Rule 29 Analysis. .................... 37

II. THE DISTRICT COURT ERRED BY GRANTING A JUDGMENT OF ACQUITTAL ON COUNT 4 .................... 49

III. THE DISTRICT COURT ABUSED ITS DISCRETION BY CONDITIONALLY GRANTING A NEW TRIAL, WHERE IT RELIED ON ITS ERRONEOUS RULE 29 ANALYSIS TO CONCLUDE THAT THE GUILTY VERDICTS PRESENTED A SERIOUS DANGER OF A MISCARRIAGE OF JUSTICE. .................... 54

CONCLUSION .................... 58

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

Coleman v. Johnson,
566 U.S. 650 (2012)....................26

Direct Sales Co. v. United States,
319 U.S. 703 (1943)....................31

Glasser v. United States,
315 U.S. 60 (1942)....................56

Herrera v. Collins,
506 U.S. 390 (1993)....................40

Jackson v. Virginia,
443 U.S. 307 (1979).................... 25, 26, 39, 43, 44

Musacchio v. United States,
577 U.S. 237 (2016)....................26

Salinas v. United States,
522 U.S. 52 (1997)....................48

Smith v. United States,
599 U.S. 236 (2023).................... 50, 51

United States v. Abbas,
100 F.4th 267 (1st Cir. 2024).................... 44, 51

United States v. Abrams,
165 F.4th 784 (3d Cir. 2026) .................... 25, 26

United States v. Akula,
177 F.4th 674 (5th Cir. 2026) ....................32

United States v. Allinson,
27 F.4th 913 (3d Cir. 2022) ....................53

United States v. Anderskow,
88 F.3d 245 (3d Cir. 1996).................... 29, 36, 45

United States v. Ashfield,
735 F.2d 101 (3d Cir. 1984)....................................................................43

United States v. Autuori,
212 F.3d 105 (2d Cir. 2000)....................................................................43

United States v. Bell,
584 F.3d 478 (2d Cir. 2009)....................................................................58

United States v. Bertram,
900 F.3d 743 (6th Cir. 2018) ..................................................................48

United States v. Bolos,
104 F.4th 562 (6th Cir. 2024) ................................................. 4, 35, 46, 48

United States v. Brennan,
326 F.3d 176 (3d Cir. 2003)....................................................................56

United States v. Brodie,
403 F.3d 123 (3d Cir. 2005)............................................................ *passim*

United States v. Burks,
974 F.3d 622 (6th Cir. 2020) ..................................................................56

United States v. Calderon,
127 F.3d 1314 (11th Cir. 1997) ..............................................................42

United States v. Caraballo-Rodriguez,
726 F.3d 418 (3d Cir. 2013)............................................................ *passim*

United States v. Cartwright,
359 F.3d 281 (3d Cir. 2004)....................................................................29

United States v. Castro,
776 F.2d 1118 (3d Cir. 1985)..................................................................53

United States v. Chalker,
966 F.3d 1177 (11th Cir. 2020) ............................................... 4, 32, 35, 48

United States v. Conley,
875 F.3d 391 (7th Cir. 2017) ..................................................................57

United States v. Crittenden,
46 F.4th 292 (5th Cir. 2022) .................... 55, 57

United States v. Dent,
149 F.3d 180 (3d Cir. 1998).................... 30, 43

United States v. Flechs,
98 F.4th 1235 (10th Cir. 2024) ....................44

United States v. Fulton,
136 F.4th 185 (4th Cir. 2025) ....................57

United States v. Giampa,
758 F.2d 928 (3d Cir. 1985).................... 38, 39

United States v. Green,
599 F.3d 360 (4th Cir. 2010) .................... 51, 52

United States v. Greenspan,
923 F.3d 138 (3d Cir. 2019)....................54

United States v. Grow,
977 F.3d 1310 (11th Cir. 2020) .................... 4, 35, 46, 48

United States v. Hart,
273 F.3d 363 (3d Cir. 2001)....................25

United States v. Innamorati,
996 F.2d 456 (1st Cir. 1993)....................52

United States v. Jannotti,
673 F.2d 578 (3d Cir. 1982)....................49

United States v. Johnson,
302 F.3d 139 (3d Cir. 2002)....................55

United States v. Jones,
2025 U.S. App. LEXIS 14862 (3d Cir. June 16, 2025)....................44

United States v. Kemp,
500 F.3d 257 (3d Cir. 2007)....................43

United States v. Kuzniar,
881 F.2d 466 (7th Cir. 1989) ..... 56, 57

United States v. Landesman,
17 F.4th 298 (2d Cir. 2021) ..... 55, 57

United States v. Lewis,
557 F.3d 601 (8th Cir. 2009) ..... 29

United States v. Marrero-Ortiz,
160 F.3d 768 (1st Cir. 1998) ..... 53, 54

United States v. Mattia,
157 F.4th 305 (3d Cir. 2025) ..... 4, 46, 48

United States v. McKee,
506 F.3d 225 (3d Cir. 2007) ..... 28, 31, 45

United States v. McLean,
715 F.3d 129 (4th Cir. 2013) ..... 46

United States v. Mercado,
610 F.3d 841 (3d Cir. 2010) ..... 29

United States v. Mickens,
2021 U.S. App. LEXIS 22139 (2d Cir. 2021) ..... 40, 41

United States v. Millender,
970 F.3d 523 (4th Cir. 2020) ..... 42, 56

United States v. Monaco,
2024 U.S. App. LEXIS 3433 (3d Cir. Feb. 14, 2024) ..... 2, 4, 32, 36

United States v. Montgomery,
2022 U.S. App. LEXIS 17475 (6th Cir. June 23, 2022) ..... *passim*

United States v. Mussare,
405 F.3d 161 (3d Cir. 2005) ..... 26

United States v. Nourian,
2026 U.S. App. LEXIS 16875 (5th Cir. June 10, 2026) ..... 4

United States v. Persaud,
866 F.3d 371 (6th Cir. 2017) ....................................................................32

United States v. Puccio,
2024 U.S. App. LEXIS 22678 (3d Cir. Sept. 6, 2024) ............................ 4, 27, 29

United States v. Pulido,
69 F.3d 192 (7th Cir. 1995) ......................................................................41

United States v. Quiles,
618 F.3d 383 (3d Cir. 2010)........................................................................38

United States v. Renteria,
903 F.3d 326 (3d Cir. 2018)................................................................. 50, 51

United States v. Reyeros,
537 F.3d 270 (3d Cir. 2008)........................................................................38

United States v. Rivera-Donate,
682 F.3d 120 (1st Cir. 2012)........................................................................52

United States v. Salahuddin,
765 F.3d 329 (3d Cir. 2014)........................................................................55

United States v. Sanchez,
969 F.2d 1409 (2d Cir. 1992)................................................... 41, 56, 57

United States v. Schlei,
122 F.3d 944 (11th Cir. 1997) ....................................................................52

United States v. Scotti,
47 F.3d 1237 (2d Cir. 1995)........................................................................29

United States v. Sher,
2024 U.S. App. LEXIS 19099 (3d Cir. Aug. 1, 2024) .............................. 2, 4, 18

United States v. Silveus,
542 F.3d 993 (3d Cir. 2008)................................................................ 54, 55, 58

United States v. Simon,
12 F.4th 1 (1st Cir. 2021)...........................................................................35

United States v. Smith,
294 F.3d 473 (3d Cir. 2002) ... 25

United States v. Sussman,
709 F.3d 155 (3d Cir. 2013) ... 26

United States v. Thomas,
2023 U.S. App. LEXIS 370 (3d Cir. Jan. 6, 2023) ... 55

United States v. Truman,
688 F.3d 129 (2d Cir. 2012) ... 40, 41

United States v. Turley,
891 F.2d 57 (3d Cir. 1989) ... 52

United States v. Tyson,
653 F.3d 192 (3d Cir. 2011) ... 25, 42

United States v. Vosburgh,
602 F.3d 512 (3d Cir. 2010) ... 53, 54

United States v. Wert-Ruiz,
228 F.3d 250 (3d Cir. 2000) ... 29

United States v. Xue,
2023 U.S. App. LEXIS 18316 (3d Cir. July 19, 2023) ... 49

Whitfield v. United States,
543 U.S. 209 (2005) ... 50

Woodby v. INS,
385 U.S. 276 (1966) ... 43

**Statutes**

18 U.S.C. § 371 ... 20

18 U.S.C. § 1028 ... 20

18 U.S.C. § 1349 ... 20

18 U.S.C. § 1956 ... 20, 49, 50, 51

18 U.S.C. § 1957 ... 20, 37, 49, 51

18 U.S.C. § 3231 .......................................................................................... 1

18 U.S.C. § 3731 .......................................................................................... 1

**Rules**

Fed. R. Crim. P. 29 ...................................................................... *passim*

Fed. R. Crim. P. 33 ................................................................ 21, 41, 55, 57

## TABLE OF ABBREVIATIONS

| | |
|---|---|
| "Appx" | refers to the Appendix supplied by the United States. |
| "Dkt. #" | refers to a docket entry in D.N.J. Crim. No. 20-800. |

## JURISDICTIONAL STATEMENT

This appeal is from an Order granting Defendants' post-trial motions for judgment of acquittal and conditionally granting a new trial. As the Indictment charged offenses against the laws of the United States, Appx105-33, the District Court had subject-matter jurisdiction under 18 U.S.C. § 3231. The Order was entered on February 3, 2026, Appx103, # 374, and the United States filed a timely Notice of Appeal on February 17, 2026, Appx1-2. This Court has jurisdiction under 18 U.S.C. § 3731.

## STATEMENT OF THE ISSUES

1. Whether the District Court erred by granting a judgment of acquittal on all three counts of conviction where it: did not engage in the proper sufficiency-of-the-evidence analysis; made its own credibility determinations; drew inferences in Defendants' favor; failed to consider the evidence as a whole; ignored critical evidence; and improperly credited Defendants' theory of the case. (Preserved: Appx4519-632, 4898-907).

2. Whether the District Court erred by granting a judgment of acquittal on the money-laundering-conspiracy charge by finding that the Government hadn't proven venue by a preponderance of the evidence, where lack of venue isn't a basis for Rule 29 relief and, regardless, Defendants wired criminal proceeds into the District. (Preserved: Appx4615-20, 4906-07).

3. Whether the District Court abused its discretion by conditionally granting a new trial, where it merely relied on its erroneous Rule 29 analysis to conclude that the guilty verdicts presented a serious danger of a miscarriage of justice. (Preserved: Appx4620-31, 4904-05).

## STATEMENT OF RELATED CASES AND PROCEEDINGS

Numerous co-conspirators have been convicted. Nine pleaded guilty and testified at trial. Three of those have been sentenced: Robert Bessey, D.N.J. Crim. No. 17-322, Saurabh Patel, D.N.J. Crim. No. 22-35, and Antonio Serna, N.D. Tex. Crim. No. 20-170. Six await sentencing: Christopher Casseri, D.N.J. Crim. No. 20-800, John Gaffney, D.N.J. Crim. No. 17-388, William Hickman, D.N.J. Crim. No. 19-191, Keith Ritson, D.N.J. Crim. No. 20-764, Hayley Taff, D.N.J. Crim. No. 20-696, and Matthew Tedesco, D.N.J. Crim. No. 17-321. Three other co-conspirators were convicted at separate trials and appealed. This Court affirmed the judgments of Thomas Sher and Steven Monaco. United States v. Sher, 2024 U.S. App. LEXIS 19099 (3d Cir. Aug. 1, 2024); United States v. Monaco, 2024 U.S. App. LEXIS 3433 (3d Cir. Feb. 14, 2024). Kaival Patel withdrew his appeal. App. No. 24-3245.

## STATEMENT OF THE CASE

Defendants' business was "all about greed, not medical need." Appx175. The fraud in this case arose from a change in how insurance companies and their

pharmacy benefits managers ("PBMs") reimbursed pharmacies for compound medications. Compound medications are "drugs with multiple ingredients that are prescribed when a standard medication can't meet a patient's specialized medical needs." United States v. Montgomery, 2022 U.S. App. LEXIS 17475, at *4 (6th Cir. June 23, 2022) (unpublished); see Appx256, 804, 988, 1770, 1937, 2899. Although PBMs previously reimbursed for just "the most expensive ingredient" in a compound, starting in 2012 they reimbursed for "all of th[e] ingredients." Appx3409-10. For Defendants, this was a chance at riches.

"Typically, a patient meets with their doctor, the doctor assesses their medical needs, and the doctor prescribes medication if necessary. The doctor then sends that prescription to a pharmacy, and the pharmacy fills the prescription." Montgomery, 2022 U.S. App. LEXIS 17475, at *3. During that process, the pharmacy assesses the legitimacy of the prescription and the PBM verifies the patient's insurance coverage and tells the pharmacy "you will be paid this amount of money and you are required to collect this co-payment from the patient." Appx3297-301; see Appx299-300. The whole process requires a "valid prescription." Appx301-02, 3297-301. A claim based on a signed prescription implicitly represents to the PBM that "the patient has been seen by the doctor, … the doctor has prescribed this medicine for the patient," and "the patient has a

condition that … this medicine would help." Appx806, 3300, 3388; see United States v. Mattia, 157 F.4th 305, 310-11 (3d Cir. 2025).

Defendants and other bad actors upended this model: They set up pharmacies that didn't "conduct themselves like pharmacies," instead "solicit[ing] particular prescriptions from patients based off of their profit," Appx3332-33, thereby "extract[ing] massive profits from the marketing of medically unnecessary drugs," Montgomery, 2022 U.S. App. LEXIS 17475, at *33. In other words, "prescriptions were written only to make money, not for the purpose of treatment." Monaco, 2024 U.S. App. LEXIS 3433, at *5. As courts around the country have explained—sometimes in cases involving Defendants' own pharmacy—that's health care fraud. United States v. Nourian, 2026 U.S. App. LEXIS 16875 (5th Cir. June 10, 2026) (unpublished); Mattia, 157 F.4th at 310-11; United States v. Puccio, 2024 U.S. App. LEXIS 22678, at *3 (3d Cir. Sept. 6, 2024) (non-precedential); Sher, 2024 U.S. App. LEXIS 19099, at *1; United States v. Bolos, 104 F.4th 562, 570-71 (6th Cir. 2024); Montgomery, 2022 U.S. App. LEXIS 17475, at *3-36; United States v. Grow, 977 F.3d 1310, 1314-25 (11th Cir. 2020); United States v. Chalker, 966 F.3d 1177, 1183-87 (11th Cir. 2020).

In 2013, Central Rexall Drugs ("CR") was a family-owned retail pharmacy in Hammond, Louisiana. Appx251-52. It had 6-7 employees, was losing money, Appx255, 257, 264, and "eked out just over $1 million in [annual] revenue," Dkt.

# 221, at 13.  CR was owned by its pharmacist, Don Fellows, who made hospice care and hormone replacement compound medications costing about $30 per prescription for the local community. Appx252-57, 434-37.  In April 2013, Defendants offered to buy CR for less than $150,000. Appx258-65.  Fellows rejected that offer. Appx265.  Defendants then made a winning proposal—they would manage CR's compounding business through their company, PMG, for 90% of the profits.  The remaining 10% would go to CR's owners—Fellows and, later, his daughter Hayley Taff. Appx266-79.  Defendants planned to drastically expand CR's compounding business, using Johnston's pre-existing network of sales representatives and compound formulas. Appx261, 269, 279-80, 809.

Although Taff was nominally the CEO, Brockmeier the COO, and Johnston the general counsel, Appx286-88, Johnston and Brockmeier were the ultimate decisionmakers, Appx289, 294-95, 2894-95.  Brockmeier was at the office every day, Appx286, 1181, 2384, always got his way, Appx802, 990, 1194, and was informed about everything, Appx2756-57, 2770, 2783-87, 2796-98, 2818-29, 2890-91, 2948-49.  Although Johnston was rarely at the office, Appx287, he was a "micromanager," Appx288, 2890, was constantly updated by Brockmeier and others, Appx287, 2383-84, 2818-23, 2836-38, 2892-96, 3249-52, 3266-75, and was the final decisionmaker, Appx802, 2790-92, 2890-91.

Defendants quickly expanded CR's footprint and business. CR took over two buildings. Appx284-86. It hired more staff, expanding to 66 employees by 2014 and later reaching 85. Appx291. That staff included Chief Compliance Officer Ryan Boyle, who failed the bar exam twice, had no health care or compliance experience, worked previously as a part-time lawyer, responded to a Craigslist posting for the position, and later admitted that he wasn't very good at his job. Appx2375-82, 2696; see Appx3031 ("he was [in] over his head"). That staff also included VP of Sales Christopher Casseri, who had no experience with compounded medications, responded to a LinkedIn message from Johnston seeking someone with an "aggressive mentality," and was enticed to the position by Johnston's promise of bonuses based on the high reimbursement rates of CR's products. Appx2884-90.

Under Defendants, CR's sales increased "really fast," with the "big jump in the Spring of 2014." Appx348. By May 2014, CR's compounding business was being reimbursed for nearly *$2 million* in prescriptions *for that month alone*, which represented 87.75% of its business. Appx349-56. As time went on, those numbers increased, peaking at *$20.6 million in April 2015* and staying above $3 million *per month* until the scheme effectively ended in March 2016. Appx2835-36, 4982-83, 4987.

To effectuate the scheme, CR created and disseminated pre-printed prescription pads, which listed its various compounded medications. Appx364-67, 990; e.g., Appx4968. CR started with Defendants' formulas, which were never tested to see if they actually "would help patients." Appx809. "Almost all" potential new formulas were suggested not by doctors, but sales representatives, Appx730; see Appx361, 826, 835-50, 869, 1000-02, 1610, 1614-23, 2908-10, 3614-16, while others were taken from LinkedIn or stolen from other compounding pharmacies, Appx1968-69, 2910-19, 3176-77. Defendants "expressed that their primary concern was the reimbursement rate of these medications," Appx360-63; see Appx868, 1607-09, 1614-23, 2079, 2908-10, and "[t]hey did not express interest in the medical benefits," Appx360, which went untested, Appx1003-08, 1014-26, 1607-09, 2943-47, and were unimportant, Appx1002. As Taff put it, "as the reimbursement potential got higher and higher, that definitely, you know, swayed the decision-making." Appx578.

Defendants added "prescriptions that were at a higher reimbursement." Appx363. They determined the reimbursement rates using "test adjudications" ("a dummy script" or "phished claim," Appx2911, 3306), which used a prior patient's personal information, without his or her consent, to submit a fake prescription claim (designed to look like a real one) to the PBM using a proposed new formula, Appx306, 813-14, 997, 2912. That test would reveal how much a particular

insurance company would reimburse for a compound using the new formula. Appx811-18, 1862, 2910-14, 3396-97.

The practice was prohibited by PBMs for three reasons: (1) their agreements required pharmacies to submit only valid claims; (2) it "undermined the entire process" and created justifiable "concern that the prescriptions that would ultimately be generated were written based on a profit point rather than a patient's actual need"; and (3) it could potentially adversely affect the unwitting patient. Appx3307-10, 3314-15; see Appx306-07, 660, 815, 998-99, 2915, 3398-400, 3467; see also Appx873 (pharmacist uncomfortable running test adjudications because CR's mission became "trying to find the most profitable formulas and fill those"). CR never told the PBMs that it engaged in this practice, Appx815, 3310, and when concerns were raised, Defendants dismissed them and personally and repeatedly ordered test adjudications of potential new formulas, Appx307-09, 653-54, 733, 811, 820-25, 843-44, 872-73, 885-86, 997-98, 2917-23, 3616-17, 3762. Defendants scrapped proposed compounds that didn't reimburse well—regardless of their potential medical usefulness. Appx1045-49, 2910, 2996-98.

In early 2015, using test adjudications, and responding to feedback from sales representatives eager for ever-more lucrative prescriptions, CR added a higher-reimbursing wellness supplement that tripled the amount of an ingredient called resveratrol. Appx834-52, 1014-28, 1957-61, 2940. CR's pharmacists

pushed back on the proposal—increasing the resveratrol well above the recommended daily dose would provide no benefits to patients, who would just "pee it out." Appx837-52, 1012-26, 1718-19. Defendants, however, pushed for it, and when the pharmacists relented, Defendants were "excited" about the high "reimbursement amount." Appx851-52, 1022-26, 2942-45; see Appx4143 (Johnston summation: "It was not useful, but was it unsafe?"). Although CR labeled the compound GW-WT and told its sales representatives it would "help with weight management," Appx1684, 1834, 1856-57, 1959, 4945-46, 4968, nothing supported that claim, Appx1016, 2946.

Over time, CR rolled out several products, with its big sellers being general wellness/metabolic supplements and antifungal, pain, and scar creams. Appx2830-33, 4981. Those products garnered huge reimbursement rates—a single patient receiving the resveratrol wellness supplement could generate approximately $20,000 in reimbursements for CR ***per month***, Appx842, 851, 996, 1049, 2059—but took almost no time to develop, Appx863-65, and cost almost nothing to make, resulting in enormous profits with margins exceeding 90%, Appx2824-29. For example, a batch of 600 capsules of CR's highest volume metabolic supplement cost $595.21 to make, but CR was reimbursed $213,369.77. Appx1027-28. A batch of scar cream cost $1386.40 to make, but CR got $33,271.27 from the PBM. Appx1063-64. CR touted the high reimbursement rates to its sales representatives,

Appx1684-86, 1835-36, 1962-63, 2925-26, 2943-47, but (tellingly) advised against informing doctors about those rates, which might dissuade them from prescribing those products, Appx2925-27.

The high reimbursement rates eventually attracted the attention of the PBMs and insurance companies, which sometimes stopped covering various ingredients. Appx363, 2939. At first, to avoid "red flags," CR tried to limit its claims for high reimbursing formulas. Appx356. Later, it just accepted that its formulas might have limited lifespans. For example, when CR announced a line of metabolic supplements, Johnston informed sales representatives that he "expect[ed] insurance payers to continue to provide coverage for some time." Appx2938.

When insurance companies stopped covering lucrative ingredients, CR substituted new ones based solely on their reimbursement rates. Appx857. For instance, insurance companies stopped covering resveratrol in the spring of 2015, so Defendants immediately looked for substitute "profitable formulas that would be covered under insurances," Appx858, 862, 1043-44, using a "high reimbursing ingredient," Appx2995. Defendants rejected similar but low-reimbursing compounds and chose hyaluronic acid—not because a doctor or pharmacist suggested it, but because a sales representative believed (correctly) it would reimburse well—about $10,000 per month. Appx860-65, 1036-41, 1051, 1967-69, 2998-3001. Hyaluronic acid, however, isn't a substitute for resveratrol or effective

orally. Appx860, 954, 1050, 1201, 1712-13. No matter, CR added it to a prescription pad, Appx866-67, 1051-52, 1609, 1861-62, 1976-77, 3001-02, 4944, and pressured sales representatives to switch patients from the old formula to the new one without providing any evidence that it was equivalent, Appx1608-09, 1978-86. One high-prescribing doctor switched all his patients to the new formula in a lengthy voicemail message. Appx1978-79, 1995-96, 3005. For another doctor, CR (with Defendants' permission and encouragement) prepared pre-filled prescription pads (with the maximum number of refills indicated) for other formula changes, so he could switch over his patients *en masse* without ever seeing those patients or discussing the new formulas with them. Appx1981-94, 3005-09, 4977-79.

CR initially planned to sell its compounds through in-house employees and Casseri was hired to assemble that staff. Appx2886, 2897. Defendants, however, determined that in-house employees "weren't as profitable" as independent contractors. Appx2900; see Appx2455-56. So, despite knowing that PBMs didn't allow pharmacies to use independent contractors, Appx2460-61, Defendants caused CR to sign up numerous sales groups, with hundreds of sales representatives, to push their compounds, Appx2474-82, all of which they hid from the PBMs, Appx2484-90, 2690-93. Defendants supervised these groups personally. Appx2903-05.

The primary qualification for CR's sales groups was "how many prescriptions they can bring into the pharmacy to get adjudicated." Appx2901-03. No experience was required, Appx1573-74, 2902-03, 3484-85, so compounds were sold by all manner of "[h]ustlers," Appx1574, and "crooks," Appx4080 (Johnston summation), including firemen, guidance counselors, teachers, maintenance workers, police officers, and a gym floor installer, Appx1574, 1589, 1758, 1825-26, 3478. None of them were trained and they learned nothing about the products they pushed. Appx1567, 1573-74, 1579, 1826-27, 1935-36, 3024-25, 3487-88. At Defendants' direction, CR's sole focus was reimbursements, so it encouraged sales representatives to sell the most profitable formulas and to select the maximum number of refills (11 or 12) for each prescription in order to "[m]ake the most money," even if that made no medical sense. Appx395-98, 731, 750-51, 1061-63, 1568, 1589, 1710-11, 1797, 1830-31, 1844, 1948, 2906-07, 4944, 4946-66, 4977-79. Prescriptions were "refilled every single month like clockwork," generating months of reimbursements from a single prescription. Appx1868, 1948, 2907 ("The more refills, the more money they got, we got.").

With Defendants' knowledge, sales representatives marketed CR's compounds directly to patients, Appx1575, 1941-44, 2022, 2517, 2973, 3226—an "unheard of" practice, Appx1578. They targeted patients whose health insurance plans paid generously for compound medications, such as Tricare and New

Jersey's insurance for teachers and public employees. Appx1306-07, 1575-77, 1704, 1825-26, 1938, 1941-43, 3485. Some sales representatives even accessed doctors' medical files, searching for such patients. Appx1841-43, 1938. Because such direct marketing was a "red flag" that wasn't allowed by PBMs, CR hid it from them. Appx3225-26, 3235-36, 3332-33, 3356-60.

Defendants compensated sales representatives with enormous commissions—sometimes exceeding 50% of the reimbursement amounts for their prescriptions with additional bonuses for high monthly volume. Appx1214, 1257, 1300, 1565, 1825, 1925-27, 2012-17, 2024-30, 2455, 2542-45. Very successful sales groups, like William Hickman's Boardwalk Medical ("Boardwalk"), which operated in New Jersey and accounted for over 90% of CR's reimbursements from July 2015 through February 2016, Appx3648, 4987; see Appx2984 ("he was our cash cow, our golden goose"), got ever-increasing commissions. Defendants even paid Hickman commissions for prescriptions he didn't generate and rewarded him and an associate with a trip to the Super Bowl. Appx1625, 1925-27, 2012-17, 2024-30, 2075, 2542-45, 2983-84, 3011.

To encourage Tricare prescriptions, Defendants changed their policy and paid commissions for those, too (and even for those before the policy change), resulting in a "lot of business" almost immediately, sometimes over $1 million ***per day***. Appx2471-74, 2515-16, 2759-67, 3650-56. In April 2015, the Defense Health

Agency ("DHA") informed CR that Tricare would no longer cover its compounds, Appx417, "due to you having dispensed compound drugs to Tricare beneficiaries based upon prescriptions written by physicians whom we have concluded may not have established a physician-patient relationship with beneficiaries necessary to write valid prescriptions," Appx2518-20. It also withheld $20 million in reimbursements. Appx2520. Despite being informed of this decision and the basis for it, Appx2520, Defendants did nothing to change their business practices.

The high commissions also motivated sales representatives to obtain compound prescriptions for themselves and family members. Appx2772-75, 3496-503. Keith Ritson collected commissions on his own metabolic supplement, which cost the insurer approximately $80,000 over a year, Appx1830-32, 3657; Hickman received approximately $50,000 in commissions for his wife's supplement over 11 months, Appx1939-41, 2033-34, 2222, 3657; and Robert Bessey received commissions for prescriptions received by his parents, which cost the insurer approximately $285,000, even though they didn't need or use them, Appx3496-503, 3657-58, 4988. Although CR had a policy against this, and the practice was "out of control," Appx2775, Brockmeier authorized numerous exceptions for important distributors, Appx2490-98, 2772-82, 2956-57.

Unsurprisingly, the untrained, inexperienced, and highly motivated sales force led to abuses. Some representatives ("probably all of them") paid "people to

agree to receive the medications." Appx1578-79, 1944-45, 1951, 2131, 2340-41, 3490-91, 3534. Some paid doctors to prescribe CR compounds. Appx751, 1581, 1757-59, 1949-50. Some cultivated relationships with doctors who agreed to sign unnecessary prescriptions for patients they never examined or after seconds-long phone consultations. Appx745-51, 1264, 1270, 1580-88, 1700-03, 1706-11, 1717, 1760-64, 1830, 1833, 1945-49, 3497-501. Some even signed prescriptions for a prescriber without her knowledge. Appx755-57.

Defendants were informed of these practices both by CR staff and through complaints from doctors or patients, including "confused patients" who never heard of the doctor or asked for a prescription. Appx309-16, 369-72, 382-88, 403-07, 831-34, 994, 1272-74, 2300, 2407-13, 2422-24, 2428-31, 2434-39, 2540-41, 2559-60, 2964-70, 3584, 3595-99, 3602-14. Complaints "picked up over time," Appx2962-63, and occurred "too frequently," Appx3606. Yet Defendants dismissed them as "one-off situations" and thus made no changes to their practices. Appx382-88, 393, 994, 2407-13, 2422-24, 2428, 2434-39, 2964-70, 3595-99, 3602-14. And they explicitly approved of these practices for at least one important sales group, Antonio Serna's MMR21, with Johnston agreeing that Serna could pay doctors per evaluation and suggesting that he pay military members to receive prescriptions under the guise they would participate in a "study." Appx1215-16, 1242-50, 1260-65, 1272-74, 1295. Serna's organization paid doctors

approximately $100,000, Appx1263-65, and it gave patients $250 for each medication they received, Appx1260. CR received over $9 million from these prescriptions. Appx2830. Defendants rewarded Serna with huge commissions, which Brockmeier described as "well deserved." Appx1300.

Although Defendants knew that PBMs required CR to collect co-pays as a way of "preventing fraudulent claims" and ensuring that patients actually wanted the prescribed compound, Appx329-33, 2385-86, 3317-20, 3421, 3472, CR regularly shipped compounds before collecting co-pays, and sometimes before verifying the co-pay with the patient, Appx345-47, 623, 1953-54, 2199, 2207, 2386-89, 2957-61, 3063, 3087, 3738-40, 3761. Collecting co-pays was so unimportant to CR that it had hundreds of thousands of dollars of unpaid co-pays, Appx452-53, 1065-66, 2717-18, collecting just 31% of them, Appx2804-13, 2876, 3417-18, even though other pharmacies, including mail-order ones, collect over 97%, Appx3329, 3403-04. CR never reported that "failure to collect" to the PBMs. Appx3339.

Besides not collecting co-pays, Defendants sometimes waived them altogether, even though that wasn't allowed, either. Appx3318, 3570-77. To make it appear it was complying with the co-pay requirement and to persuade patients with high co-pays to accept prescriptions, CR contracted with Affordable Medication Solutions ("AMS"), which it claimed was a co-pay coupon program

that lowered the cost of co-pays to patients. Appx335-40, 2389-92. In reality, CR paid AMS $10,100 per month and no co-pays were paid or anything of value returned. Appx340-44, 2392, 2400, 2721-22, 3668-69. Discounting co-pays was prohibited by CR's contracts with the PBMs, so Defendants lied to PBMs about it. Appx2396-401, 2406-07, 3344-48.

Sales groups relied heavily on certain doctors, who prescribed enormous amounts of CR compounds, Appx3619-36, 4984-86, even though Defendants publicly advertised compounds as "a very specific medication, prepared by a pharmacist, for a patient's individual needs," Appx2899. For example, in March 2015, Dr. Erik Wagner submitted 248 new prescriptions and, including refills, 394 of his prescriptions were filled that month. Appx3626-27, 4984. From October 2015 through January 2016, CR filled between 390 and 536 prescriptions for Dr. John Gaffney each month. Appx3633-34. On some days, Dr. Jeff Durgin submitted more than 100 prescriptions; in March 2015, he submitted 689 prescriptions; and in April 2015, CR filled 1517 of his prescriptions. Appx3635-36.

Defendants had access to information showing those huge numbers and CR staff brought it to their attention, but Defendants dismissed any concerns. Appx425-34, 446, 1066-67, 1951-53, 2517-18, 2837-38, 2979-80, 4980. Likewise, whole families were receiving the full panoply of CR compounds, fueling

enormous reimbursements for the pharmacy—one family received over $100,000 worth of compounds per month totaling over $1,000,000 for the life of the scheme. Appx426-27, 1589-96, 1706, 1713-14, 2062-71, 2509-12, 3491-96, 3657-58, 4947-66, 4988; see Sher, 2024 U.S. App. LEXIS 19099, at *2-3.

The huge numbers were eye-opening to CR's staff and sales representatives, who knew that "something wasn't right here." Appx1869; see Appx1678 (Matthew Tedesco: "the bells went off like crazy…. but we never received any phone calls" from CR). When Ritson saw the numbers—particularly whole families getting multiple compounds and certain doctors writing a "ton" of prescriptions—he was "alarm[ed]" and "contacted a lawyer." Appx1867-69.

By summer 2015, Taff knew that CR's sole "mission was to fill as many compounds as possible," despite being "not medically necessary"—a concern she shared with Brockmeier. Appx448-50. CR's pharmacist reached the same conclusion. Appx873. At the same time, Hickman understood that CR "was not legitimate": "I realized that co-pays weren't being collected, patients—the medicine wasn't medically necessary, patients didn't have a patient-doctor relationship. Some patients weren't seen. Multiple family members were loaded up on multiple products." Appx2078; see Appx2287 ("Everybody knew what was going on."). And Casseri realized "[i]t was illegal the way that we were making the money" and "knew we were breaking the law." Appx3014, 3049, 3127.

Concerns about CR's practices weren't limited to staff and sales representatives. Defendants were repeatedly informed about news stories, federal criminal investigations, and laws that raised red flags about CR's practices. Appx399-402, 409-10, 413-17, 2441-54, 2518-33, 2560-68, 2574-82, 3013-15, 3150, 3617-19. In one such investigation of CR sales representatives who were very close to Johnston, the very same practices used by CR were described as a "first class scam." Appx2452, 4976; see Montgomery, 2022 U.S. App. LEXIS 17475. Despite the glaring similarities—"what I was reading in the articles and what I was seeing on television was exactly what we were doing or what was taking place at [CR] at the time," Appx3013-14 (Casseri)—Defendants took no action, Appx415, 2450, 2453-54, 2530, 2533, 2581-82, 3014.

CR's fraud continued until early 2016, when the last of the insurance companies stopped generously reimbursing for compound medications. Appx464, 1626, 1865, 2035-38. Over the course of the scheme, three PBMs reimbursed CR approximately **$146 million** for its compounds. Appx3658-59. Of that, Tricare paid approximately $40 million and the various New Jersey state insurance companies for public employees paid approximately $59 million. Appx3658, 4988. CR sent approximately $26.241 million in commissions to Boardwalk in New

Jersey via electronic and wire transfers. Appx481-82, 3667-68. Johnston and Brockmeier earned over $34 million and $5 million, respectively. Appx3669-89.[1]

In September 2020, Defendants were charged in a 24-count Indictment with: conspiracy to commit health care fraud and wire fraud, in violation of 18 U.S.C. § 1349 (Count 1); conspiracy to commit identity theft, contrary to 18 U.S.C. § 1028(a)(7), in violation of 18 U.S.C. § 371 (Count 2); conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h) (Count 4); and money laundering, in violation of 18 U.S.C. § 1957 (Counts 5-24). Appx105-33. In addition to Counts 1 and 2, Casseri was also charged with making false statements (Count 3). Appx105-21. Casseri pleaded guilty before trial. Dkt. # 202. On December 23, 2024, the District Court dismissed Defendants' substantive money laundering counts. Dkt. # 229. The Government didn't appeal.

A seven-week trial commenced on January 28, 2025, before the Honorable Edward S. Kiel, U.S.D.J. The jury heard the testimony of eighteen witnesses: CR employees Taff, Boyle, Casseri, VP of Finance Khaled Farahat, and pharmacists John Mark Rolling and Melissa Olsen; sales representatives Serna, Ritson, Hickman, Tedesco, and Bessey; Drs. Gaffney and Saurabh Patel and Nurse Practitioner Candace Craven; an employee of Express Scripts, one of the PBMs

---

[1] The disparity is attributable to Johnston's much-larger ownership stake in the companies that managed CR's compounding business. Appx3671, 3676.

defrauded by Defendants; and an IRS agent, an FBI agent, and the managing director of the Federal Reserve Bank of New York. The Government's theory was simple: "[D]efendants orchestrated a scheme to take over Central Rexall Drugs and use it as a mill to crank out compound medication after compound medication …. for the sole purpose of making money." Appx3941; see Appx4018. And if they somehow didn't know they were perpetrating a massive fraud, they were willfully blind to what was happening. E.g., Appx4032-33. Defendants *agreed* that there was fraud and red flags, but claimed the real victims were CR and Defendants. E.g., Appx4080-85. The Court instructed the jury on willful blindness and good faith. Appx3901-07. On March 10, 2025—the second day of deliberations—the jury convicted Defendants of all three remaining counts of the Indictment. Appx4314-22, 4330-33.

In May 2025, Defendants filed motions for a judgment of acquittal and a new trial, under Rules 29 and 33, Appx4334-518, 4633-747, which the Government opposed, Appx4519-632. The Court heard argument on October 27, 2025. Appx4751-887. The parties filed post-argument letters. Appx4888-943.

On January 16, 2026, the Court filed a 65-page opinion granting Defendants' Rule 29 motions and conditionally granting their Rule 33 motions. Appx3-67; see Appx68. The Court focused on Count 1, finding that Counts 2 and 4 logically relied on that count. Appx5, 14. As to the health-care-fraud conspiracy, it found:

> [T]he inferences the government advanced had no logical and convincing connection to any established facts. The only evidence that directly connected defendants to an alleged fraudulent scheme came from the mouth of a witness whose testimony was uncorroborated and who the jury undoubtedly saw as patently incredible. In sum, the evidence did nothing more than paint defendants as bad people who must have done something illegal to make all that money.

Appx4.

The Court further explained that the evidence "does not in any manner support an inference that defendants entered into an agreement to defraud PBMs." Appx12. It questioned this Court's willful blindness precedent, Appx13, and how compound prescriptions could be "medically necessary" because they're not lifesaving, Appx20-21. As for "red flags," the Court accepted Defendants' explanations for all of them and questioned whether a jury could infer knowledge from them. Appx24-35. It discounted entirely Serna's testimony, finding that "he was a patently incredible witness that no rational jury could have credited and, indeed, the jury in this case did not credit." Appx38. It found that the prescriptions couldn't form the basis for a false statement, Appx45-48, and that reliance on other of Defendants' false statements was a prejudicial variance because they "cannot be treated as intrinsic evidence of that nonexistent falsity," Appx50.

Although the Court rejected several of Defendants' challenges to Count 2, it nevertheless granted their Rule 29 motions, finding that no rational jury could find that they used the test adjudications to further health care fraud. Appx51-59. And

it found no venue for the Count 4 money-laundering conspiracy because CR's many wire transfers to Boardwalk in New Jersey "have nothing to do with the conspiracy charged" and therefore reliance on them "would be fundamentally unfair to defendants." Appx60-65. The Court also found that the presence of a Fedwire server in New Jersey "cannot satisfy venue." Appx61-64.[2]

Finally, under Rule 29(d), the Court conditionally granted Defendants' new trial motion "[f]or the same reasons the Rule 29 aspect of the Motion will be granted." Appx67.

## SUMMARY OF ARGUMENT

Defendants commandeered a struggling family-owned pharmacy to churn out insurance reimbursement claims for medically unnecessary prescriptions. Three PBMs reimbursed CR approximately **$146 million** for its compounded medications; Johnston took home over **$34 million**; and Brockmeier made over **$5 million**. After hearing from numerous witnesses, including multiple co-conspirators, the jury quickly returned guilty verdicts, finding that Defendants conspired to commit multiple crimes.

Despite the ample evidence of Defendants' guilt, the Court vacated the jury's verdict, granted a judgment of acquittal, and conditionally granted new trials. The Court, however, failed to conduct the proper sufficiency-of-the-

---

[2] The Government isn't appealing that determination.

evidence analysis. Instead, it disregarded critical witness testimony based on its own credibility determination, drew inferences in Defendants' favor, considered the evidence piecemeal, ignored critical evidence, and improperly credited Defendants' theory of the case. Applying the proper legal standard, ample evidence supported the jury's verdict.

Likewise, the Court erred by granting a judgment of acquittal on Count 4. That's not the proper remedy for lack of venue. Regardless, there was ample evidence that this offense took place in the District of New Jersey—Defendants wired over $26 million in criminal proceeds to just one sales group in that District.

Finally, the Court abused its discretion by conditionally granting a new trial. Besides relying on its faulty Rule 29 analysis, the Court provided no support for that relief. Far from raising concerns that innocent people had been convicted, the evidence overwhelmingly supported the guilty verdicts.

# ARGUMENT

## I. THE DISTRICT COURT ERRED BY GRANTING A JUDGMENT OF ACQUITTAL ON ALL THREE COUNTS OF CONVICTION.

**Standard of Review: Plenary review. United States v. Abrams, 165 F.4th 784, 797 n.9 (3d Cir. 2026).**

The District Court reversibly erred by granting Defendants' Rule 29 motions, conducting a flawed sufficiency-of-the-evidence analysis. Applying the correct legal standard, there was ample evidence for a rational jury to find Defendants guilty on all three counts of the Indictment.

### A. Rule 29 Standard.

When reviewing a claim that insufficient evidence supported the jury's verdict, the district court must apply a "highly deferential" standard of review. United States v. Hart, 273 F.3d 363, 371 (3d Cir. 2001). It must view the evidence, and the inferences that can be drawn from that evidence, in the light most favorable to the Government. Id. Evidence is insufficient only where no "rational trier of fact could have found proof of guilt beyond a reasonable doubt based on the available evidence." United States v. Smith, 294 F.3d 473, 476 (3d Cir. 2002); see Jackson v. Virginia, 443 U.S. 307, 318-19 (1979).

Thus, reversal of the jury's verdict is appropriate only where "the prosecution's failure is clear," United States v. Tyson, 653 F.3d 192, 199 (3d Cir. 2011) (cleaned up), and there is "no evidence, regardless of how it is weighted,

from which the jury could find guilt beyond a reasonable doubt," United States v. Mussare, 405 F.3d 161, 166 (3d Cir. 2005) (cleaned up). Because the Court cannot "usurp the role of the jury by weighing credibility and assigning weight to the evidence, or by substituting its judgment for that of the jury," United States v. Brodie, 403 F.3d 123, 133 (3d Cir. 2005); see Musacchio v. United States, 577 U.S. 237, 243 (2016), the verdict "must be upheld" "[u]nless the jury's conclusion is irrational," United States v. Caraballo-Rodriguez, 726 F.3d 418, 432 (3d Cir. 2013) (en banc). "[T]he only question under Jackson is whether that finding [of guilt] was so insupportable as to fall below the threshold of bare rationality." Coleman v. Johnson, 566 U.S. 650, 656 (2012) (per curiam).

This Court applies plenary review. It thus applies the same deferential standard the district court should have used in considering whether there was legally sufficient evidence to support the verdict. Abrams, 165 F.4th at 797 n.9. Therefore, a defendant challenging a guilty verdict on sufficiency grounds bears "a very heavy burden." United States v. Sussman, 709 F.3d 155, 162 (3d Cir. 2013) (cleaned up).

### B. There Was Ample Evidence For A Rational Jury To Find Defendants Guilty On All Three Counts.

The jury convicted Defendants of conspiracies to commit: health care and wire fraud (Count 1); identity theft (Count 2); and money laundering (Count 4). With the exception of the Court's venue determination, see **Point II**, its analysis as

to all three counts relied on its insufficiency findings on Count 1, Appx14 n.4. That count required the Government to prove that:

> (1) two or more persons agreed to commit healthcare [or wire] fraud, (2) [Defendant] was a party to or a member of that agreement, and (3) [Defendant] joined the agreement or conspiracy knowing of its objective to commit healthcare [or wire] fraud, and intended to join together with at least one other conspirator to achieve that objective. Thus, the jury had to find that [Defendant] had knowledge of the specific objective contemplated by the ... conspiracy. Because willful blindness is a subset of knowledge[,] and an alternative way of proving knowledge[,] proof of willful blindness [can be] sufficient to prove knowledge[.]

Puccio, 2024 U.S. App. LEXIS 22678, at *6 (cleaned up); accord Appx3915-22 (elements of health care and wire fraud).

The Court found that: (1) "[t]he government presented no evidence that the defendants knowingly entered into an agreement to commit healthcare and wire fraud," Appx11-14; and (2) the Government didn't prove that Defendants "knew the object of the conspiracy was to commit healthcare or wire fraud by submitting false and fraudulent insurance claims to the pharmacy benefits administrator for medically unnecessary compounded prescription medications." Appx3900; see Appx14-51. To the contrary: When the trial evidence and inferences that can be drawn from it are viewed in the light most favorable to the Government, a rational jury had ample basis to find that Defendants conspired to commit health care and wire fraud. And because the Court's insufficiency analysis on Counts 2 and 4

relied on its insufficiency finding as to Count 1, it follows that its entry of judgments of acquittal on those counts was erroneous, too.

Start with the first element the Court found lacking: Defendants' membership in the conspiracy. "[C]ommon sense suggests, and experience confirms, that illegal agreements are rarely, if ever, reduced to writing or verbalized with the precision that is characteristic of a written contract. Rather, the illegal agreement can be, and almost always is, an implicit agreement among the parties to the conspiracy." United States v. McKee, 506 F.3d 225, 238 (3d Cir. 2007). Thus, "a conspiratorial agreement," like all the elements of conspiracy, "can be proven circumstantially based upon reasonable inferences drawn from actions and statements of the conspirators or from the circumstances surrounding the scheme." Id.; see Brodie, 403 F.3d at 134.

The Court's finding that there was no evidence of an agreement is unsupportable in law and fact. For starters, by focusing solely on whether Johnston and Brockmeier agreed with *each other*, the Court entirely ignored the evidence that they separately agreed with testifying co-conspirators "C[asseri] and Hayley Taff and William Hickman and others," as charged in the Indictment. Appx109; see Appx3890-91 (jury instructions).

Similarly, the Court incorrectly claimed the Government solely "sought to establish the object of the conspiracy under a willful blindness theory" and it's

impossible "'to join a conspiracy … he does not know … exists.'" Appx12-13 (quoting United States v. Scotti, 47 F.3d 1237, 1243 (2d Cir. 1995)). Given all the evidence, the jury could infer knowledge—it didn't need to rely on willful blindness. In any event, this Court has already rejected the District Court's concern, which "flounders on" this Circuit's "ruling to the contrary in" United States v. Anderskow, 88 F.3d 245 (3d Cir. 1996), and subsequent cases. United States v. Wert-Ruiz, 228 F.3d 250, 255 n.3 (3d Cir. 2000) (rejecting reliance on Scotti); see Puccio, 2024 U.S. App. LEXIS 22678, at *9 n.5. See generally United States v. Lewis, 557 F.3d 601, 613 (8th Cir. 2009) ("[A] willful blindness instruction is particularly appropriate when the defendant denies any knowledge of a criminal scheme despite strong evidence to the contrary." (cleaned up)).

Finally, the District Court relied on pre-Caraballo-Rodriguez drug-conspiracy opinions to question the sufficiency of the Government's evidence. Appx12 (citing United States v. Mercado, 610 F.3d 841 (3d Cir. 2010), and United States v. Cartwright, 359 F.3d 281 (3d Cir. 2004)). But in Caraballo-Rodriguez, 726 F.3d at 430, this Court en banc unanimously recognized that the "analysis in" those kinds of cases had "too often been more akin to ad hoc second-guessing the juries' verdicts than exercising a review function based on sufficiency of the evidence." The District Court's reliance on those opinions, therefore, replicated the errors that Caraballo-Rodriguez corrected.

Viewed in the light most favorable to the Government, the evidence overwhelmingly proved that Defendants conspired together, with others, or both. The Court, however, focused solely on one piece of evidence—the 2824 telephone calls between Defendants during December 2013-August 2016. Appx3270-71. Contrary to the Court's finding, the Government wasn't required to definitively prove that Defendants discussed only the fraudulent scheme during those approximately 726 hours of conversations. Appx12, 3270-71; see United States v. Dent, 149 F.3d 180, 188 (3d Cir. 1998) ("Dent's contention that the evidence also permits a less sinister conclusion is immaterial."). Besides, the jury easily could have inferred an agreement from these calls and a mountain of other evidence. For example:

- Johnston and Brockmeier attempted to buy CR together and they jointly owned the companies that ran its compounding operation, Appx258-79, 3671, 3676;
- Brockmeier was always at the pharmacy and Johnston was a "micromanager," Appx286, 288, 1181, 2384, 2890;
- along with Taff, they were repeatedly described as the "management group," Appx2386, 2412, 2439, 2442, 2455, 2461, 2471;
- they were the ultimate decisionmakers, directly supervised sales groups, and made important decisions on a host of topics, including test adjudications, formula changes, commissions, co-pays, and policy waivers, e.g., Appx307-09, 360-63, 653-54, 733, 802, 811, 820-25, 843-44, 851-52, 868, 872-73, 885-86, 990, 997-98, 1002, 1022-26, 1065-66, 1194, 1214, 1607-09, 1614-23, 2079, 2455, 2471-74, 2490-98, 2542-45, 2772-82, 2790-92, 2890-91, 2903-05, 2908-10, 2917-23, 2942-45, 2956-57, 2983-84, 3318, 3570-77, 3616-17, 3762;

- they were informed of red flags and made no changes to CR's operations; no "secrets" were kept from them, Appx399-402, 409-11, 413-17, 425-30, 446, 450, 1066-67, 1951-53, 2441-54, 2517-33, 2560-68, 2574-82, 2837-38, 2891, 2979-80, 3013-15, 3150, 3617-19;
- employees and sales representatives with less knowledge of CR's operations knew that CR was engaging in fraud, Appx448-49, 873, 1678, 1867-69, 2078, 2287, 3049, 3127; and
- Defendants benefited from the fraud, with Johnston making over $34 million and Brockmeier over $5 million, Appx3669-89.

From all that evidence, a jury could infer a conspiratorial agreement. E.g., McKee, 506 F.3d at 237-42 (jury could infer that named partner knew of the agreement where employees knew of the fraud, defendant was "perceived as the 'boss,'" he wasn't "an absentee partner," and he had a "financial … motive" in the scheme); see Direct Sales Co. v. United States, 319 U.S. 703, 713 (1943) ("stake in the venture" isn't required, but it's not irrelevant); Brodie, 403 F.3d at 150–51 ("[I]t would be reasonable for a jury to give weight—indeed, substantial weight—to the fact that the Defendant was the President" of a company engaged in criminal conduct.).

Consider next the second element the Court found lacking: that Defendants "knew the object of the conspiracy was to commit healthcare or wire fraud by submitting false and fraudulent insurance claims to the pharmacy benefits administrator for medically unnecessary compounded prescription medications." Appx3900. "Proving fraudulent intent does not require direct evidence. Rather, 'a jury may consider circumstantial evidence and infer intent from evidence of efforts

to conceal the unlawful activity, from misrepresentations, from proof of knowledge, and from profits.'" United States v. Persaud, 866 F.3d 371, 380 (6th Cir. 2017); see United States v. Akula, 177 F.4th 674, 682 (5th Cir. 2026) ("A reasonable jury could infer from this circumstantial evidence that Dr. Akula was aware of Canon's improper billing procedures and knowingly decided to continue in the fraudulent scheme."). Evidence of Defendants' fraudulent intent also was overwhelming.

A "rational jury could legitimately" use CR's structure and Defendants' involvement "as a prism through which to assess all of the other circumstantial evidence presented against the Defendant[s] in this case." Brodie, 403 F.3d at 150. This was a "straightforward scheme to defraud," Chalker, 966 F.3d at 1185, and Defendants "demonstrated their intent to defraud" "[a]t every turn," Montgomery, 2022 U.S. App. LEXIS 17475, at *31. The jury could rationally find that, with the primary purpose of lining their own pockets at the expense of unwitting insurers and PBMs, Defendants set up CR for the sole purpose of "fill[ing] medically unnecessary prescriptions for patients who neither wanted nor needed them," Chalker, 966 F.3d at 1186, and that "prescriptions were written only to make money, not for the purpose of treatment," Monaco, 2024 U.S. App. LEXIS 3433, at *5. For example, Defendants:

- hired an inexperienced and ineffectual lawyer to head up compliance, Appx2375-82, 2696, 3031;

- chose ingredients for the compounds on their pre-printed prescription pads based on reimbursement rates, not medical usefulness, overruling CR's pharmacists, Appx360-63, 578, 837-52, 858-68, 873, 1002-08, 1014-26, 1036, 1039-41, 1051-52, 1607-09, 1614-23, 1718-19, 1861-62, 1967-69, 1976-77, 2079, 2908-10, 2942-45, 2998-3002;

- adopted formulas suggested by sales representatives, not doctors, in search of compounds that reimbursed for amounts that dwarfed the cost to make them and without testing for efficacy, Appx361, 730, 826, 835-50, 858-65, 869, 1000-02, 1016, 1036, 1039-44, 1051, 1610, 1614-23, 1967-69, 2824-29, 2908-10, 2946, 2995, 2998-3001, 3614-16;

- determined the formulas using test adjudications, a practice they hid from PBMs, and which involved using a prior patient's information without consent, Appx306-09, 653-54, 660, 733, 811-21, 823-25, 843-44, 872-73, 885-86, 997-99, 1862, 2910-23, 3307-10, 3396-400, 3467, 3616-17, 3762;

- pushed sales representatives to sell the most expensive compounds (while withholding reimbursement rates from doctors) and to pre-fill the prescription pads with the maximum number of refills to ensure the most amount of money, Appx395-98, 731, 750-51, 1061-63, 1568, 1589, 1684-86, 1710-11, 1797, 1830-31, 1835-36, 1844, 1868, 1948, 1962-63, 1981-94, 2906-07, 2925-27, 2943-47, 3005-09;

- allowed the unheard-of practice of marketing compounds directly to patients and searching for patients with insurance that best compensated for compound medications, Appx1306-07, 1575-78, 1704, 1825-26, 1938, 1941-44, 2022, 2517, 2973, 3225-26, 3235-36, 3332-33, 3356-60, 3485;

- used a sales system of independent contractors who were chosen for their aggressiveness, not experience, and who weren't trained on selling prescription drugs or the products themselves, Appx1567, 1573-74, 1579, 1589, 1758, 1825-27, 1935-36, 2474-93, 2901-03, 3024-25, 3478, 3484-88;

- approved and encouraged Serna's plan to pay doctors for consultations and patients for a fake study, Appx1215-16, 1242-50, 1260-65, 1272-74, 1295;

- looked the other way when concerns were raised about doctors and patients being paid and not knowing about certain prescriptions, Appx309-16, 369-72, 382-88, 393, 403-07, 831-34, 994, 1272-74, 2300, 2407-13, 2422-24, 2428-31, 2434-39, 2540-41, 2559-60, 2962-70, 3584, 3595-614;

- changed the policy on paying commissions for Tricare prescriptions in a successful effort to attract such business, Appx2471-74, 2515-16, 2759-67, 3650-56;

- doled out ever-increasing commissions to high-performing sales representatives, including CR's "cash cow," Boardwalk, Appx1214, 1257, 1300, 1565, 1625, 1825, 1925-27, 2012-17, 2024-30, 2075, 2455, 2542-45, 2983-84, 3011, 3648;

- did nothing when eye-opening volumes of prescriptions from certain doctors and for certain families were presented to them, even though others were alarmed by the numbers, Appx425-30, 446, 1066-67, 1951-53, 2517-18, 2837-38, 2979-80, 4980, 4988;

- made exceptions to rules prohibiting sales representatives from receiving commissions for their prescriptions and those of family members, resulting in some sales representatives receiving huge sums of money to get prescriptions they or their family members didn't need or want, Appx1939-41, 2033-34, 2222, 2490-98, 2772-82, 2956-57, 3496-503, 3657-58;

- did little to collect co-pays that the PBMs required and entered a fraudulent agreement with AMS to make it appear that CR was collecting co-pays, Appx329-47, 452-53, 623, 1065-66, 1953-54, 2199, 2207, 2385-92, 2396-401, 2406-07, 2717-18, 2721-22, 2804-13, 2876, 2957-61, 3063, 3087, 3317-20, 3329, 3339, 3344-48, 3403-04, 3417-18, 3421, 3472, 3570-77, 3668-69, 3738-40, 3761;

- waived co-pays in violation of PBM rules, Appx3318, 3570-77;

- did nothing to change practices after DHA told CR that it suspected that CR's patients were not in valid doctor-patient relationships, Appx417, 2518-20, and when numerous investigations and stories were presented to them alleging that the very same practices constituted health care fraud, Appx399-402, 409-17, 2441-54, 2518-33, 2560-68, 2574-82, 3013-15, 3150, 3617-19, 4976; and

- made huge sums of money, Appx3669-89.

No wonder the jury returned guilty verdicts on the second day of deliberations: "A reasonable jury could infer from the evidence that illegitimate prescriptions were not an unintended consequence of [Defendants' actions] but, rather, were a goal." United States v. Simon, 12 F.4th 1, 30 (1st Cir. 2021); see Bolos, 104 F.4th at 570-71. "Even if these actions taken in isolation could have a plausible innocent explanation, when taken together, a reasonable factfinder could easily conclude that they establish an intentional scheme to defraud." Montgomery, 2022 U.S. App. LEXIS 17475, at *31-36. Indeed, the Eleventh Circuit in Grow, 977 F.3d at 1314-25, and Chalker, 966 F.3d at 1183-87, rejected sufficiency challenges based on remarkably similar facts.

Thus, given Defendants' position, control of CR, and information provided to them, there was ample evidence for the jury to find actual knowledge. See Brodie, 403 F.3d at 155 ("As all the evidence suggests that Mr. Sabzali was a star salesman in 'the Caribbean,' it would be not be an impermissible leap to infer that an involved president of the company would know why that was so and how it was occurring."). But even if Defendants lacked actual knowledge, the jury could have rationally found they were willfully blind to what was happening. Among other things, Defendants relied on sales representatives who were untrained and motivated them to sell as many compounds as possible. And CR's employees and

sales representatives saw what was going on, knew that it was wrong, and told Defendants, who did nothing about it. Appx399-402, 409-17, 448-49, 873, 1678, 1867-69, 2078, 2287, 2441-54, 2518-33, 2560-68, 2574-82, 3013-15, 3049, 3127, 3150, 3617-19. Thus, a rational jury could find that each Defendant "closed his eyes to what would otherwise have been obvious to him." 3d Cir. Model Crim. Jury Instruction 5.06; see Anderskow, 88 F.3d at 252-53.

In sum, ample evidence supported the jury's verdict on Count 1. Because the Court erred in finding the evidence on Count 1 insufficient, it also erred in granting judgments of acquittal on Counts 2 and 4. As to Count 2, contrary to the Court's determination, Defendants' misuse of patient information to submit test adjudications "meaningfully advanced the charged conspiracy to commit healthcare and wire fraud." Appx59. As the evidence showed, those test adjudications—which were prohibited by the PBMs and thus hidden—allowed Defendants to identify the highest-reimbursing formulas, which were then added to CR's prescription pads and prescribed to patients who didn't need those medications. In other words, the reason for prohibiting test adjudications was realized in this case, as "the formulas were created to maximize profit rather than tailored by a doctor for unique patient needs." Montgomery, 2022 U.S. App. LEXIS 17475, at *36; see Monaco, 2024 U.S. App. LEXIS 3433, at *5. Likewise,

as to Count 4, the monetary transactions involved criminally-derived property, as required under 18 U.S.C. § 1957(a).

### C. Numerous Errors Plagued The Court's Rule 29 Analysis.

Despite the ample evidence discussed above, five fundamental errors plagued the District Court's sufficiency analysis. It: (1) made its own credibility determinations, (2) drew inferences in Defendants' favor, (3) failed to consider the evidence as a whole, (4) ignored critical evidence, and (5) accepted Defendants' theory that causing PBMs to reimburse for medically unnecessary prescriptions wasn't fraud.

*First*, the Court disregarded Serna's damning testimony by improperly substituting its view of witness credibility for the jury's. It recognized that Serna's testimony "directly connected defendants to an alleged fraudulent scheme." Appx4, 38. After all, Serna testified that Johnston agreed that Serna could pay doctors per evaluation and suggested that he pay military members to receive prescriptions under the guise that they would participate in a "study." Appx1215-16, 1242-50, 1260-65, 1272-74, 1295. But the Court ignored all that testimony, determining that Serna "was a patently incredible witness that no rational jury could have credited and, indeed, the jury in this case did not credit." Appx38. According to the Court, "Serna was caught in lie after lie" and "a number of jurors openly laugh[ed] at much of his testimony." Appx38. It further cited extra-record

evidence that Serna was involved in a related scheme. Appx39 n.14. By wiping away Serna's testimony, the Court found there was no direct evidence "connect[ing] the alleged underlying fraudulent scheme to defendants." Appx38.

It's well-established that "the district court may not make credibility determinations when it rules on a motion for judgment of acquittal." United States v. Giampa, 758 F.2d 928, 935 (3d Cir. 1985); see United States v. Reyeros, 537 F.3d 270, 277 (3d Cir. 2008) (same). Indeed, defense counsel *conceded* this point. Appx4648 (must "treat even the most compromised witnesses as credible"); Appx4841-42 ("[F]or purposes of Rule 29, you have to accept his testimony as true. As absurd as it might be, you have no choice.... I just want to be clear that I'm not saying that you should or even can consider his credibility for purposes of Rule 29."). Thus, "[i]n this case, [the] standard of review requires that [the Court] view [Serna] as a credible witness." United States v. Quiles, 618 F.3d 383, 395 (3d Cir. 2010). By deciding who a rational jury could credit, the District Court "act[ed] not merely as the thirteenth juror, but as the decisive vote on the jury." Caraballo-Rodriguez, 726 F.3d at 431.

The District Court's reasons for ignoring this rule do not withstand scrutiny. Despite Serna's credibility being questioned repeatedly during and after trial, no one ever asserted that the jury "laugh[ed]" at his testimony until the Court said so in its opinion. See Appx3842-58, 4120, 4154-59, 4231-36, 4334-518, 4519-724,

4751-907; Dkt. ## 268, 270-71. And even if some jurors laughed at some of his testimony, that wouldn't justify ignoring Serna's testimony entirely. After all, Serna testified for hours and the jurors still could have credited his testimony implicating Defendants. "The trial judge cannot arrogate to himself this power of the jury simply because he finds a witness unbelievable." Giampa, 758 F.2d at 935. Besides, the question on sufficiency review is whether "*any* rational trier of fact," not this one in particular, "could have found the essential elements of the crime beyond a reasonable doubt." Jackson, 443 U.S. at 319.

As for Serna's being caught in "lie after lie," Appx38, that wasn't established, either. To be sure, the Government elicited that Serna lied about speaking to the Government and reviewing the subject of his redirect testimony, Appx1550, but no other "lies" were definitively established, and it was for the jury—not the District Court—to decide how much of his testimony to credit, Appx3877, 3883-85, 3895.

Moreover, other aspects of Serna's testimony were corroborated. For example, although Defendants repeatedly claimed they wouldn't have provided a list of doctors to Serna, Serna's contemporaneous email asking for such a list supported that testimony. Appx1222-23, 2516. Brockmeier forwarded that email to Johnston with a single word: "yess." Appx2516-17, 4971. Brockmeier knew that patients were being paid—Taff told him, Appx403-04, and he received an

email summarizing a patient's statement that "the only reason he agreed to get the prescription was to get paid," Appx4972-75. Indeed, doctors associated with MMR21 were writing extraordinary numbers of prescriptions, Appx3625-29, 4984-85—amounts that raised "red flags," Appx2517-18. And DHA ultimately stopped covering CR's compounds "based upon prescriptions written by physicians whom we have concluded may not have established a physician-patient relationship with beneficiaries necessary to write valid prescriptions," Appx2519-20, which was entirely consistent with Serna's testimony about the process, Appx1263-64, 1270.

The District Court was wrong to rely on extra-record evidence to justify ignoring Serna's testimony. "[T]he sufficiency of the evidence review authorized by Jackson is limited to 'record evidence.'" Herrera v. Collins, 506 U.S. 390, 402 (1993).

The District Court's opinion contains other grave errors, too. Seizing on Defendants' about-face in their post-argument submission that credibility could be considered on sufficiency review, Appx4889, the Court stated that "[w]hile court's [sic] generally accept a jury's credibility findings, an exception exists when the testimony in question was 'incredible on its face' and/or 'def[ied] physical realities,'" Appx37 (quoting United States v. Mickens, 2021 U.S. App. LEXIS 22139, at *7 (2d Cir. 2021) (unpublished), and citing United States v. Truman, 688

F.3d 129 (2d Cir. 2012), and United States v. Sanchez, 969 F.2d 1409 (2d Cir. 1992)). Putting aside that those opinions aren't binding in this Circuit, they don't stand for the proposition that judges can intrude on the jury's credibility determinations on sufficiency review.

In Mickens and Truman, the Second Circuit explained that the "testimony of a single accomplice witness is sufficient to sustain a conviction," unless it's "incredible on its face" or "def[ies] physical realities"—not that such testimony can simply be ignored in the sufficiency analysis. Truman, 688 F.3d at 139 (proper place to attack credibility is at trial, "not in a motion for a judgment of acquittal"). Making matters worse, Mickens *affirmed* the denial of a Rule 29 motion, 2021 U.S. App. LEXIS 22139, at *14, and Truman *reversed* an order granting one, 688 F.3d at 140-41. Neither, therefore, supports a district court's intrusion on the jury's credibility determinations to set aside a verdict. See United States v. Pulido, 69 F.3d 192, 206 (7th Cir. 1995) ("Insufficiency arguments based on a witness's purported lack of credibility are wasted on an appellate court because the jury … is the only entity entitled to make such credibility determinations.") (cleaned up). Sanchez is even further afield, as that opinion was applying a *Rule 33 standard*. 969 F.2d at 1413-14.

Besides, while Serna might have been caught in a lie at trial, his testimony that Defendants knew he paid doctors and suggested a ruse to pay patients were not

"facts that [he] physically could not have possibly observed or events that could not have occurred under the laws of nature." United States v. Calderon, 127 F.3d 1314, 1325 (11th Cir. 1997) (cleaned up). This error, alone, compels reversal, as the District Court recognized that Serna "connect[ed] the alleged underlying fraudulent scheme to defendants." Appx38; see United States v. Millender, 970 F.3d 523, 529-30 (4th Cir. 2020) (reversing judgment of acquittal where district court improperly considered credibility of witness); Tyson, 653 F.3d at 202 (district court "overrode the jury's credibility determination and substituted its own").

*Second*, the Court failed to "[v]iew[] the evidence in the light most favorable to the government, as [it] must." Caraballo-Rodriguez, 726 F.3d at 433. Instead, when discussing the evidence, the Court repeatedly credited innocuous explanations. For example, it found that evidence of communication between Defendants couldn't support an agreement because there was no direct evidence of what was said. Appx11-14. It found that the most logical explanation for two-thirds of CR patients failing to pay their co-pays, which were often $20, was simply a "lack of money." Appx27. It found the high volume of prescriptions and unusual prescriptions weren't red flags because doctors signed them. Appx28-32, 35-36. It credited evidence that Defendants investigated some red flags while not crediting evidence of ones they ignored. Appx43. And so on.

That's patent error. That inferences drawn from evidence might permit a conclusion "less sinister" than guilt is "immaterial," as the evidence need not be "inconsistent with every conclusion save that of guilt," Dent, 149 F.3d at 188 (cleaned up), and there's "no requirement … that the government's evidence foreclose every possible innocent explanation," United States v. Kemp, 500 F.3d 257, 293 (3d Cir. 2007) (cleaned up).

Although the District Court might "have reached a different result" had it "been the fact-finder," United States v. Autuori, 212 F.3d 105, 118 (2d Cir. 2000) (cleaned up), the sufficiency "inquiry does not require a court to 'ask itself whether it believes that the evidence at the trial established guilt beyond a reasonable doubt,'" but rather whether "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt," Jackson, 443 U.S. at 318-19 (quoting Woodby v. INS, 385 U.S. 276, 282 (1966)); see United States v. Ashfield, 735 F.2d 101, 106 (3d Cir. 1984) (same).

*Third*, the Court failed to "review the evidence as a whole, not in isolation." Caraballo-Rodriguez, 726 F.3d at 430 (cleaned up). Instead, it simply marched through categories of evidence, finding that inferences the Government sought to draw from each individual category were lacking. E.g., Appx23-39. That "divide and conquer strategy" is the antithesis of proper sufficiency-of-the-evidence

review. United States v. Abbas, 100 F.4th 267, 280 (1st Cir. 2024); see United States v. Jones, 2025 U.S. App. LEXIS 14862, at *8 (3d Cir. June 16, 2025) (non-precedential) (court cannot "take each piece of evidence bit-by-bit"); United States v. Flechs, 98 F.4th 1235, 1247-48 (10th Cir. 2024) (same). The Court was required to consider all the evidence "in conjunction and as a whole." Brodie, 403 F.3d at 134. In other words, while failure to collect co-pays, or prescription volume, or unusual prescriptions, or number of refills, or test adjudications, or changes to the formulas, or knowledge of others, or pending investigations into similar conduct, or management role, or the amount of money being made might not be sufficient "standing alone," "the jury could rationally decide that the scale finally tip[ped]" after considering all of that evidence "together." Caraballo-Rodriguez, 726 F.3d at 432, 434 (cleaned up). That's what the jury did here.

*Fourth*, the Court didn't consider "*all of the evidence*," as required. Jackson, 443 U.S. at 319. Indeed, it ignored the evidence that was inconsistent with Defendants' theory of the case. For example, the Court completely ignored Taff's nearly 500 pages of testimony, more than any other witness, even though she was a part-owner of CR, its nominal CEO, and an indicted co-conspirator who shared an office with Brockmeier and helped Defendants carry out the fraud. Appx244-740. She damningly concluded that by the "summer of 2015" CR's "mission was to fill as many compounds as possible," not "to fill patient needs," and it did so by filling

a "large number" of prescriptions that "were not medically necessary." Appx448-50. The Court ignored the similar testimony of other witnesses, Appx873, 1867-69, 2078, 2287, including indicted co-conspirator Casseri, Appx3013-14, 3049, 3127, even though they helped carry out the fraud and shared their concerns with Defendants, Appx450, 3013-14. Obviously, that employees concluded CR was perpetrating a massive fraud was powerful evidence supporting the inference that Defendants reached the same conclusion, given their access to the same information. See McKee, 506 F.3d at 237-42 ("[A]s we have already stressed, 'rank and file' employees were aware of what was happening with withholding on wages of RIY members and non-members. It was therefore reasonable for the jury to infer that McKee, a named partner involved with the operation of the business, also knew."); Anderskow, 88 F.3d at 252-53.

The Court ignored other critical evidence, too. For example, in finding that there was no "standard by which the jury could gauge whether a certain volume of prescriptions is a 'red flag,'" Appx32, it ignored that numerous witnesses, including CR's pharmacist, were alarmed by the numbers, Appx425-30, 446, 1066-67, 1951-53, 2517-18, 2837-38, 2979-80. It found that the damning evidence of formula changes—including numerous witnesses explaining that ingredients were selected *solely* for the purpose of increasing reimbursements—was irrelevant because the types of compounds CR sold weren't lifesaving and therefore were

"inherently medically unnecessary." Appx20-21. As discussed below, that's simply wrong. The jury could have considered all of this evidence in determining Defendants' guilt. The Court's refusal to do so was erroneous.

*Fifth*, the Court took issue with the concept of "medical necessity" as applied to the compound medications in this case. Appx15-23. And crediting Defendants' theory of the case, it found that the prescriptions couldn't be "medically unnecessary" because doctors signed them. Appx45-48. That, too, was wrong.

Start with "medical necessity" or "medically unnecessary." Those terms don't appear in the wire fraud or health care fraud statutes and thus those statutes can't be unconstitutionally vague on that basis. See United States v. McLean, 715 F.3d 129, 136-37 (4th Cir. 2013) ("Although the statute does not enumerate every possible fraud scheme, an average person would understand that" billing for medically unnecessary care "is prohibited."). And there is "a consistent history of convictions for the billing of unnecessary medicines and procedures." Bolos, 104 F.4th at 573 (citing cases); see Grow, 977 F.3d at 1321. Indeed, this Court said as much in Mattia, explaining in a very similar compounding case that the prescriptions themselves implicitly (and falsely) represented to the PBMs that the claim was valid, *i.e.*, "based on a doctor's determination that a particular drug is needed by a patient." Mattia, 157 F.4th at 310-12; see Appx4748-50.

Nor were those terms somehow vague in this case. Contrary to the Court's musings, witnesses explained—and Defendants agreed, Appx4811-12—that compounds don't need to be lifesaving to be medically necessary. Appx1061, 1699-703, 1791-92, 1813-14. And "[t]he parties agree[d] that for something to be 'medically necessary,' a medical professional must determine whether a patient warrants a particular treatment of medication." Appx18. In other words, a valid prescription implicitly represents that "the patient has been seen by the doctor, … the doctor has prescribed this medicine for the patient," and "the patient has a condition that … this medicine would help." Appx301-02, 806, 3297, 3300, 3388.[3]

Highlighting the intuitive meaning of these terms, see Appx1791 (Gaffney: "medically necessary" means "[p]retty much what the term states")—especially for people running a nationwide pharmacy business—Defendants used them during the scheme. For example, CR's standard operating procedures manual stated that it would "only bill for services that are medically necessary." Appx4989-93; see Appx2606-07. At Johnston's direction, in July 2015, in an effort to "cover us," CR added a legal note to the bottom of its prescription pads, in print so small that doctors and sales representatives didn't notice it, stating that the items ordered

[3] There was nothing "confusi[ng]" about related terminology. Appx18. Something that is not "medically appropriate" or "medically beneficial" is not "medically necessary." Indeed, Dr. Gaffney explained that the terms are "similar." Appx1813.

were "medically necessary." Appx1613-14, 1767-69, 2539, 4944, 4977-79. And Taff testified that PBMs wouldn't "pay for prescriptions that were not medically necessary." Appx302.

Further, contrary to the Court's determination, "[a] doctor's prescription is not a get-out-of-jail-free card," where, as here, "there was sufficient evidence that the patients were receiving medically unnecessary treatments and prescriptions." Grow, 977 F.3d at 1321-22; see United States v. Bertram, 900 F.3d 743, 749-50 (6th Cir. 2018). After all, "[t]hat it was not" Defendants themselves "directly making these misrepresentations is of no consequence: '[i]f conspirators have a plan which calls for some conspirators to perpetrate the crime and others to provide support, the supporters are as guilty as the perpetrators.'" Mattia, 157 F.4th at 311 n.3 (quoting Salinas v. United States, 522 U.S. 52, 64 (1997)); see Bolos, 104 F.4th at 572 ("While yes, he is correct that it was solely the doctors' responsibility to establish that relationship, it was his responsibility not to fill prescriptions which he reasonably knew were being generated without such a relationship.").

Precisely for that reason, other Circuits have upheld convictions against sufficiency challenges in very similar cases—opinions that the District Court either ignored or barely discussed. E.g., Montgomery, 2022 U.S. App. LEXIS 17475, at *31-36; Grow, 977 F.3d at 1316-25; Chalker, 966 F.3d at 1183-87. Indeed, Montgomery explicitly references CR, as that case involved one of its top sales

groups and prescribers. 2022 U.S. App. LEXIS 17475, at *6-7, 16. And like in this case, the defendants there used "downlinks" as "part of the 'process'" and "concealed that they were the ones soliciting the cream orders rather than the prescriptions originating out of the typical doctor/patient consultation process." Id. at *34-36.

Simply put, the Court bought Defendants' theory of the case. But "[r]eversing the jury's conclusion simply because another inference is possible—or even equally plausible—is inconsistent with the proper inquiry for review of sufficiency of the evidence challenges." Caraballo-Rodriguez, 726 F.3d at 432. "In the end, the jury bought the government's story. That was hardly irrational." United States v. Xue, 2023 U.S. App. LEXIS 18316, at *6 (3d Cir. July 19, 2023) (non-precedential). "[T]he court's action in overturning the jury's resolution of this issue was plainly an intrusion on the jury's prerogative." United States v. Jannotti, 673 F.2d 578, 599 (3d Cir. 1982) (en banc).

## II. THE DISTRICT COURT ERRED BY GRANTING A JUDGMENT OF ACQUITTAL ON COUNT 4.

**Standard of Review: Same as Point I.**

The Court gave another reason for granting a judgment of acquittal on Count 4—lack of venue in the District of New Jersey. Appx60-65. That was error, too.

Count 4 charged a conspiracy to commit money laundering, contrary to 18 U.S.C. § 1957(a), in violation of 18 U.S.C. § 1956(h). Appx122-27. Under 18

U.S.C. § 1956(i), venue is proper in a conspiracy prosecution "in the district where venue would lie for the completed offense," *i.e.*, in "any district in which the financial or monetary transaction is conducted," "or in any other district where an act in furtherance of the … conspiracy took place." See Whitfield v. United States, 543 U.S. 209, 217-18 (2005). The jury need only find venue by a preponderance of the evidence. United States v. Renteria, 903 F.3d 326, 329 n.5 (3d Cir. 2018); see Appx3932.

In concluding that "Defendants are entitled to acquittal on Count Four," Appx65, the Court found that commission payments to Hickman and Boardwalk in New Jersey "have nothing to do with the conspiracy charged." Appx64-65. That's wrong.

*First*, lack of venue is a "trial error"—a "decision that venue in the [District of New Jersey] was improper did not adjudicate [Defendants'] culpability." Smith v. United States, 599 U.S. 236, 239, 254 (2023). So dismissal, not judgment of acquittal, would have been the only remedy for lack of venue in this case. Id. at 245. Even were the Court correct—and it's not—that venue over Count 4 did not lie in New Jersey, its styling that conclusion as a "'judgment of acquittal' under Rule 29…. does not trigger the Double Jeopardy Clause." Id. at 253-54.

*Second*, the Court "treat[ed] the offense of conviction as if it were a substantive money laundering offense rather than what it is: conspiracy to commit

a money laundering offense." United States v. Green, 599 F.3d 360, 372 (4th Cir. 2010). But § 1956(i) permits a defendant charged with conspiracy to be tried in any district "where an act in furtherance of the … conspiracy took place." See Smith, 599 U.S. at 244; Renteria, 903 F.3d at 329. As courts have explained, "the steps a conspirator takes to produce the proceeds subsequently laundered furthers a money-laundering conspiracy." Abbas, 100 F.4th at 290 (citing cases). Here, it was undisputed that numerous steps were taken in New Jersey to defraud the PBMs and thus to generate the "criminally derived property" at issue in Count 4. See 18 U.S.C. § 1957(a), (f)(2); see also Appx230 (Brockmeier opening: "The worst activity took place in New Jersey, that's why we're all in New Jersey. That's why these guys are in New Jersey. All the worst stuff happened in New Jersey.").

*Third*, the Court was wrong to find that the "commission payments from Central Rexall to Boardwalk Medical …. have nothing to do with the conspiracy charged in Count Four." Appx64. The Indictment charged that between 2014 and 2017, "in the District of New Jersey, and elsewhere, [D]efendants … knowingly conspire[d] and agree[d] with each other and with others to engage in monetary transactions by, through and to a financial institution, affecting interstate and foreign commerce, in criminally derived property of a value greater than $10,000." Appx122, ¶ 56. The commissions wired to Boardwalk, in New Jersey, which far

exceeded $10,000, easily fell within this charging language and provided venue in the District of New Jersey. See Appx481-82, 3667-68.

The Court, however, determined that Count 4 was limited by the "manner and means" section of that count, which set forth only those transactions where CR wired proceeds to PMG, Bluen Medical, and both Defendants. Appx65; see Appx122-27, ¶¶ 57-61. But the Court could reach that conclusion only by ignoring that Count 4 incorporated earlier paragraphs of the Indictment, Appx122, ¶ 55, one of which explicitly alleged that "[o]n or about October 15, 2015, William Hickman, through his company Boardwalk Medical LLC, received in New Jersey a payment from Central Rexall of $2,447,076.19 for his work and the work of people working with him to find patients in New Jersey to receive Central Rexall prescriptions," Appx119, ¶ 49d. The Court thus ignored the well-settled rule that an indictment must be read "in its entirety." United States v. Turley, 891 F.2d 57, 59 (3d Cir. 1989); see Green, 599 F.3d at 372.

The Court also ignored that the Government is not "limited at trial to the overt acts listed in the indictment." United States v. Innamorati, 996 F.2d 456, 477 (1st Cir. 1993); see United States v. Rivera-Donate, 682 F.3d 120, 130 (1st Cir. 2012). The payments to Boardwalk, thus, satisfied the venue requirement. See United States v. Schlei, 122 F.3d 944, 975 n.10 (11th Cir. 1997).

Moreover, even if the Court was right that Count 4 didn't include the commission payments to Boardwalk, at most that would constitute a variance—"where the charging terms [of the indictment] are unchanged, but the evidence at trial proves facts materially different from those alleged in the indictment." United States v. Castro, 776 F.2d 1118, 1121 (3d Cir. 1985). Relief, however, is warranted "only where the discrepancy between the indictment and the proof at trial prejudiced the defendant's substantial rights." United States v. Allinson, 27 F.4th 913, 922 (3d Cir. 2022); see United States v. Marrero-Ortiz, 160 F.3d 768, 773 (1st Cir. 1998).

According to the Court, this was such a case: "To expand the confines of the alleged illegal acts under Count Four to Central Rexall's payment of commissions would be fundamentally unfair to defendants." Appx65. Not so.

The Court never explained how "that variance surprised or otherwise … prejudiced the defense, so as to require reversal." United States v. Vosburgh, 602 F.3d 512, 534 (3d Cir. 2010) (cleaned up). It was undisputed that CR paid Boardwalk commissions in New Jersey (through wire transfers into New Jersey) for illegal acts occurring in New Jersey. See Appx230 (Brockmeier opening).

Indeed, when Defendants challenged venue in their Rule 29 motion at trial, the Government relied in part on the payments to Boardwalk in New Jersey. Appx3798-99. Defendants didn't object or express surprise at the Government's

theory. Appx3804-05. Same for when the Government argued in summation that the jury could rely on those commission payments to convict on Count 4. Appx4040-46. They didn't object or argue venue at all. Appx4052-253. Instead, they waited until their post-trial motions to complain for the first time. Appx4464-65, 4471-73.

The record, therefore, shows that Defendants were not unfairly surprised and would have done nothing differently had the commission payments been more explicitly charged in Count 4. Thus, the Court was wrong to grant relief. See Vosburgh, 602 F.3d at 534-36; Marrero-Ortiz, 160 F.3d at 773 ("Because the appellant cannot credibly claim surprise, the asserted variance does not warrant setting aside the verdict."). See generally United States v. Greenspan, 923 F.3d 138, 152-54 (3d Cir. 2019).

## III. THE DISTRICT COURT ABUSED ITS DISCRETION BY CONDITIONALLY GRANTING A NEW TRIAL, WHERE IT RELIED ON ITS ERRONEOUS RULE 29 ANALYSIS TO CONCLUDE THAT THE GUILTY VERDICTS PRESENTED A SERIOUS DANGER OF A MISCARRIAGE OF JUSTICE.

**Standard of Review: Abuse of discretion. United States v. Silveus, 542 F.3d 993, 1004 (3d Cir. 2008).**

As required by Rule 29(d), the Court also conditionally ruled on Defendants' new trial motion. Appx65-67. The Court granted that motion "[f]or the same reasons the Rule 29 aspect of the Motion will be granted." Appx67. A district

court's decision to grant a new trial is reviewed for abuse of discretion. Silveus, 542 F.3d at 1004. The Court abused its discretion.

Under Rule 33, new trial motions "are not favored and should be granted sparingly and only in exceptional cases." Id. at 1005 (cleaned up). "Even when a district court 'believes that the jury verdict is contrary to the weight of the evidence, it can order a new trial only if it believes that there is a serious danger that a miscarriage of justice has occurred—that is, that an innocent person has been convicted.'" United States v. Thomas, 2023 U.S. App. LEXIS 370, at *10-11 (3d Cir. Jan. 6, 2023) (non-precedential) (quoting Silveus, 542 F.3d at 1004-05). In other words, "a district court may not reweigh the evidence and set aside the verdict simply because it feels some other result would be more reasonable." United States v. Landesman, 17 F.4th 298, 331 (2d Cir. 2021) (cleaned up). After all, although the "district judge … was there throughout the trial…. some other people sat through the trial: the twelve citizens who performed their civic duty as jurors." United States v. Crittenden, 46 F.4th 292, 300 (5th Cir. 2022) (en banc).

In considering a defendant's motion, the district court must "exercise[] its own judgment in assessing the Government's case"—it does not view the evidence in the light most favorable to the Government. United States v. Johnson, 302 F.3d 139, 150 (3d Cir. 2002). The court, however, cannot lightly intrude on the jury's credibility determinations. See United States v. Salahuddin, 765 F.3d 329, 347 (3d

Cir. 2014) ("It was the jury's responsibility to weigh Mazzocchi's credibility considering his entire testimony, including the alleged inconsistencies."); United States v. Brennan, 326 F.3d 176, 191 (3d Cir. 2003) ("Brennan describes Bond's testimony as 'simply unbelievable,' but that determination was, first and foremost, one for the jury."); see also Glasser v. United States, 315 U.S. 60, 77 (1942) ("The short answer to this is that the credibility of a witness is a question for the jury."); United States v. Burks, 974 F.3d 622, 626 (6th Cir. 2020).

To be sure, some courts have adopted "an extremely narrow" exception, allowing the Court to weigh credibility "where the testimony contradicts indisputable physical facts or laws." United States v. Kuzniar, 881 F.2d 466, 470-71 (7th Cir. 1989); see Sanchez, 969 F.2d at 1414 ("patently incredible or defies physical realities"). "In general," however, "conflicting testimony or a question as to the credibility of a witness are not sufficient grounds for granting a new trial." Kuzniar, 881 F.2d at 470.

Here, by simply relying on its flawed Rule 29 analysis, the Court abused its discretion by granting a new trial. See Millender, 970 F.3d at 531 ("We have not seen … a single case in which an appellate court affirmed the conditional grant of a new trial founded on reasoning as sparse as the district court's here."). As explained above, the Court totally ignored Serna's testimony, corroborated in key respects, directly implicating Defendants in the fraud. But even if credibility can

be considered on a Rule 33 motion, Serna's testimony didn't "violate immutable laws of nature." Kuzniar, 881 F.2d at 471. Indeed, it was undisputed that Defendants' sales representatives paid doctors and patients during this scheme. E.g., Appx194-95 (Johnston opening: "They were corrupt sales representatives who paid patients and doctors to receive prescriptions."). Serna's claim that Defendants knew this and encouraged it doesn't "def[y] physical realities." Sanchez, 969 F.2d at 1414; see United States v. Conley, 875 F.3d 391, 400 (7th Cir. 2017) ("A finder of fact is entitled to believe the testimony of even the most dishonest of witnesses.").

Likewise, as explained above, the Court considered the Government's evidence "on a piecemeal basis." Landesman, 17 F.4th at 331. That's not allowed under Rule 33, either. It also ignored critical pieces of evidence such as Taff's entire testimony. But the Court must "assess the evidence as a whole." United States v. Fulton, 136 F.4th 185, 192 (4th Cir. 2025). Although the District Court "could quibble with … evidence in isolation, putting the puzzle pieces together reveals a clear picture." Crittenden, 46 F.4th at 298-99 ("Because the district court either improperly discounted or overlooked this evidence, it abused its discretion in ordering a new trial.").

Simply put, in light of the mountain of evidence, the Court abused its discretion in finding "a serious danger that … an innocent person has been

convicted." Silveus, 542 F.3d at 1005 (cleaned up); see United States v. Bell, 584 F.3d 478, 485 (2d Cir. 2009) ("Although the District Court has discretion to order a new trial in extraordinary circumstances, we cannot say that its decision to do so was reasonable in the circumstances presented here or on the record viewed as a whole.").

## CONCLUSION

For these reasons, this Court should reverse the District Court's order granting judgments of acquittal and conditionally granting a new trial, and remand this case for reinstatement of the convictions on Counts 1, 2, and 4, and for sentencing.

Respectfully submitted,

ROBERT FRAZER
United States Attorney

By: JOHN F. ROMANO
Assistant U.S. Attorney
970 Broad Street, Suite 700
Newark, NJ 07102-2535
(973) 645-2866

Date: July 16, 2026

## CERTIFICATE OF COMPLIANCE

I hereby certify that I am an Assistant United States Attorney for the District of New Jersey, that I am filing the attached Brief for Appellant, and:

(1) this brief contains 12,999 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f), and thus does not exceed the 13,000-word limit;

(2) this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared using a Microsoft Word for Microsoft 365 word-processing system and it is in a proportionally-spaced typeface, namely Times New Roman, that is at least 14 points;

(3) the text of the electronic PDF brief and appendix is identical to the text of the paper copies of the brief and appendix; and

(4) the electronic PDF brief and appendix have been prepared on a computer that is automatically protected by a virus detection program, namely a continuously-updated version of CrowdStrike Windows Sensor v. 7.35.20709.0, and no virus was detected.

By: John F. Romano
Assistant U.S. Attorney

Dated: July 16, 2026

**Appendix for Appellant**

**Volume I (pp. 1-68)**

# CONTENTS OF APPENDIX

**Page**

**Volume I**

Notice of Appeal ........................................................................................1

District Court Opinion (Dkt. # 373).......................................................................3

District Court Order (Dkt. # 374) ........................................................................68

**Volume II**

Docket Report, D.N.J. Crim. No. 20-800 ................................................................69

Indictment ..............................................................................................105

Trial Transcript, January 28, 2025.......................................................................134

Trial Transcript, January 30, 2025.......................................................................320

**Volume III**

Trial Transcript, February 3, 2025........................................................................543

Trial Transcript, February 4, 2025........................................................................784

**Volume IV**

Trial Transcript, February 5, 2025........................................................................1030

Trial Transcript, February 10, 2025......................................................................1287

**Volume V**

Trial Transcript, February 11, 2025......................................................................1517

Trial Transcript, February 13, 2025......................................................................1783

**Volume VI**

Trial Transcript, February 18, 2025 .................... 2041

Trial Transcript, February 19, 2025 .................... 2313

**Volume VII**

Trial Transcript, February 20, 2025 .................... 2551

Trial Transcript, February 24, 2025 .................... 2733

**Volume VIII**

Trial Transcript, February 25, 2025 .................... 2990

Trial Transcript, February 26, 2025 .................... 3254

**Volume IX**

Trial Transcript, February 27, 2025 .................... 3507

Trial Transcript, March 3, 2025 .................... 3749

**Volume X**

Trial Transcript, March 4, 2025 .................... 3839

Trial Transcript, March 5, 2025 .................... 4049

Trial Transcript, March 6, 2025 .................... 4258

Trial Transcript, March 10, 2025 .................... 4314

Verdict Sheet .................... 4330

Johnston's Post-Trial Motion (Dkt. # 327) .................... 4334

Brockmeier's Post-Trial Motion (Dkt. # 328) .................... 4518

**Volume XI**


Government's Response (Dkt. # 342)........................................4519

Defendants' Reply (Dkt. # 350)........................................4633

Government's Letter (Dkt. # 364) ........................................4748

Oral Argument Transcript, October 27, 2025........................................4751

Defendants' Post-Argument Letter (Dkt. # 368) ........................................4888

Government's Post-Argument Letter (Dkt. # 369)........................................4898

Johnston's Letter (Dkt. # 371) ........................................4908

Government's Response (Dkt. # 372)........................................4939

Government Trial Exhibit 5 (excerpt) ........................................4944

Government Trial Exhibit 5E........................................4947

Government Trial Exhibit 20A ........................................4967

Government Trial Exhibit 284 ........................................4971

Government Trial Exhibit 352 ........................................4972

Government Trial Exhibit 353 ........................................4974

Government Trial Exhibit 358 ........................................4976

Government Trial Exhibit 649A (excerpt)........................................4977

Government Trial Exhibit 896B (excerpt)........................................4980

Government Trial Exhibit 901A2 ........................................4981

Government Trial Exhibit 902A2 ........................................4982

Government Trial Exhibit 1074 ....................................................................4984

Government Trial Exhibit 1078 ....................................................................4985

Government Trial Exhibit 1086 ....................................................................4986

Government Trial Exhibit 1096 ....................................................................4987

Government Trial Exhibit 1103 ....................................................................4988

Johnston Trial Exhibit 39 (excerpt) ............................................................4989

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, Plaintiff, | : | Hon. Edward S. Kiel, U.S.D.J. |
| v. | : | Crim. No. 20-800 (ESK) |
| CHRISTOPHER KYLE JOHNSTON and TRENT BROCKMEIER, Defendants. | : | **Notice of Appeal** |

Notice is hereby given that, pursuant to 18 U.S.C. § 3731 and 28 U.S.C. § 1291, the United States of America appeals to the United States Court of Appeals for the Third Circuit from the District Court's opinion entered on January 16, 2026 [Docket Entry 373], and judgment of acquittal entered on February 3, 2026 [Docket Entry 374], vacating the jury's verdict and conditionally granting a new trial as to Counts 1, 2, and 4 of the Indictment.

Respectfully submitted,

TODD BLANCHE
U.S. Deputy Attorney General

JORDAN FOX
Chief of Staff to the Deputy Attorney General
Associate Deputy Attorney General
Special Attorney

By: Mark E. Coyne
Supervisory Assistant U.S. Attorney
Chief, Appeals Division

February 17, 2026
Newark, New Jersey

**CERTIFICATION OF SERVICE**

I hereby certify that on February 17, 2026, I caused a copy of the attached Notice of Appeal to be served electronically, using the Court's ECF System, by Notice of Electronic Filing on the following Filing Users:

Lawrence S. Lustberg, Esq.
llustberg@fbtgibbons.com

Marc Agnifilo, Esq.
marc@agilawgroup.com

Mark E. Coyne
Chief, Appeals Division

Dated: February 17, 2026

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **UNITED STATES OF AMERICA,**<br><br>**v.**<br><br>**CHRISTOPHER KYLE JOHNSTON and TRENT BROCKMEIER.** | **Case No. 20–cr–00800–ESK**<br><br>**OPINION** |

**TABLE OF CONTENTS**


I. BACKGROUND ....................3
II. MOTION FOR JUDGMENT OF ACQUITTAL ....................6
A. Legal Standard ....................6
B. Discussion ....................7
1. Count One: Conspiracy to Commit Healthcare Fraud ....................8
a. The Agreement ....................9
b. The Objective of the Conspiracy ....................12
i. Medically Unnecessary ....................13
ii. Red Flags ....................21
(A) Copayments ....................22
(B) Volume of Prescriptions ....................26
(C) Signature Stamps ....................30
(D) Refills Selected ....................31
(E) Unusual Prescription ....................33
(F) Serna's Testimony ....................34
iii. Willful Blindness ....................37
iv. False Statements ....................42
(A) Reimbursement Claims ....................43
(B) Prejudicial Variance ....................46
2. Count Two: Conspiracy To Commit Identity Theft ....................49
a. Crux ....................49
b. Deprivation of Property ....................52
c. Materiality....................55

d. Intent ....................................................................................56
3. Count Four: Conspiracy to Commit Money Laundering .........58
a. Venue ......................................................................................58
i. Fedwire Transfers ........................................................59
ii. Commission Payments ................................................62
III. MOTION FOR NEW TRIAL ..............................................................63
A. Legal Standard ..............................................................................63
B. Discussion .....................................................................................64
IV. CONCLUSION ...................................................................................65


**KIEL, U.S.D.J.**

**IN THIS MATTER,** the jury, following a six-week trial, found defendants Christopher Kyle Johnston and Trent Brockmeier were guilty of conspiring to commit healthcare fraud, wire fraud, identity theft, and money laundering. A jury's verdict must be given the highest deference. Indeed, being judged by a jury of our peers is a bedrock foundation of our democracy. However, where the proofs neither directly nor circumstantially prove, as a matter of law, a defendant's guilt beyond a reasonable doubt, the jury's verdict cannot stand. This is such a case. The inference of guilt the government sought the jury to accept as to defendants' alleged conspiracy to commit healthcare fraud and wire fraud was based on such things as defendants' earnings, their purported failure to investigate potential "red flags" in a manner acceptable to the government, and their alleged noncompliance with contractual terms. However, the inferences the government advanced had no logical and convincing connection to any established facts. The only evidence that directly connected defendants to an alleged fraudulent scheme came from the mouth of a witness whose testimony was uncorroborated and who the jury undoubtedly saw as patently incredible. In sum, the evidence did nothing more than paint defendants as bad people who must have done something illegal to make all that money.

Defendants' convictions on the charges of conspiracies to commit identity theft and commit money laundering also cannot stand. The government failed

to prove that the submission of "test adjudications" amounted to a conspiracy to commit identity theft that meaningfully advanced the conspiracy to commit healthcare and wire fraud. And venue cannot be established in this District for the conspiracy to commit money laundering charge simply because an electronic signal that is a part of the process of a wire transfer passed through a server located in New Jersey. Based on this record, I am compelled to vacate the jury's verdict and enter a judgment of not guilty as to both defendants on all counts.

## I. BACKGROUND[1]

On September 16, 2020, a grand jury indicted defendants and Christopher Casseri for their roles in an alleged scheme to defraud pharmacy benefit managers (PBMs), also known as pharmacy benefit administrators. (ECF No. 1 (Indictment).) In Counts One and Two, defendants and Casseri were charged with conspiracies to commit healthcare fraud, wire fraud, and identity theft. (*Id.* ¶¶1–49.) In Count Three, Casseri was charged with false statements. (*Id.* ¶¶50–54.) In Count Four, defendants were charged with conspiracy to commit money laundering. (*Id.* ¶¶55–61.) In Counts Five through 24, defendants were charged with money laundering. (*Id.* ¶¶62, 63.)

Central Rexall was a retail pharmacy in Hammond, Louisiana serving local customers. (*Id.* ¶1(a).) Between July 2013 and December 2016, defendants took over management of Central Rexall and expanded its operations to develop and market compound medications nationwide. (*Id.* ¶¶13, 16.) The Indictment describes compound medications to be intended to be tailored for patients with individual needs, thus PBMs and insurance companies reimburse such medications at high rates. (*Id.* ¶¶3, 15.) Under

[1] Because I write for the parties who are intimately familiar with this case, I provide only a brief overview of the facts.

defendants' leadership, Central Rexall became very profitable. Johnston, who served as general counsel of Central Rexall, and Brockmeier, who served as chief operating officer, made millions. (*Id.* ¶¶1(b), 1(c), 38, 39.) The government attributed their success to Central Rexall's wide scheme to defraud pharmacy networks by billing PBMs for "medically unnecessary" and, therefore, fraudulent prescriptions. (*See generally* Indictment.)

For some compound medication formulas, Central Rexall submitted "test claims" or "test adjudications" to determine their reimbursement rates. (*Id.* ¶¶27, 28.) Through its sales distributors, Central Rexall provided preprinted prescription pads with profitable compound medication formulas to medical professionals. (*Id.* ¶¶22, 29.) The government asserted that despite defendants allegedly having knowledge and/or reason to know that no legitimate doctor-patient relationship existed between the prescribers and patients, Central Rexall filled prescriptions for compound medications and submitted reimbursements claims to PBMs. (*See generally* Indictment.)

In November 2023, defendants and Casseri moved to dismiss the Indictment (Dismissal Motions). (ECF Nos. 118–122, 126, 127.) I denied the Dismissal Motions in part (ECF Nos. 180, 184, 187), but on reconsideration (ECF No. 196), granted the Dismissal Motions with respect to the substantive money laundering charges in Counts Five through 24 (ECF No. 229). On November 13, 2024, Casseri pleaded guilty to a one-count superseding information for conspiracy to defraud a healthcare benefit program. (ECF No. 200.)

Trial began on January 23, 2025. (ECF No. 283.) The government called 18 witnesses.[2] (*See generally* ECF Nos. 288–308 (Trial Tr.).) On

[2] The government called the following witnesses: (1) Hayley Taff, Central Rexall's chief executive officer; (2) Candance Craven, a nurse practitioner working with Top

March 3, 2025, the government rested, and defendants moved for a judgment of acquittal on all counts, to which I reserved decision. (*Id.* pp. 3648:14–3675:7.) Defendants presented no witnesses. The jury began deliberations on March 6, 2025 and returned guilty verdicts on all counts on March 10, 2025. (*Id.* pp. 4186:1–4187:21.)

On May 22, 2025, defendants filed an omnibus motion for judgment of acquittal pursuant to Federal Rule of Criminal Procedure (Rule) 29, or alternatively, new trial pursuant to Rule 33 (Motion). (ECF Nos. 327, 327–1 (Mov. Br.).) The government filed an opposition to the Motion (ECF No. 342 (Opp'n Br.)) on July 11, 2025, in response to which defendants filed a reply (ECF No. 350 (Reply Br.)) on August 18, 2025. On October 24, 2025, the government filed a letter to advise me of a decision from the Third Circuit that it believed relevant to the Motion. (ECF No. 364.) Oral argument on the Motion was heard on October 27, 2025. (ECF No. 367 (Mot. Tr.).) At my direction, the parties submitted supplemental letter-briefs on November 10, 2025. (ECF Nos. 368, 369.) On December 8, 2025, defendants filed a letter citing to new authority in support of their position. (ECF No. 371.) The government filed a response to defendants' letter on December 15, 2025. (ECF No. 372.)

---

Tier; (3) John Mark Rolling, Central Rexall's pharmacist; (4) Melissa Olsen, Central Rexall's pharmacist; (5) Antonio Serna, a sales representative for Military Medical Relief 21 (MMR21); (6) Matthew Tedesco, a sales representative for Boardwalk Medical; (7) Saurabh Patel; a doctor working with a Central Rexall sales representative; (8) John Gaffney, a doctor working with Boardwalk Medical; (9) Keith Ritson, a sales representative for Boardwalk Medical; (10) William Hickman, a sales representative for Boardwalk Medical; (11) Ryan Boyle, Central Rexall's chief compliance officer; (12) Khaled Farahat, Central Rexall's vice president of finance; (13) Casseri, Central Rexall's vice president of sales; (14) Andrew Brooks, an FBI analyst; (15) Robert Bessey, a sales representative for Boardwalk Medical; (16) Sean O'Malley, a certified fraud examiner; (17) Brandon Galloway, an FBI special investigator on this case; and (18) Blake Stockwell, a senior manager of Express Scripts' pharmacy special investigations unit.

## II. MOTION FOR JUDGMENT OF ACQUITTAL

### A. Legal Standard

In support of the Rule 29 aspect of the Motion, defendants argue that because the government's case consisted of "inappropriate inferences, improper arguments, and legal deficiencies," the government failed to introduce evidence from which a rational juror could find guilt beyond a reasonable doubt on any count. (Reply Br. p. 15.) Rule 29 provides that "the court … must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). "[U]nless no reasonable juror could accept the evidence as sufficient to support the defendant's guilt beyond a reasonable doubt," the court must uphold the jury's verdict. *United States v. Fattah*, 914 F.3d 112, 182–83 (3d Cir. 2019); *United States v. Wolfe*, 245 F.3d 257, 261 (3d Cir. 2001) (noting that a court must "review the record in the light most favorable to the prosecution to determine whether any rational trier of fact could have found proof of guilt beyond a reasonable doubt based on the available evidence"). Thus, "a finding of insufficiency should 'be confined to cases where the prosecution's failure is clear." *United States v. Smith*, 294 F.3d 473, 477 (3d Cir. 2002) (quoting *United States v. Leon*, 739 F.2d 885, 891 (3d Cir. 1984)).

"Reversing the jury's conclusion simply because another inference is possible—or even equally plausible—is inconsistent with the proper inquiry for review of sufficiency of the evidence." *United States v. Caraballo-Rodriguez*, 726 F.3d 418, 432 (3d Cir. 2013). "[T]he evidence does not need to be inconsistent with every conclusion save that of guilt." *Id.* (quoting *United States v. Cooper,* 567 F.2d 252, 254 (3d Cir. 1977)). So long as the evidence "establish[es] a case from which the jury can find the defendant guilty beyond a reasonable doubt," the verdict must be upheld. *Id.* (quoting *Cooper*, 567 F.2d at 254).

When reviewing a Rule 29 motion, the "court[] must be ever vigilant … not to usurp the role of the jury by weighing credibility and assigning weight to the evidence, or by substituting its judgment for that of the jury." *United States v. Brodie*, 403 F.3d 123, 133 (3d Cir. 2005). Instead, the court must assess "whether all the pieces of evidence, taken together, make a strong enough case to let a jury find [the defendant] guilty beyond a reasonable doubt." *Id.* at 134 (alteration in original) (quoting *United States v. Coleman*, 811 F.2d 804, 807 (3d Cir. 1987)).

## B. Discussion

"To establish a charge of conspiracy, the [g]overnment must show (1) a shared unity of purpose, (2) an intent to achieve a common illegal goal, and (3) an agreement to work toward that goal, which [the defendant] knowingly joined." *United States v. Boria*, 592 F.3d 476, 481 (3d Cir. 2010); *see* 18 U.S.C. §1349. "Conviction for conspiracy requires proof that the defendant has 'knowledge of the illegal objective contemplated by the conspiracy.'" *United States v. Cummings*, 156 F. App'x 438, 440 (3d Cir. 2005) (quoting *United States v. Mastrangelo*, 172 F.3d 288, 291 (3d Cir. 1999)). The existence of the conspiracy can be based on direct evidence or "inferred from evidence of related facts and circumstances from which it appears, as a reasonable and logical inference, that the activities of the participants could not have been carried on except as a result of a preconceived scheme or common understanding." *Boria*, 592 F.3d at 481. In other words, "drawing inferences from established facts is an acceptable method of proof when direct evidence is not available." *United States v. Casper*, 956 F.2d 416, 422 (3d Cir. 1992). However, "the inferences drawn must have a logical and convincing connection to the facts established." *Id.*

"[T]he very nature of the crime of conspiracy is such that it often may be established only by indirect and circumstantial evidence." *Brodie*, 403 F.3d at

134. "The fact that evidence is circumstantial does not mean it is less probative than direct evidence." *Casper*, 956 F.2d at 422. Yet, when "the government's evidence of defendant's guilt rests only upon a chain of inferences and the defendant contends that the evidence is insufficient to support the verdict, [the court] must determine whether the 'proved facts logically support the inference' of guilt." *Id.* (quoting *United States v. Bycer,* 593 F.2d 549, 551 (3d Cir. 1979)). "[C]lose scrutiny" must, accordingly, be given "to the sufficiency of the government's evidence in a conspiracy case" because "[s]light evidence of a defendant's connection with a conspiracy is insufficient to support a guilty verdict." *Brodie*, 403 F.3d at 134 (quoting *Coleman*, 811 F.2d at 808); *see Krulewitch v. United States*, 336 U.S. 440, 449 (1949) (noting that "the looseness and pliability of the [conspiracy] doctrine present[s] inherent dangers which should be in the background of judicial thought wherever it is sought to extend the doctrine to meet the exigencies of a particular case"). "Conspiracy cannot be proven 'by piling inference upon inference' where those inferences do not logically support the ultimate finding of guilt." *Brodie*, 403 F.3d at 134 (quoting *Coleman,* 811 F.2d at 808).

Here, the government presented no credible direct evidence of guilt. The government's case relied entirely upon circumstantial evidence. Thus, I must assess whether the inferences the government seeks to draw are reasonable and sufficient to support the guilty verdict on all counts beyond a reasonable doubt.

### 1. Count One: Conspiracy to Commit Healthcare and Wire Fraud

Defendants argue that they are entitled to acquittal as to Count One because the government failed to prove that they: (1) agreed to and knowingly participated in the conspiracy; and (2) had knowledge of the specific illegal objective of the conspiracy. (*See generally* Mov. Br. pp. 27–105.)

**a. The Agreement**

"One of the requisite elements the government must show in a conspiracy case is that the alleged conspirators shared a 'unity of purpose,' the intent to achieve a common goal, and an agreement to work together toward the goal." *United States v. Wexler*, 838 F.2d 88, 90–91 (3d Cir. 1988) (quoting *United States v. Kates*, 508 F.2d 308, 310 (3d Cir. 1975)); *United States v. Onque*, 169 F. Supp. 3d 555, 567 (D.N.J. 2015) (noting that "[t]here can be no conspiracy without evidence that the defendant agreed to work with someone else"). "Although all of the elements of the government's case, including the existence of the agreement, may be proven entirely through circumstantial evidence, there must be evidence tending to prove that [the] defendant entered into an agreement." *United States v. Schramm*, 75 F.3d 156, 159 (3d Cir. 1996) (quoting *United States v. Scanzello,* 832 F.2d 18, 20 (3d Cir. 1987)). Given that "[s]ecrecy and concealment are essential features of [a] successful conspiracy," it is rare that there be direct evidence of a qualifying agreement. *Blumenthal v. United States,* 332 U.S. 539, 557 (1947); *United States v. Pressler,* 256 F.3d 144, 149 (3d Cir. 2001) (noting that "rarely is there direct evidence of a qualifying agreement"). Thus, "evidence of a continuing personal or professional relationship between the principal architects and the defendant, the existence of 'excessive financial gain' or over-generous compensation, and the defendant's role in the overall operation" may be sufficient to establish the existence of an agreement. *Onque*, 169 F. Supp. 3d at 567 (quoting *United States v. Pearlstein*, 576 F.2d 531, 541–42 (3d Cir. 1978)).

To demonstrate that defendants knowingly entered into an agreement to commit healthcare and wire fraud, the government emphasized defendants' joint control of Central Rexall. (*See* Trial Tr. pp. 3808:10–3810:3; Opp'n Br. pp. 18–20.) The government noted that although Johnston was rarely in the office, he "was on the phone almost constantly" with Brockmeier. (Trial Tr.

pp. 154:21–25, 3143:6–3144:1; Opp'n Br. 20.) Telephone records from December 2013 through August 2016 show that defendants spoke for an average of 45 minutes every day, including weekends. (Trial Tr. pp. 3137:16–3138:10; Opp'n Br. p. 20.) Given the length of their telephone calls and their business relationship, the government submits that the jury could infer that defendants had agreed to defraud PBMs.

I find that, when viewed in a light most favorable to the government, this evidence does not in any manner support an inference that defendants entered into an agreement to defraud PBMs. *See United States v. Mercado*, 610 F.3d 841, 847 (3d Cir. 2010); *United States v. Cartwright*, 359 F.3d 281, 294 (3d Cir. 2004). The government has no information—and presented no evidence at trial—about the content of these calls. (Trial Tr. pp. 3138:11–13; 3145:1–12.) Lacking any evidence of what was discussed, the jury was left to speculate about their content, which could have concerned matters entirely unrelated to the charged conduct. (*See id.* p. 3145:1–12.) In other words, the record supports countless possibilities and invites impermissible speculation. After all, defendants were in business together and ran a fast-growing and substantial pharmacy. The mere fact that they spoke regularly cannot infer the existence of a criminal conspiracy.

No dispute exists that defendants jointly operated Central Rexall. Like any business, their goal was to make money. However, to hold defendants criminally liable, the government had the burden to establish that defendants agreed to accomplish this goal through illegal means. The government appears to suggest that defendants' substantial profit is circumstantial evidence of their intent and agreement to participate in a fraudulent scheme. *See United States v. Machado*, 886 F.3d 1070, 1083 (11th Cir. 2018) (holding that "[e]vidence that the defendant profited from a fraud may also provide circumstantial evidence of the intent to participate in that fraud"). However,

given that the government sought to establish the object of the conspiracy under a willful blindness theory, *see infra* pp. 37–42, it is difficult to reconcile how "someone can consciously avoid learning of the activities and objects of [the] conspiracy," yet have "intend[ed] [for] those events to take place." *United States v. Mankani,* 738 F.2d 538, 547 n.1 (2d Cir. 1984) (noting that the error of the government's case became obvious because "[i]f someone can consciously avoid learning of the activities and objects of a conspiracy, how can that person ever intend those events to take place"). In essence, "it is logically impossible for a defendant to intend and agree to join a conspiracy … he does not know … exists." *United States v. Scotti*, 47 F.3d 1237, 1243 (2d Cir. 1995)*; United States v. Ferrarini*, 219 F.3d 145, 155 (2d Cir. 2000).[3]

The government presented no evidence that the defendants knowingly entered into an agreement to commit healthcare and wire fraud. Accordingly,

[3] The willful blindness instruction I charged the jury with (Trial Tr. pp. 3767:16–3773:24) is consistent with the Third Circuit's model instruction. 3d Cir. Model Crim. Jury Instruction 5.06. *See infra* pp. 39, 40. When a court's instruction matches the model instruction, courts are unlikely to find the instruction erroneous. *See United States v. Puccio*, No. 23–02260, 2024 WL 4100244, at *3–4 (3d Cir. Sept. 6, 2024 (rejecting a defendant's argument that he should be acquitted of conspiracy to commit healthcare fraud because the willful blindness instruction, which matched the model instruction, cannot be used to establish intent to enter into an unlawful agreement; *United States v. Anderskow*, 88 F.3d 245, 252 (3d Cir. 1996) (affirming a conspiracy conviction where "the jury had ample evidence with which to conclude that, at a minimum, [the defendant] had willfully blinded himself"). To the extent the government argues that willful blindness demonstrates defendants' intent, *Puccio* and *Anderskow* do not provide any guidance as to why a jury can be instructed to take into consideration willful blindness to prove the intent element of a conspiracy. I note that unlike *Anderskow*, 88 F.3d at 252, wherein the defendant willfully participated, rather than withdraw, in a scheme after discovering its illegal nature, the government failed to present any evidence of defendants knowing that the prescriptions Central Rexall submitted reimbursement claims for were medically unnecessary. *See infra* pp. 37–42.

the government failed to prove defendants' guilt on Count One beyond a reasonable doubt.[4]

**b. The Objective of the Conspiracy**

The object of the conspiracy in Count One is alleged to have been a scheme for defendants to "unlawfully enrich themselves by causing the submission of false and fraudulent insurance claims to [PBMs] for medically unnecessary Central Rexall compounded prescription medications and by sharing in the profits realized by Central Rexall from payments for those compounded prescription medications." (Indictment ¶ 14.) Simply put, the government alleges that defendants "knowingly and willfully" conspired to violate the federal healthcare fraud and wire fraud statutes by submitting "false and fraudulent claims" for "medically unnecessary" compound medications. (*Id.* ¶¶ 13, 14, 37.) "The issue under this theory of fraud is not whether the government can prove that the [underlying conduct was] objectively unnecessary, but rather whether it has offered sufficient proof of that fact." *United States v. Med 1st*, No. 16–000076, 2017 WL 4848823, at *2 (W.D. Ky. Oct. 26, 2017). Liability on Count One thus hinges on whether: (1) these various compound medication prescriptions were "medically unnecessary" and thereby "false and fraudulent"; and, if so, (2) defendants knew these prescribed compound medications were "medically unnecessary."

---

[4] Given the government's failure to establish the existence of an agreement, defendants must be acquitted of Count One. Count Two and Count Four are premised on Count One. Thus, defendants must also be acquitted of Count Two and Count Four. *See United States v. Camick*, 796 F.3d 1206, 1219 (10th Cir. 2015) (reversing the defendant's conviction for aggravated identity theft because the conviction was premised on his now-reversed convictions for mail fraud, wire fraud, and material false statements); *United States v. Medina*, 485 F.3d 1291, 1300–01 (11th Cir. 2007)). (vacating the defendants' convictions for conspiracy to commit healthcare fraud since there was no evidence "to establish that [defendants] were aware of the health care fraud"). For completeness, I address defendants' other challenges to their convictions.

The government maintains that because of defendants' role in directing numerous Central Rexall practices that were part of the fraud, ample evidence existed for a rational jury to find defendants guilty of conspiracy to commit healthcare fraud and wire fraud. (Opp'n Br. p. 17.) Defendants, however, argue that the government failed to prove that defendants agreed to pursue this specific object of the conspiracy. Defendants challenge their convictions on Count One because the phrase "medically unnecessary" used in the Indictment is unconstitutionally vague, and the government's proofs lacked sufficiency and materiality. (Mov. Br. pp. 27–105.)

**i. <u>Medically Unnecessary</u>**

As a threshold issue, defendants argue that it is illogical to find them guilty of having conspired to submit medically unnecessary claims when they had no way of knowing what "medically unnecessary" means. The parties extensively argued this vagueness issue at oral argument on the Dismissal Motions. (ECF No. 182 (Dismissal Mots. Tr.) pp. 33:23–66:6.) At that stage, I agreed with the government that given its burden to prove defendants' intent, the lack of specific definition for "medically unnecessary" was not fatal. (*Id.* pp. 62:10–17, 64:22; ECF No. 180.) In fact, the government conceded that "[i]f all [defendants] did was fill prescriptions, then [it] might have a hard time proving [defendants'] *mens rea*." (Trial Tr. p. 62:10–17.) I determined that while Count One's *scienter* requirement did not eliminate the vagueness challenge, since "it does limit the objection that the statute punishes defendant[s] for an offense … [they] w[ere] unaware of," this issue would be best left for trial. (*Id.* pp. 62:22–64:22.) With trial having concluded, I revisit this issue.

"A criminal defendant may seek to vacate his conviction by demonstrating a law's facial or as-applied unconstitutionality." *United States v. Marcavage*, 609 F.3d 264, 273 (3d Cir. 2010). A statute is unconstitutionally vague if it

fails to "provide a person of ordinary intelligence fair notice of what is prohibited" or authorizes arbitrary and discriminatory enforcement. *Holder v. Humanitarian Law Project*, 561 U.S. 1, 18 (2010) (quoting *United States v. Williams*, 553 U.S. 285, 304 (2008)). A statute can be attacked as unconstitutional based on its text or its "application to a particular person under particular circumstances." *Marcavage*, 609 F.3d at 273. "When a challenge arises strictly under the Due Process Clause, … statutory vagueness is considered in terms of 'the particular facts at issue, for "[a] plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others."'" *United States v. Patel*, 485 F. App'x 702, 707 (5th Cir. 2012) (second alteration in original) (quoting *Holder*, 561 U.S. at 18–19).

The government insists that because courts within the Third Circuit and elsewhere have upheld the submission of "medically unnecessary" claims as a valid healthcare fraud theory, I must do the same. (Opp'n Br. pp. 70, 71 (citing *United States v. Monaco*, No. 22–02895, 2024 WL 617718, at *1–3 (3d Cir. Feb. 14, 2024); *United States v. Chu*, No. 19–00678, 2022 WL 2314839 (D.N.J. June 28, 2022); *United States v. Anand*, No. 19–00518, 2022 WL 6755821, at *1–4 (E.D. Pa. Oct. 11, 2022); *United States v. Bolos*, 104 F.4th 562, 573 (6th Cir. 2024); *United States v. Grow*, 977 F.3d 1310, 1321 (11th Cir. 2020); *United States v. Bertram*, 900 F.3d 743, 748–51 (6th Cir. 2018); *United States v. McLean*, 715 F.3d 129, 137–40 (4th Cir. 2013); *United States v. Weir*, No. 21–00008, 2025 WL 1235776, at *11–12 (M.D. Tenn. Apr. 29, 2025)).) The government's position, however, ignores its burden and oversimplifies this issue. The question before me is not whether "medically unnecessary" can *ever* support a healthcare fraud charge. Rather, the question is whether defendants had fair notice that "medically unnecessary" could form the basis for criminal liability under the specific facts of this case. *See Patel*, 485 F.

App'x at 707. In other words, I must assess whether "medically unnecessary" meant something concrete for defendants, such that they did not have to "guess at its contours." *Id.* (quoting *Gentile v. State Bar of Nevada*, 501 U.S. 1030, 1048 (1991)).

The Indictment identifies the object of the conspiracy as the submission of "medically unnecessary" compound prescription medications, yet "medically unnecessary" appears only once in the Indictment. (*See generally* Indictment.) Instead, the Indictment relies upon the terms "medical necessity" and "not medically necessary" to describe the conspiracy. (*See id.* ¶¶24, 29, 30, 32, 34.) For example, the Indictment charges defendants with having "manipulated the ingredients [of the compound medications] to obtain the highest possible insurance reimbursement rather than to serve the medical needs of the patients." (*Id.* ¶24; *see also id.* ¶30 (charging defendants with developing different combinations of ingredients for medications based on their reimbursement rates "rather than the medical necessity or effectiveness of the new combination of ingredients").) Furthermore, the Indictment describes Central Rexall's compound medication prescriptions as "not medically necessary" because they were: (a) "for patients who had not been examined by a doctor or other medical professional"; (b) "signed or authorized by doctors and medical professionals without a determination that the medication was medically necessary"; (c) "signed or authorized by doctors and medical professionals who were paid kickbacks"; (d) "for 12 months of refills that were not medically necessary and that a patient could not reasonably use in 12 months"; (e) "for medications that patients had not agreed to receive"; and (f) "for patients who agreed to receive the medications because they were paid or received other benefits to do so." (*Id.* ¶34.) "Medical necessity" and "not medically necessary" are, however, distinct from "medically unnecessary."

Adding to the confusion, the government deviated from the Indictment at trial by attempting to define "medically unnecessary" through the lens of what is "medically appropriate" or "medically beneficial." For example, the government asked: (a) Craven whether it was "*medically appropriate* to give a patient six months of a new medication without following up" (Trial Tr. p. 618:7–8); (b) Olsen whether a compound formula would be "*medically appropriate for everybody in the general population*" (*id.* p. 873:19–21); (c) Rolling whether increasing the amount of an ingredient in the compound medication was "*beneficial* to the patient" (*id.* p. 716:15–17); and (d) Casseri whether Central Rexall had a research department to identify "*medically beneficial* ingredients" in its formulas (*id.* p. 2776:17–18). The same terminology appeared in the government's closing argument. In urging the jury to convict, the government asserted that defendants "knew that they were submitting claims for medically unnecessary prescriptions because they manipulated the ingredients … not for any *medical benefit*." (*Id.* p. 3813:7–10.) The government told the jury that "there was absolutely no *medical benefit*" for formula changes, and that defendants "made formulas for the sole reason of their greed and not for any medical benefit." (*Id.* pp. 3815:7–23, 3826:8–11). Not only do the terms "medical appropriateness" and "medical benefit" not appear in the Indictment, they too are distinguishable from "medically unnecessary."

The government suggests that "medically unnecessary" prescriptions are those that were either issued without a patient examination by a medical professional or developed solely for profit and lacked any medical benefit. The parties agree that for something to be "medically necessary," a medical professional must determine whether a patient warrants a particular treatment or medication. (Mot. Tr. p. 74:16–17*; see* Mov. Br. pp. 34–36; Opp'n Br. pp.70–74.) Defendants do not dispute that because some of the

prescriptions at issue were written without a valid doctor-patient relationship, the prescriptions were not based on medical necessity. (Mov. Br. p. 36.) Trial evidence confirmed that the prescribing medical professionals—not Central Rexall—were responsible for determining whether a compound medication was medically necessary. (*See* Trial Tr. pp. 644:6–665:2 (Craven testifying that a determination as to a patient's needs was made between the patient and the supervising doctor); *id.* pp. 1608:16–1609:11 (Dr. Patel testifying that his signature on a prescription indicates his judgment as to "the appropriate course of treatment for" a patient); *id.* pp. 1666:21–1667:17 (Dr. Gaffney testifying that by signing a prescription, he is "basically telling the pharmacy that [he has] come to the conclusion that this prescription is appropriate and medically necessary").) Upon receipt of a signed prescription by a medical professional, Central Rexall understood the patient to have been seen by a doctor who determined the prescribed medication to be suitable for the patient's condition. (*Id.* p. 673:18–25.)

This raises a question as to whether "medically unnecessary" is the inverse of "medically necessary." (*See* Mot. Tr. p. 60:9–20.) "Medically unnecessary" has "no singular or static definition." *United States v. Mattia*, No. 21–00576, 2024 WL 2834154, at *7 & n.12 (D.N.J. June 3, 2024). It is not defined by statute and "can have different meanings based on context and other factors." *Id.* "Medically unnecessary" has therefore been considered a vague term. *Id.*, *reconsideration denied*, No. 21–00576, 2024 WL 3540448 (D.N.J. July 25, 2024), and *rev'd and remanded*, 157 F.4th 305 (3d Cir. 2025) (noting that while the Third Circuit does not share the District Court's concerns of "medically unnecessary" being a vague, elastic term, because this aspect of the defendant's motion to dismiss was not ruled upon, the issue of unconstitutional vagueness will be left for the District Court to address in the first instance); *see United States v. Merino*, 846 F. App'x 494, 496 (9th Cir. 2021) (holding that to the

extent "medically necessary" is governed by regulations, "even Medicare providers reasonably disagree about what those regulations require").

Generally, "unnecessary" means something that is not needed or required. *See Chu*, 2022 WL 2314839, at *3 (noting that because defendant submitted reimbursement claims for treatment that was never actually provided, the claims were "medically unnecessary"); *Anand*, 2022 WL 6755821, at *4 (noting that defendants "provided patients with … medically unnecessary prescription medications based on what the patient's insurance would cover, not what the patients medically needed"). But Central Rexall was in the business of general wellness compounds; it produced supplements and creams for weight loss, eczema, scars, wounds, libidos, and the like. While such medications may improve or enhance a patient's life, general wellness medications are not lifesaving and, in a sense, never necessary—or always "medically unnecessary." (*See* Trial Tr. pp. 3825:25–3826:7.)[5] Logically, then, even with a doctor-patient relationship and a doctor's genuine medical assessment that a patient would benefit from a Central Rexall's compound medication, defendants face criminal liability under the government's theory because Central Rexall's compounded medications are inherently medically unnecessary.

The same reasoning applies to the government's issue with Central Rexall having changed their formulas' ingredients to obtain a higher reimbursement

---

[5] The government recognized in its closing that Central Rexall's compound medications "were not cancer drugs or lifesaving medications that took years and years of expensive research and development," but "were vitamin supplements, scar creams and other creams using existing ingredients." (Trial Tr. pp. 3825:25–3826:4.) The government suggests that since "these formulas would serve no purpose for any person," the compound medications were medically unnecessary. (*Id.* p. 3826:8–11.) Rather than take issue with just defendants' alleged conduct, by raising this argument, the government appears to criminalize the compound medication industry as a whole for not taking "years and years of expensive research" to develop medications. (*See id.* pp. 3825:25–3826:11.)

rate. (*See id.* p.3826:8–11; Mov. Br. pp.40–46.) The government made much ado at trial about Central Rexall's tripling of resveratrol in its weight loss supplement, replacement of resveratrol with hyaluronic acid in its metabolic supplements, and doubling of sildenafil in its libido-enhancing supplements. (*See* Trial Tr. pp.3815:1–3827:3.) According to the government, defendants' push for more expensive formulas that they knew lacked any medical purpose is evidence of their intent to defraud the insurance companies. (*Id.* p.3815:11–13.) However, whether the increased amount of these ingredients added any benefit is irrelevant because weight loss, metabolic, and libido supplements are general wellness medications that are inherently "medically unnecessary." The changes in the formulation may, perhaps, not make general wellness medications *more beneficial*, but the changes did not transform them from being "medically necessary" to "medically unnecessary." Therefore, the changes in formulation cannot support an inference of defendants' knowledge to submit prescriptions for "medically unnecessary" compound medications.[6]

---

[6] If an ingredient stops being more *beneficial* at a certain dosage, insurance companies and PBMs have the authority to limit their reimbursement rate for that ingredient to a maximum dosage. (*See* Trial Tr. pp.757:12–18, 952:5–8.) Insurance companies are not "babes in the woods" in dealing with healthcare providers and pharmacies. Stockwell testified that Express Scripts has a team of auditors and a team of investigators. (*Id.* p.3201:11–14). The audit team looks for incorrectly billed claims rather than intentional acts. (*Id.* pp.3201:18–3202:20.) Meanwhile, the investigation team, which Stockwell was part of, looks for intentional acts—*i.e.*, whether a pharmacy is billing false prescriptions, manipulating co-pays, or waiving co-pays. (*Id.* pp.3202:21–3204:14.) Inspections of a pharmacy, however, did not involve examination into all of a pharmacy's prescriptions and claims or compliance with every part of the provider agreement. (*Id.* p.3202:7–17.) Thus, "passing an audit [did not] mean that a pharmacy ha[d] a clean bill of health." (*Id.* p.3202:18–20.) Boyle testified that there were audits by PBMs "almost daily." (*Id.* p.2459:6–13.)) When assessing Central Rexall, Stockwell explained that he was "trying to see if there [was] a rational explanation" as to Central Rexall's conduct "and [was] hoping that the pharmacy [could] enlighten him." (*Id.* pp.3223:12–14.) Of note, Stockwell did not uncover any evidence of direct solicitation or reach any conclusion that Central Rexall had billed for false claims. (*Id.* pp. 3319:21–3320:4, 3320:20–25.) I point this out not

Moreover, profitability alone does not make something "medically unnecessary." *See United States v. Sorensen*, 134 F.4th 493, 502 (7th Cir. 2025); *United States v. Marchetti*, 96 F.4th 818, 821–27 (5th Cir. 2024)); *Grow*, 977 F.3d at 1325; *Medina*, 485 F.3d at 1298. Pharmacies, like any business, try to be increasingly profitable. (Mov. Br. p. 42.) But, pharmacies are at the mercy of prescribers, who determine what medications are prescribed, and insurers, who set reimbursement rates. (*Id.*; Trial Tr. pp. 757:12–18, 952:5–8.) While Central Rexall developed and determined the safety of the formula, prescribers were responsible for determining necessity. *See supra* pp. 16, 17. No evidence was presented that defendants encouraged Central Rexall to fill such medications without a signed prescription from a medical professional, or that defendants knew prescribers submitted signed prescriptions without making a valid medical necessity determination. Instead, the record establishes that while Central Rexall's sales representatives may have known that certain prescriptions were submitted without a doctor-patient relationship, neither defendants nor anyone else at Central Rexall were made aware of this fraud. (*See e.g.,* Trial Tr. pp. 647:1–3 (Craven testifying that she never spoke

---

to "blame the alleged victims" but to recognize that insurance companies and PBMs on the one hand, and pharmacies on the other, seek to maximize their profits. There is nothing illegal for insurance companies and PBMs to do all that they can do to legally increase their profits—from setting reimbursement rates, to declining to reimburse for certain medications, to conducting audits and investigations. The same principle should apply to pharmacies. Defendants had a business plan that took advantage of a significant change in the law regarding reimbursements for compound medications. (*Id.* pp. 34:10–13, 512:5–515:23.) The fact that Central Rexall, like insurance companies and PBMs, tried to make as much money as possible does not support an inference of defendants' knowledge that Central Rexall was submitting prescriptions for medically unnecessary compound medications. Otherwise, the fact that a company or a defendant was seeking to maximize profit could always infer criminal intent. *See United States v. Hawkins*, 360 F. Supp. 2d 689, 694–95 (E.D.Pa. 2005) (noting that "[i]n fraud cases, where motive and intent have particular evidentiary value, the courts have generally not allowed evidence of a defendant's financial status alone, without more").

to anyone from Central Rexall), 1504:23–25 (Tedesco testifying that he never discussed the fraud he was committing with Casseri), 1766:1–8 (Ritson testifying that he never told anyone at Central Rexall of his fraud), 2154:22–2156:6 (Hickman testifying that he never told Central Rexall that he was paying patients), 2157:6–8 (Hickman testifying that he never told Central Rexall that he gave Dr. Gaffney gifts in exchange for prescriptions), 2232:20–2233:2 (Hickman testifying that he never told about at Central Rexall of his or his representatives' fraud), 3011:15–3012:7 (Casseri testifying that Hickman never told him of his fraudulent scheme), 3402:7–23 (Bessey testifying that he never told anyone at Central Rexall of his fraud).)

As the record reflects, "medically unnecessary" is a broad term. Neither the defendants nor the jury were given a concrete definition of "medically unnecessary." Throughout trial, the government substituted "medically unnecessary" for terms it argues were similar. But, in doing so, the government undermined its position that "medically unnecessary" is a settled and well-understood term that is not unconstitutionally vague. Rather than present a consistent theory of what constituted "medically unnecessary" compounded prescription medications, the government created more confusion. This left jurors to apply their own notions of what is "medically unnecessary" and defendants were left to wonder what "medically unnecessary" means. *See Patel*, 485 F. App'x at 707. Having had the benefit of the trial, I conclude that the term "medically unnecessary," in this case, has "no singular or static definition." *See Mattia*, 2024 WL 2834154, at *7 n.12.

**ii. <u>Red Flags</u>**

To sustain defendants' convictions on Count One, the government must prove that defendants knowingly submitted claims for "medically unnecessary" prescriptions. Without a concrete definition of that term, it is unclear how defendants could have acted with the requisite knowledge. The government

nevertheless contends that the jury could infer fraud from various alleged "red flags," including Central Rexall's copayment practices, and a medical professional's prescription volume, use of a signature stamp, selection of refills, and prescribed medications. In support of this position, the government relies heavily on Serna's testimony and argues that defendants ignored these "red flags" in pursuit of profit. (Opp'n Br. pp. 18–55.)

**(A) Copayments**

The government insists that Central Rexall's low copay collection rate is evidence of defendants' knowledge that medically unnecessary prescriptions were being filled. The government acknowledges that copayment collection was a contractual obligation imposed by PBMs. (*See id.* pp. 52–54.) While breach of contract does not give rise to criminal liability, *see e.g.*, *United States ex rel. O'Donnell v. Countrywide Home Loans, Inc.*, 822 F.3d 650, 656–63 (2d Cir. 2016); *United States ex rel. Main v. Oakland City Univ.*, 426 F.3d 914, 917 (7th Cir. 2005), the government argues that Central Rexall's failure to collect copayments facilitated defendants' ability to perpetuate fraud (Opp'n Br. pp. 52–54).

While Express Scripts' provider manuals from December 2013 through December 2015 directed Central Rexall to collect copayments from patients, they did not expressly dictate when the collection was to be made or that every copayment must be collected. (GX59 p. 16 (noting that "[n]etwork [p]rovider shall ensure that the [c]opayment is the correct amount charged to the [m]ember and is not changed or waived"); GX60 p. 16 (same); GX61 p. 13 (same); GX62 p. 13 (same); GX63 p. 13 (same).) In 2016, Express Scripts amended its provider manual to include that "the collection of the [c]opayment must occur

prior to dispensing each medication." (GX64 p.13.)[7] The 2016 provider manual also added that "[c]opayments are a critical benefit design tool that can sensitize [m]embers to the cost of their medications and encourage [m]embers to seek out less expensive medications that are equally as effective as more expensive medications," which if not collected, "may result in improper reimbursement to [n]etwork [p]roviders for medication that would not otherwise have been dispensed." (*Id.*) The government appears to rely upon this language to suggest that if patients failed to make their copayment or if Central Rexall failed to collect the copayment, the medication was medically unnecessary. However, far from warning pharmacies that the failure to pay copayments was a "red flag," this new language prods the collection of copayments because patients are more likely to get less expensive—but still medically necessary—medication if required to make a copayment. Thus, the additional language is more about maximizing Express Scripts' profit through the filling of less expensive medication than an alarm that the failure to pay copayments is indicative of medically unnecessary prescriptions. Also, regardless of whether a patient makes a copayment, the pharmacy has received a signed prescription from a medical professional indicating medical necessity.

The trial evidence proved that the government's position that Central Rexall deliberately and systematically failed to collect copayments was not true.

---

[7] Pursuant to Express Scripts' provider manuals, network providers were consistently prohibited from instituting copayment discount programs. (GX59 p.16; GX60 p.16; GX61 p.13; GX62 p.13; GX63 p.13.) The government notes that in violation of the provider manual, Central Rexall entered into a copayment discount program with Affordable Medication Solutions. (*See* Opp'n Br. pp.53, 54.) Beyond this possibly amounting to a breach of contract, it is unclear how this is related to defendants' alleged submission of medically unnecessary claims. Stockwell explained that when inspecting Central Rexall, he did not have information as to its unpaid copayments. (Trial Tr. pp.3221:21–3222:5.) Stockwell had not asked for access to Central Rexall's internal system or Quickbase records. (*Id.* p.3274:5–19.)

Central Rexall had a policy and system in place to promptly tell patients the copayment amount. Upon receipt of a signed prescription by a medical professional, Central Rexall would input the patient's information into its Quickbase database and call the patient to confirm the prescription. (Trial Tr. pp. 164:17–165:5.) If the patient verified the prescription, Central Rexall would submit the prescription to the PBM for adjudication. (*Id.* pp. 165:10–19; 674:7–14.) Within seconds, the PBM would advise whether the prescription was covered and the cost of the copayment. (*Id.* pp. 166:18–23; 3168:14–19; 3174:3–21.) Central Rexall would then call the patient again to relay the copayment amount. (*Id.* p. 172:5–8.) In accordance with Central Rexall's policy, "[i]t [was] an ABSOLUTE MUST to call and inform all patients of their copays—no exception." (GX139; Trial Tr. pp. 177:24–178:3.)[8]

Through this procedure, Central Rexall discovered patients who were unaware that prescriptions were submitted on their behalf. (*Id.* pp. 2560:6–18, 2561:10–17; GX347.)[9] These prescriptions, which appeared to be from medical professionals who had submitted them without a medical necessity determination, were put on hold and not shipped. Boyle would then be

---

[8] To the extent Brockmeier is alleged to have waived copayments, the record establishes only four such instances. (GX121; GX123, GX125, GX126.) These waivers occurred after the patient had verified the prescription and stated a specific reason for the waiver. (*Id.*) Express Scripts permitted the waiver of copays in certain situations or "special circumstances." (*See* Trial Tr. pp. 3191:1–3192:2; GX59 p. 16; GX60 p. 16; GX61 p. 13; GX62 p. 13; GX63 p. 13; GX64 p. 13.) As Stockwell noted, so long as copayments were collected, Express Scripts would not have any issues. (Trial Tr. pp. 3220:24–3221:5.)

[9] Trial testimony was elicited about Central Rexall's efforts to confirm the prescription for a patient who was travelling abroad. Central Rexall initially communicated with the patient's son, who was unaware of the prescription. Central Rexall placed the patient's prescription on hold, and it was neither filled nor shipped. Only after the patient returned, and Central Rexall was able to personally verify the prescription with the patient, was the prescription filled. (Trial Tr. pp. 2984:17–2985:15; GX 624; DX 131BBB.)

notified, and he would investigate the prescriber and/or sales group responsible for submitting the prescriptions. (*Id.* pp.2561:18–2562:2.)[10]

Prescriptions that patients validated were either reversed if the patient decided they no longer wanted the prescription or processed if the patient agreed to pay the copayment. (*Id.* pp.172:12–18; 212:8–16; 684:5–10; 758:14–759:9; 3169:1–5.) Patients could pay the copayment by phone or receive an invoice with the prescription. (*Id.* pp.212:8–16, 3864:8–9.) Central Rexall followed up with patients whose prescriptions shipped before copayments were collected and hired a staff member dedicated exclusively to collecting delinquent copayments. (*Id.* p.2743:3–15.) Every patient's copayment status was monitored through Paladin, a software database Central Rexall purchased. (*See id.* pp.2719:12–2721:1; DX888.)

While trial testimony established that some patients decided they did not want a prescription because the copayment was too high (Trial Tr. pp.201:25–202:8; 3561:21–3562:7), there was no testimony as to why patients did not fulfill their copayment obligations upon receipt of their medications. The government's position is that the only reasonable inference that can be drawn from the failure of some patients to make their copayments is that defendants were aware that their prescriptions for compound medications were medically unnecessary. But this proposed inference does not have any logical and convincing connection to any established fact. Common sense dictates that a patient may delay or fail to make payment for a variety of reasons—for example lack of money—but it is too far a logical leap to infer that defendants were aware

---

[10] For example, through the patient-verification process, Central Rexall staff identified Valiera Best as a patient who had never been examined by the prescriber and was not aware of the prescription. (GX 347.) Central Rexall put Best's prescription on hold, so it was neither filled nor submitted for reimbursement. (*See* DX 131GGG.) Central Rexall then discussed the issue with the relevant sales representative group. (GX 347.)

that those patients who failed to pay copayments did so because the medications were medically unnecessary.

As evidenced from the unrebutted database records, Central Rexall made significant and good faith collection efforts. (*See id.* pp. 490:2–4; 933:5–8.) Those efforts resulted in the decrease in percentage of outstanding copayments from 2014 to 2015, and a further decrease in 2016. (*See* Trial Tr. p. 2719:1–21; DX867; Reply Br. p. 38). The government produced no evidence that would infer that Central Rexall did not take good faith efforts at collecting copayments. The government simply relied on an unadorned percentage of unpaid copayments without any evidence of whether that percentage was excessive or unreasonable for the compound medicine industry.

Accordingly, the lack of copayments does not infer a medically unnecessary prescription. Whether a prescription is medically necessary is the sole province of the medical professional. Although the government invited the jury to infer that missed copayments meant the defendants knew the prescriptions were medically unnecessary, the record does not support this inference.

**(B) <u>Volume of Prescriptions</u>**

The government argues that the volume of prescriptions from prescribers associated with Top Tier, Supreme Medical, MMR21, and Boardwalk Medical was so implausibly high that defendants must have known the prescriptions were medically unnecessary. (Opp'n Br. pp. 20–42.) The government characterizes the "sheer volume" of prescriptions as another "red flag" supporting an inference of illegality. (*Id.*) Like the percentage of outstanding copayments, no evidence was offered to establish what prescription volume is reasonable. Presenting numbers in a vacuum invites speculation, from which criminal conduct or knowledge cannot be inferred.

As to Top Tier, the government emphasizes Craven's over 20 prescriptions in one day and over 170 prescriptions in a single month. (Opp'n Br. pp. 21–26.) The government argues that because these numbers are so outrageous, the jury could reasonably infer that defendants knew Craven submitted prescriptions without a valid doctor-patient relationship. (*Id.*) But no evidence established that Craven's prescribing volume was unusual for her practice or for any prescriber. Although defendants were notified that Craven's prescriptions were suspicious, defendants learned of this only after routine patient-verification calls revealed that patients did not know Craven. (Reply Br. p. 53; DX131.) Craven was one of Central Rexall's top providers, yet defendants initiated an internal investigation into Craven upon learning of her suspicious activity. (Trial Tr. pp. 259:7–19, 2517:10–2518:9.) It can, thus, be inferred that had the volume of Craven's prescriptions alone raised a red flag, defendants would not have ignored it. Nothing in the record shows defendants were advised—or had reason to conclude—that the number of prescriptions Craven submitted indicated fraud. Craven herself testified that she never spoke with anyone at Central Rexall and did not know how many of her prescriptions were filled through Central Rexall. (*Id.* pp. 646:23–647:5.)

The government also points to Supreme Medical and the "eye-popping" prescribing activity of Dr. Jeff Durgin. (Opp'n Br. pp. 27–29.) Dr. Durgin did not testify, and the government introduced no evidence about his patient volume, practice patterns, or typical prescribing history. Yet, the government argues that Dr. Durgin's submission of 689 prescriptions in March 2015, 541 in April 2015, and more than 130 in a single day should have alerted defendants that the prescriptions were medically unnecessary. (*Id.*) According to the government, "[t]hese prescriptions [were] obviously fraudulent, as no doctor could examine anywhere near that number of patients and make a decision that it was medically necessary for each of those patients to receive a compound

medication supposedly tailored to their individual medical needs."[11] (*Id.* p. 28.) The government relies upon an email addressed to Central Rexall in which Dr. Durgin wrote that he had "signed a contract" that would result in it receiving "many prescriptions." (*Id.* pp. 27, 28; GX411.) But that email says *nothing* about whether the additional volume of prescriptions would be "eye-popping" or so obviously outrageous. (*See* GX411.)

The government failed to present how prescription volume is equal to patient volume. A single patient may legitimately receive multiple prescriptions, and raw prescription counts do not reflect how many patients a prescriber examined. (*See* Trial Tr. pp. 3581:16–3582:17.) Although the government suggests that Dr. Durgin's email supports an inference that he was paid to write prescriptions, it failed to establish that defendants knew of the email. Boyle testified that he was forwarded the email but did not specify whether defendants were aware of it. (*See id.* pp. 2407:1–2408:10.) Because nothing in the record established what constitutes an "eye-popping" volume or show that no medical professional could lawfully issue the number of prescriptions Dr. Durgin submitted, the government's inference fails.

MMR21 and its associated prescribers—Dr. William Elder-Quintana and nurse practitioner Eric Wagner—formed the government's next set of volume-based examples. (Opp'n Br. pp. 29–34.) Since neither of these prescribers testified, it is unclear what relationship, if any, defendants and Central Rexall

---

[11] By requiring compound medications to be tailored to the patient's individual needs, the government introduced yet another way that a prescription could be "medically unnecessary." But Central Rexall's business was in general wellness compounds, such as supplements and creams for weight loss, eczema, scars, wounds, libidos, and the like, which are *not* tailored to the patient's individual needs. Thus, under the government's theory, there would be an inference that all pharmacies in the business of general wellness compounds are engaged in fraud, and their executives have knowledge that the prescriptions being filled are medically unnecessary. *See supra* pp. 17–19.

had with Dr. Elder-Quintana and Wagner.[12] As with the other sales groups, the government introduced no evidence as to why criminality could be inferred from Dr. Elder-Quintana's 411 prescriptions within four months and 59 in a single day and Wagner's 545 prescriptions over the course of four months and 248 in one month. No information was provided as to the number of patients they could examine per day or whether multiple prescriptions were issued for one patient. Regardless of the high reimbursements Central Rexall received from Dr. Elder-Quintana and Wagner's prescriptions, financial volume does not equate to prescribing volume, nor does it illuminate whether defendants should have recognized fraud based solely on the number of prescriptions submitted.

The government's attempt to infer illegality from Boardwalk Medical's prescriptions fares no better. (*Id.* pp. 38–42.) Within one year, Dr. Gaffney wrote 758 prescriptions for 220 patients. (*Id.* pp. 38, 39.) He testified that he could see roughly 30 patients in one day and submitted as many as 63 prescriptions in a single day. (*Id.*; Trial Tr. pp. 1656:20–1657:8.) While Dr. Gaffney admitted that none of those 220 patients had a medical need for Central Rexall's compound medications, he testified that his signed prescriptions gave Central Rexall no reason to suspect invalidity or fraud. (Trial Tr. pp. 1637:12–20, 1656:3–5, 1666:15–1667:17, 1672:12–14.) As to Boardwalk Medical's other prescribers, the government cites to Dr. Sokalsky's 169 prescriptions in less than a year, with as many as 29 in a single day, and Dr. Kauffman's 187 prescriptions in about a year, with as many as 42 in a short period. (Opp'n Br. pp. 39, 40.) Given that Dr. Sokalsky actually examined his patients, the government's reliance on his prescription volume does not support

---

[12] Serna provided the jury with a unique narrative of defendants' alleged scheme with MMR21. Serna's testimony will be discussed in a separate section. *See infra* pp. 34–37.

an inference that his prescriptions were medically unnecessary. (*See* Trial Tr. p. 3582:18–21.)

The large disparity between what the government considers a "very high number of prescriptions"—*i.e.*, Dr. Durgin's 689 prescriptions in one month in comparison to Dr. Sokalsky's 169 prescriptions in about a year—highlights the absence of any benchmark for reasonableness. Beyond some patients warranting more than one prescription, trial testimony also established that prescriptions were submitted to Central Rexall in batches. (*See id.* pp. 1751:3–13, 2385:14–19, 3496:14–3501:4, 3582:6–3584:7.) Because several prescriptions were sometimes submitted at one time, the numbers of prescriptions submitted in one day does not reasonably reflect the number of prescriptions a prescriber issued that day. (*See id.*) Additionally, Central Rexall's July 2015 formulation change during which physicians resubmitted prescription because of ingredient substitutions or coverage changes may have also attributed to a spike in the number of prescriptions. (*Id.* p. 3582:24–3584:7.)

Absent evidence establishing some standard by which the jury could gauge whether a certain volume of prescriptions is a "red flag" of medically unnecessary prescriptions for compound medication, no reasonable jury could have concluded that the volume of prescriptions was evidence of defendants' fraudulent intent.

**(C) <u>Signature Stamps</u>**

The government suggests that because many prescriptions bearing Craven's name were signed with a stamp, defendants must have known that her prescriptions were medically unnecessary. (Opp'n Br. pp. 23–25; Trial Tr. pp. 3839:18—3840:25.) However, there is nothing in the record that suggests that a stamped signature is inherently suspicious or indicates that a

prescription is medically unnecessary. Craven's testimony undermines the government's position.

No witness testified that defendants saw these prescriptions, examined them, or knew they were stamped rather than signed. The government presented no pharmacist, compliance officer, PBM representative, or medical professional who stated that a stamped prescription should alert a pharmacy operator to possible fraud. Craven was the only medical professional to testify on the issue, and she confirmed that signature stamps are common in the medical profession and not improper when used with authorization. (*Id.* pp. 639:21–640:4, 646:18–22.) Thus, the mere use of a stamp is not a red flag.

Craven explained that her stamp had been stolen and used without her approval. (*Id.* pp. 623:21–624:7.) But Craven stated that she never informed anyone at Central Rexall about the theft and did not check whether anyone in her office had contacted the pharmacy. (*Id.* pp. 645:3–16.) The government offered no evidence that defendants noticed the stamped signatures, knew they were unauthorized, or believed that the use of a signature stamp was indicative of a lack of medical necessity. Accordingly, the evidence presented at trial of signature stamps on prescriptions cannot be used as an inference of defendants' knowledge of medically unnecessary prescriptions.

**(D) <u>Refills Selected</u>**

The government also argues that the number of refills selected should have alerted defendants that the prescriptions were medically unnecessary. (Opp'n Br. pp. 38–40, 48, 49.) According to the government, defendants directed sales representatives to seek the maximum number of refills, which medical professionals testified were not medically appropriate quantities. (*Id.*) In response, defendants assert that the government's theory misstates both the evidence and the law.

The government relies on testimony that defendants encouraged representatives to seek the maximum number of refills on the prescriptions. (*Id.* pp. 48, 49; Trial Tr. pp. 264:15–265:25, 2774:2–15.) It also relies on testimony from Olsen, Dr. Patel, and Craven that large quantities of refills would not be medically appropriate for compound medications, as "logically [a prescriber would] want to see if they're going to work before" they are refilled. (*Id.* pp. 48, 49; Trial Tr. pp. 617:5–618:9, 928:14–929:8, 1578:2–16.) As Casseri explained, "[t]he more refills that the pharmacy would obtain from [a] compound, … additional funds … would come in from the PBM." (*Id.* pp. 2773:25–2774:5.) This meant that "the more money [the PBM] got, [Central Rexall] got." (*Id.*) Missing from the government's presentation, however, is that Central Rexall received reimbursements only when prescriptions were filled. (*See* Mov. Br. p. 65 (noting that "there was no allegation, let alone evidence, that Central Rexall billed a PBM for, and received payment for, a prescription that a patient did not actually receive"); *see generally* Indictment.) The government offered no evidence of the number of refills that Central Rexall filled or that defendants knew of any improper refill.

Refills served only as *potential* authorizations requiring patient action. (*See* Mov. Br. pp. 53, 54.) Ritson testified that checking the maximum refills did not "necessarily mean that the patient is going to get all of those," but that "if the insurance company would cover it for that long, then the doctor's prescription is good for that many refills." (Trial Tr. pp. 1744:22–1745:12.) In other words, a prescriber who selected the maximum number of refills authorized a patient to get a refill without going back to the doctor. (*Id.* pp.2974:25–2975:19.) However, refills would not be filled without confirmation from the patients. (*Id.* pp. 1744:25–1745:12; 1540:24–1541:14.) For example, Tedesco explained that when Central Rexall would call a patient in connection with refills, and the patient said they did not need the refill, the

prescription was put on hold. (*Id.* pp. 1540:24–1541:14.) Central Rexall's Quickbase entries confirmed this practice and reflected that refills were held, cancelled, or declined at the patient's request. (*See* DX 131F; DX 131II; DX 131K.)

Rather than support the government's position, the evidence affirmatively demonstrated, and was unrebutted, that: (1) refills did not reflect actual dispensing; (2) refills operated only as *potential* patient authorizations; and (3) Central Rexall maintained patient-verification safeguards to ensure that no prescription—initial or refill—was filled without patient consent. The selection of authorized refills, therefore, does not support an inference of defendants' knowledge that prescriptions were medically unnecessary.

**(E) Unusual Prescriptions**

In further support of its position, the government points to several prescriptions, which it deemed as suspicious. These include prescriptions for: (1) an 11-year old with age spots; (2) eczema cream for a three-year old; (3) the same scar cream for a three- and 77-year old; (4) the same supplement for a 16- and 77-year old; (5) libido creams for women; (6) several families, including husbands, wives, children, and relatives, all receiving multiple prescriptions with the same medication and large number of refills; and (7) a medical professional who is not a dentist prescribing "magic mouthwash." (*See* Opp'n Br. pp. 21–42, 64–67.) The government also suggests that the prescriptions written by prescribers located in different states from patients gives rise to a reasonable inference of fraud. (*Id.*)

The prescriptions at issue were all signed by licensed medical professionals, and Central Rexall had no reason to second-guess those prescribing decisions. *See supra* pp. 16, 17. Like the presentation of the volume of prescription in a vacuum, the government offered no competent evidence that the types of medications prescribed were unusual or that

defendants would have recognized them as such. Indeed, the government did not present any evidence that these prescriptions were medically unnecessary. Without evidence that these prescriptions were medically unnecessary, the government suggested that the jury assume the outrageousness of the prescriptions.

Similarly, the government produced no evidence that defendants knew in which states the prescribers were licensed. There was also no evidence that defendants saw any of these prescriptions or were told about them. (*See* Reply Br. pp. 35, 57, 58.) Accordingly, nothing about the "unusual prescriptions" supports an inference of defendants' knowledge of medically unnecessary prescriptions.

### (F) Serna's Testimony

The government asserts that Serna's testimony establishes that defendants must have been aware that the prescriptions originating through MMR21 were illegitimate[13] (Opp'n Br. pp. 29–34.) Defendants allegedly reached an agreement with Serna, wherein MMR21 would refer members to participate in free studies with doctors, who would prescribe them with Central Rexall's compound medications. (*Id.*) In exchange for their participation, both the doctors and patients would receive kickbacks. (*Id.*) Serna attributed defendants for developing this scheme and providing him with a list of medical professionals to use. (*Id.*) They included Dr. Elder-Quintana, Wagner, and nurse practitioner Walter Simmons. (*Id.*) Because MMR21's members took

---

[13] Defendants note that while the government's reliance on Serna was limited at trial, the government now argues that Serna alone can support defendants' convictions. (Reply Br. pp. 21–27.) The government suggests that Serna's testimony established defendants' conspiracy "to get unnecessary prescriptions by paying doctors and patients." (Opp'n Br. p. 69.) Since defendants alleged payments to doctors and/or patients is an Anti-Kickback Act issue, which was not charged in the Indictment, I restricted the use of such evidence during trial. (ECF No. 249 ¶ 5.)

part in a fictitious study through which they received medically unnecessary prescriptions, the government asserts that "[b]y themselves, the terms of the deal Serna struck with [defendants] established a conspiracy to commit fraud." (*Id.* p. 31.)

When resolving a Rule 29, I must treat all incriminating evidence against defendants as true and credible. *United States v. Riley*, 621 F.3d 312, 329 (3d Cir. 2010). This includes testimony from witnesses with serious credibility problems. *United States v. Salahuddin*, 765 F.3d 329, 347–49 (3d Cir. 2014.) Since "[a] jury is free to believe part of a witness' testimony and disbelieve another part of it," courts are typically restricted from rejecting witness testimony, even if the witness is found to have lied and committed perjury. *United States v. Boone*, 279 F.3d 163, 189 (3d Cir. 2002). In other words, courts "presume that the jury properly evaluated credibility of the witnesses, found the facts, and drew rational inferences." *United States v. Iafelice*, 978 F.2d 92, 94 (3d Cir. 1992). Presumptions can, however, be rebutted. While court's generally accept a jury's credibility findings, an exception exists when the testimony in question was "incredible on its face" and/or "def[ied] physical realities." *United States v. Mickens*, No. 20–00258, 2021 WL 3136083, at *3 (2d Cir. July 26, 2021) (alteration in original) (quoting *United States v. Truman*, 688 F.3d 129, 139 (2d Cir. 2012)); *see also United States v. Sanchez*, 969 F.2d 1409, 1414 (2d Cir. 1992) (noting that "[w]here testimony is patently incredible or defies physical realities, it may be rejected by the court, despite the jury's evaluation"). This exception applies when a questionable witness is found to have inconsistently testified as to the core facts and no other witness can corroborate his or her version of events. *Mickens*, 2021 WL 3136083, at *3; *see United States v. Tharrington,* No. 24–00310, 2025 WL 2434922, at *3–4 (E.D. Pa. Aug. 22, 2025) (finding that because the "witnesses' testimony was not 'patently incredible' nor 'defie[d] physical realities' and no other exceptional

circumstances exist, the [c]ourt will defer to the jury's resolution of the purportedly conflicting testimony and their assessment of the witnesses' credibility" (alteration in original)).

At trial, Serna was caught in lie after lie. (*See e.g.*, Trial Tr. pp. 1302:7–1326:17, 1402:24–1402:23, 1407:5–18, 1408:6–1417:24.) In fact, as Serna's testimony evolved, I saw a number of jurors openly laugh at much of his testimony following the government's initial direct examination. The government suggests that defendants are trying to convince me to totally discredit Serna's testimony only because Serna denied meeting with prosecutors to prepare for his redirect. (Opp'n Br. p.33.) However, as defendants note, "ca[tching] Serna on the lowest hanging fruit of all lies imaginable" demonstrates that Serna was a patently incredible witness. (Mot. Tr. p. 127:17–25.) The government ignores Serna having been caught, among several other things, obstructing justice by responding to a grand jury subpoena with forged documents, blaming his deceased sister for his crimes, and lying about his military status. (*See* Trial Tr. pp. 1302:7–1326:17, 1401:24–1403:23, 1407:5–18.) The government must overlook Serna's faults because he was the *only* witness to connect the alleged underlying fraudulent scheme to defendants. (*See* Trial Tr. pp. 1078:13–1083:25.) But having witnessed the jurors' reaction to Serna's testimony and hearing the sheer audacity of his lies, I find that he was a patently incredible witness that no rational jury could have credited and, indeed, the jury in this case did not credit.

Other than Serna, no other witness testified, and no evidence was produced, that defendants or Central Rexall had a direct relationship with the medical professionals. (*See e.g.,* Trial Tr. pp. 647:1–3, 1504:23–25, 1671:1–17, 1766:1–8, 2154:22–2156:6, 2157:6–8, 2232:20–2233:2, 3011:15–3012:7, 3402:7–

23.)[14] Instead, the other witnesses established that sales groups affiliated with Central Rexall recruited the medical professionals who submitted prescriptions to Central Rexall. (*See* Trial Tr. p. 858:3–24.) These medical professionals have explained that this arrangement was entered into with the sales groups, and Central Rexall was not aware the prescriptions they submitted were invalid. (*See e.g.,* Trial Tr. pp. 647:1–3, 1504:23–25, 1671:1–17, 1766:1–8, 2154:22–2156:6, 2157:6–8, 2232:20–2233:2, 3011:15–3012:7, 3402:7–23.)

Based on the totality of the record evidence, my observation of the jurors, and the obviousness of Serna's false testimony, I find that a reasonable jury would not have—and indeed, this jury did not—credit Serna's version of the events. *See Mickens*, 2021 WL 3136083, at *5.

**iii. <u>Willful Blindness</u>**

Willful blindness is an "alternative way of proving knowledge" and refers to a defendant's "deliberate ignorance." *United States v. One 1973 Rolls Royce, V.I.N. SRH-16266 By & Through Goodman*, 43 F.3d 794, 806–08 (3d Cir. 1994).

---

[14] In support of its position, the government points to an email in which Serna asked Brockmeier to "send … a list of doctors [he] may have that [MMR21] may refer business to." (GX284; *see* Trial Tr. pp. 1089:10–1090:23; Opp'n Br. p. 31 n.3.) Brockmeier forwarded the email to Johnston and Boyle saying "yess." (GX 284; *see* Trial Tr. pp. 2383:10–2384:5.). However, the government did not produce any email from anyone at Central Rexall to Serna providing him with a list of doctors. Serna also testified that neither he nor his sister received such a list from Central Rexall. (Trial Tr. pp. 1262:17–1263:4, 1272:5–15.) It is unclear from Serna's testimony how Serna became aware of Dr. Elder-Quintana, Wagner, and Simmons. (*Id.* pp. 1263:5–1269:9.) On cross-examination, Serna testified that his sister arranged for him to meet with these medical professionals. (*Id.*) However, of note, Dr. Elder-Quintana and Simmons were involved in a fraudulent scheme Serna was indicted for in the Northern District of Texas, Case No. 20–cr–00170. (Reply Br. pp. 22, 23.) Serna's participation in the Texas scheme began prior to his agreement with Central Rexall. (*Id.*) Thus, attributing defendants with creating a near identical scheme that happened to involve the same doctors as the Texas scheme does not withstand even the slightest scrutiny.

This theory "may be used in a case to prove that a defendant acted knowingly and willfully by showing that she or he had knowledge or awareness of certain facts or circumstances." *Onque*, 169 F. Supp. 3d at 570. In other words, a "willful blindness instruction is justified as long as there was sufficient evidence that a defendant 'deliberately avoided learning the true facts' or 'closed his eyes to what would otherwise have been obvious to him.'" *Id.* (quoting *United States v. Stewart,* 185 F.3d 112, 126 (3d Cir. 1999)). In the context of conspiracy cases, a willful blindness instruction "ensure[s] that a juror who believe[s] that a defendant turned a blind eye toward his co-defendant's conduct w[ill] not vote to acquit the willfully blind defendant." *United States v. Sharma*, 190 F.3d 220, 231 (3d Cir. 1999). If a defendant was not proven to have had knowledge of the illegal objective contemplated by the conspiracy, the court is obligated to overturn a defendant's conspiracy conviction. *See e.g., Wexler*, 838 F.2d at 91*; Coleman,* 811 F.2d at 808; *United States v. Samuels,* 741 F.2d 570, 573–74 (3d Cir. 1984); *United States v. Molt,* 615 F.2d 141, 146 (3d Cir. 1980); *Cooper,* 567 F.2d at 254–55.

"A willfully blind defendant is 'one who takes deliberate actions to avoid confirming a high probability of wrongdoing and who can almost be said to have actually known the critical facts.'" *Onque*, 169 F. Supp. 3d at 570 (quoting *Global–Tech Appliances, Inc. v. SEB S.A.,* 563 U.S. 754, 769 (2011)). This is different from a defendant who "should have known of facts of which he or she was unaware." *United States v. Wert-Ruiz*, 228 F.3d 250, 255 (3d Cir. 2000). "Willful blindness is not to be equated with negligence or a lack of due care." *Id.* Thus, "[t]he instruction 'must make clear that the defendant himself was subjectively aware of the high probability of the fact in question, and not merely that a reasonable man would have been aware of the probability.'" *Id.* (quoting *United States v. Caminos,* 770 F.2d 361, 365 (3d Cir. 1985)).

Consistent with the Third Circuit Model Jury Instruction for Willful Blindness (5.06), I instructed the jury as follows:

> To find Mr. Johnston and Mr. Brockmeier guilty of conspiracy to commit healthcare fraud and wire fraud, you must find that the government proved beyond a reasonable doubt that Mr. Johnston and Mr. Brockmeier knew the object of the conspiracy was to commit healthcare fraud or wire fraud by submitting false and fraudulent insurance claims to the pharmacy benefits administrator for medically unnecessary compounded prescription medications.
>
> ….
>
> No one can avoid responsibility for a crime by deliberately ignoring what is obvious.
>
> Thus, you may find that Mr. Johnston and Mr. Brockmeier knowingly conspired to commit healthcare fraud and wire fraud based upon evidence which proves that: One, Mr. Johnston and Mr. Brockmeier himself actually or subjectively believed that there was a high probability that false and fraudulent insurance claims were submitted to the pharmacy benefits administrator for medically unnecessary compounded prescription medication; and, second, Mr. Johnston and Mr. Brockmeier consciously took deliberate actions to avoid learning or made deliberate efforts to avoid knowing about the existence of the submission of false and fraudulent claims to the pharmacy benefits administrator for medically unnecessary compounded prescription medications.
>
> ….
>
> You may find that Mr. Johnston and Mr. Brockmeier knew that false and fraudulent insurance claims were submitted to the pharmacy benefit administrator for medically unnecessary compounded prescription medication. If you find that Mr. Johnston and Mr. Brockmeier actually believed that this fact did not exist, also you may not find that Mr. Johnston and Mr. Brockmeier knew that false and fraudulent insurance claims were submitted to the pharmacy benefits administrator for medically unnecessary compounded prescription medications if you find only that … Mr. Johnston and Mr. Brockmeier consciously disregarded a risk that the fact existed, or that Mr. Johnston and Mr. Brockmeier should have known that the fact existed, or that a reasonable person would have known of a high probability that that fact existed. It is not enough that Mr. Johnston and Mr. Brockmeier may have been reckless or stupid or

> foolish and may have acted out of inadvertence or accident. You must find that Mr. Johnston and Mr. Brockmeier themselves actually or subjectively believed there was a high probability that false and fraudulent insurance claims were submitted to the pharmacy benefits administrator for medically unnecessary compounded prescription medication, consciously took deliberate actions to avoid learning it, or made deliberate efforts to avoid knowing about it and did not actually believe that it did not exist.
>
> ….
>
> A belief that Mr. Johnston or Mr. Brockmeier were negligent or committed some civil violation is insufficient to form the basis for a criminal conviction. Ordinary civil negligence does not give rise to criminal liability, nor does an ordinary breach of contract or a failure to honor one's promise give rise to criminal liability. The government's burden of proof in criminal cases, proof beyond a reasonable doubt as to each and every element of the charged offense is higher than the burden that applies in civil cases. And you should only consider and apply the heightened reasonable doubt standard that I have directed to you.
>
> The offenses charged in the [I]ndictment require proof that … Mr. Johnston and Mr. Brockmeier acted knowingly, intentionally, willfully and with intent to defraud. If you find that Mr. Johnston and Mr. Brockmeier acted in good faith, that would be a complete defense to these charges. Because good faith on the part of Mr. Johnston or Mr. Brockmeier would be inconsistent with either of them acting willfully with intent to defraud.

(Trial Tr. pp. 3767:16–3773:24.) [15] Despite the instruction articulating otherwise, I find that the evidence supports only a negligence theory—not deliberate avoidance of knowledge.

---

[15] Defendants objected to the willful blindness instruction at trial, arguing that "defendants did a great many things to try to get to the truth and try to make sure that there was a valid doctor-patient relationship." (*See* Trial Tr. pp. 3688:3–3696:21.) I recognized willful blindness as a "dangerous charge," but found that pursuant to *Puccio*, 2024 WL 4100244 at *3, I was required to give the charge. (Trial Tr. pp. 3688:3–3689:1, 3695:15–3696:4.) Defendants do not renew their challenge to the instruction as applied to knowledge of the unlawful aims and objective element of the conspiracy charge but argue that the jury could not find beyond a reasonable doubt

Evidence showing that defendants did not ignore the suspicious prescriptions or practices brought to their attention was unrebutted. (*See e.g.*, Trial Tr. pp. 700:15–21, 2499:10–23, 2555:9–11, 2561:6–9, 2579:16–2580:9; DX1634; DX1703; DX1920.) For example, Casseri testified that while errors were inevitable in an organization of Central Rexall's size, Central Rexall's policies were designed to detect those errors. (Trial Tr. p. 2980:13–17.) Boyle testified that he was instructed to review, communicate about, and address prescription-related issues when questions arose. (*Id.* pp. 2561:6–2562:2). Defendants largely accepted Boyle's recommendations as to how to handle a particular situation. (*Id.* pp. 2530:22–2531:4.) This undermines the government's theory that defendants deliberately avoided learning the truth.

Faced with the unrebutted evidence of defendants' attempts to address suspicious prescriptions, the government criticizes the efforts as being not quick enough or aggressive enough in response to suspicious activity. (Opp'n Br. pp. 41, 42, 86.) Throughout trial, the government emphasized that when patients said that they did not know about prescriptions submitted on their behalf, Central Rexall did not call the prescribers. (*See e.g.*, Trial Tr. 1493:16–22, 1636:2–11.) Central Rexall was, however, under no legal obligation to do so. Instead, imposing an obligation to do something different or do more is sounded in negligence, not criminal intent. That the government would have liked Central Rexall and defendants to have responded to the alleged "red flags" differently is not sufficient to establish willful blindness particularly where, as here, the government did not produce any evidence that Central Rexall's protocols to address suspicious activity were inherently flawed and designed to

---

that they were willfully blind to the submission of false and fraudulent claims. (*See* Mov. Br. pp. 83–98; Reply Br. pp. 50–59.)

avoid learning the truth. The government also failed to produce any evidence, direct or circumstantial, that calling the prescribers would have led defendants to discover fraud being committed by others. Criticism, without more, of a business' system of oversight, policies, investigation, and practices in response to issue that arise is not proof of deliberate avoidance.

Willful blindness, moreover, cannot be inferred simply because defendants were positioned at the top of the corporate structure. The government was required to prove beyond a reasonable doubt that it was defendants that consciously chose not to learn the truth. Because no rational juror could find beyond a reasonable doubt that defendants consciously avoided learning that prescriptions were medically unnecessary, the government failed to carry its burden.[16]

### iv. **False Statements**

"Assessing whether a communication is fraudulent, truthful, or otherwise is a highly contextual inquiry." *United States v. Ferriero*, 866 F.3d 107, 120 (3d Cir. 2017). "[T]here are no hard and fast rules of law to apply," to determine whether a scheme is fraudulent in nature. *Pearlstein*, 576 F.2d at 535. "The scheme need not be fraudulent on its face, but must involve some sort of fraudulent misrepresentations or omissions reasonably calculated to deceive persons of ordinary prudence and comprehension." *Id.* The fraudulent or false representation may, instead, be "effected by deceitful statements of half-truths or the concealment of material facts." *United States v. Bryant*, 655 F.3d 232, 249 (3d Cir. 2011) (quoting *United States v. Olatunji*, 872 F.2d 1161, 1167 (3d Cir. 1989)).

[16] Defendants also argue that the government misstated the negligence standard in its summation, thereby advising the jury that it had a lesser burden. (Mov. Br. p. 93.) Since I determined that there was insufficient evidence to establish that defendants were willfully blind, I need not address this argument.

In support of this element, the government argues that "defendants made false claims to … PBMs each time they submitted claims for medically unnecessary prescriptions." (Trial Tr. p. 3889:1–3.) The government also frames the conspiracy by referring to several false statements outside the submission of medically unnecessary claims. (*Id.* pp. 3889:19–3892:22.) Defendants assert that because the government's proofs, or lack thereof, rely upon an implied false certification theory and constitute a fatal variance from the Indictment, they must be acquitted of Count One. (Mov. Br. pp. 57–83; Reply Br. pp. 60–70.)

**(A) <u>Reimbursement Claims</u>**

Central Rexall's submission of reimbursement claims for prescriptions that defendants allegedly knew were medically unnecessary does not satisfy the government's burden to prove a false statement.

Express Scripts[17] did not affirmatively ask pharmacies to confirm whether there was a valid doctor–patient relationship before submission of a reimbursement. "[T]here was no box to check, blank to fill, code to enter, or space to sign in which Central Rexall represented that it was submitting a reimbursement claim for a medically necessary prescription." (Mov. Br. p. 61; *see* Trial Tr. pp. 3253:2–3254:4.) The government argues that "the question [was] not asked because the billing of [the claim] implies that it exists." (Trial Tr. p. 3253:2–17.) Since Express Scripts' provider "manual outline[d] that all claim submissions should be true and accurate," a valid patient-prescriber relationship was "built into every claim submission." (*Id.*)

[17] Although Central Rexall had contractual relationships with multiple PBMs, the government only introduced evidence about Express Scripts' claims-submission process.

The Third Circuit recently "join[ed] the Fifth and Eleventh Circuits in recognizing that implicit misrepresentations can give rise to valid charges under" the healthcare fraud statute. *Mattia*, 157 F.4th at 310; *see United States v. Anderson*, 980 F.3d 423, 429 (5th Cir. 2020) (concluding "that an implicit misrepresentation theory of health care fraud is valid"); *see also United States v. Gonzalez*, 834 F.3d 1206, 1214 (11th Cir. 2016) (noting that "[a] person makes a false claim if the treatments that were billed were 'not medically necessary[] or were not delivered to the patients'" (second alteration in alteration) (quoting *Medina*, 485 F.3d at 1304)).[18] In the context of the False Claims Act, the Court determined that an implicit misrepresentation is encompassed by the submission of a claim that "omits its violations of statutory, regulatory, or contractual requirements" of "the goods or services provided." *Escobar*, 579 U.S. at 187. "[T]he word 'prescription' itself, if ascribed a common-sense definition, suggests a level of validity based on a doctor's determination that a particular drug is needed by a patient." *Mattia*, 157 F.4th at 311; *see United States v. Smith*, 573 F.3d 639, 651 (8th Cir. 2009) (noting that "the word prescription ... in common parlance, means only a *bona fide* order—*i.e.*, directions for the preparation and administration of a medicine, remedy, or drug for a real patient who actually needs it after some sort of

[18] The Third Circuit's *Mattia* decision was issued after briefing on the Motion was completed. Prior to this decision, the Third Circuit had endorsed an implied false certification theory in only civil fraud cases. *See United States ex rel. Wilkins v. United Health Grp., Inc.*, 659 F.3d 295 (3d Cir. 2011); *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176 (2016); *cf. Mattia*, 147 F.4th at 310 (noting that "[w]e have long recognized that implicit misrepresentations are cognizable in other fraud contexts, and we see no justification in the text of Section 1347(a) to stray from this approach"). Since defendants' argument that "an implied false certification theory would be invalid if exported from the civil the civil to criminal context" (Mov. Br. p. 67) has been put to rest, my analysis focuses on defendants' remaining argument that the basis for the claims to the PBMs did not include an implied representation of medical necessity (*id.* pp. 66, 67).

examination or consultation by a licensed doctor" (quoting *United States v. Nazir*, 211 F. Supp. 2d 1372, 1375 (S.D. Fla. 2002))).

Relying on this line of authority, the government argues that when submitting reimbursement claims, Central Rexall implicitly represented the validity of the prescriptions. (Opp'n Br. pp.74–83.) The government asserts that because Express Scripts only permitted reimbursements for "valid" prescriptions, defendants were obligated to disclose that the prescriptions were medically unnecessary. (*Id.*) The trial record, however, does not support the government's theory.

Rather than establish an implicit certification of medical necessity, the evidence shows that submission of a reimbursement claim merely alerted a PBM that a pharmacy possessed a prescription for a patient that it intended to fill. (Trial Tr. 675:6–16.) No witness testified that the claims-submission process required pharmacies to evaluate, certify, or disclose the medical necessity of a prescription as determined by a physician. Indeed, no testimony was introduced explaining how a PBM would even receive, process, or verify such a representation during the claim submission process. (Mov. Br. p.62 n.17.)

Olsen testified that a valid prescription requires "the patient's name, address, date, medication being prescribed, quantity, … directions for use," and physician's signature. (Trial Tr. pp.938:14–939:3.) Evidence established that a reimbursement claim for a signed prescription indicates that a medical judgment was made by a licensed prescriber. (*Id.* p.3255:9–24.) However, without pointing to any evidence, the government suggests that a reimbursement claim independently communicated—or was understood to communicate—that the underlying prescription was medically necessary. *Id.* As discussed at length, "medically unnecessary" is an inherently vague and contested concept. *See supra* pp.13–21. The government's theory effectively

seeks to impose criminal liability for failing to disclose that a prescription was medically unnecessary, without establishing that defendants had any objective, knowable standard by which to determine what "medically unnecessary" meant in the first place. Assuming the Government equates medical necessity with the existence of a genuine doctor–patient relationship, the record establishes that medical necessity is a determination entrusted to physicians—not pharmacists, PBMs, or pharmacy executives. (Trial Tr. p. 3255:9–24.)

Stockwell acknowledged that, while a prescription that is not medically necessary might be "inappropriate" and "potentially fraudulent," it would be hard for Express Scripts to see whether a prescription was medically necessary from the perspective of a pharmacy. (*Id.* p. 3182:5–9.) He further explained that different doctors can examine the same patient and reach different conclusions about what is medically necessary, and that neither a PBM nor a pharmacist is in a position to second-guess a physician's medical judgment. (*Id.* pp. 3255:16–3256:5.) As I suggested, "the implied representation for a pharmacy is different … tha[n] the implied representation … [of] a valid prescription from a doctor." (Mot. Tr. 13:12–18.)

Accordingly, the evidence at trial failed to establish that Central Rexall's reimbursement claims implicitly conveyed a factual assertion that defendants knew to be false. At most, the government proved a disagreement about the medical judgment underlying prescriptions written by licensed physicians. That is insufficient to satisfy the false-statement element of Count One.

**(B) <u>Prejudicial Variance</u>**

The Indictment clearly charged defendants with having made false statements when submitting claims for reimbursements. (Indictment ¶ 14.) The object of the conspiracy was that defendants "unlawfully enrich[ed] themselves by causing the submission of false and fraudulent insurance claims to [PBMs] for medically unnecessary Central Rexall compounded prescription

medications." (*Id.*) By framing Count One as such, the government limited its proof to a scheme to defraud accomplished through fraudulent reimbursement claims. Yet, during summation, the government urged the jury to convict defendants on Count One for alleged false statements not charged in the Indictment. Specifically, the government asked the jury to consider Central Rexall/defendants': (1) false statement to CVS/Caremark; (2) direction to Olsen to lie about the use of a copay discount program; (3) letter to the federal government about Central Rexall's compliance program; (4) submission of the CVS recredentialing questionnaire; (5) termination of its relationship with Good Neighbor; (6) approval of false answers on the Catamaran recredentialing application; and (7) submission of test adjudications. (Mov. Br. pp. 74–83; Opp'n Br. pp. 80, 81; Trial Tr. pp. 3889:19–3892:22.) Defendants challenge these additional statements as a variance between Count One's proof and the Indictment. (Mov. Br. pp. 69–83.)

As to this element of the charge, the jury was charged:

> In this case, the [I]ndictment alleges that the scheme to defraud was carried out by making false or fraudulent statements, representations or claims. The representations which the government charges were made as part of a scheme to defraud [are] set forth in the [I]ndictment.
>
> The government is not required to prove every misrepresentation charged in the [I]ndictment. It is sufficient that the government proves beyond a reasonable doubt that one or more of the alleged material misrepresentations were made in furtherance of the alleged scheme to defraud. However, you cannot convict Mr. Johnston and Mr. Brockmeier of conspiracy to commit wire fraud unless all of you agree as to at least one of the material misrepresentations.

(Trial Tr. p. 3783:11–23.) The jury was thus instructed to convict only if they agreed on a misrepresentation alleged in the Indictment. (*See* Mov. Br. pp. 71, 72.)

A defendant has a "substantial right to be tried only on charges presented in an indictment returned by a grand jury." *United States v. Syme*, 276 F.3d

131, 149 (3d Cir. 2002). When "the evidence at trial proves facts materially different from those alleged in the indictment," a variance occurs. *United States v. Castro*, 776 F.2d 1118, 1121–22 & n.1 (3d Cir. 1985). Thus, variances are prejudicial when the jury convicted a defendant on an uncharged theory and defendants lacked notice of this theory. *See United States v. Schurr*, 775 F.2d 549, 553–54 (3d Cir. 1985); *United States v. Balter*, 91 F.3d 427, 441 (3d Cir. 1996) (noting that to demonstrate prejudice from a variance, a defendant "must show (1) that there was a variance between the indictment and the proof adduced at trial and (2) that the variance prejudiced some substantial right"). When substantial rights are affected by the variance, a verdict can stand only if "the conviction is sure that the error did not influence the jury, or h[ave] but very slight effect." *Kotteakos v. United States*, 328 U.S. 750, 764 (1946).

The government argues that no variance occurred because the challenged statements were intrinsic evidence that advanced or concealed the charged scheme. (Opp'n Br. pp. 81–83.) Courts permit the government to introduce evidence of uncharged acts or statements that are connected to the charged scheme. *See United States v. Granado*, 523 F. App'x 153, 156 (3d Cir. 2013). Intrinsic evidence may, however, only contextualize or support the charged theory; it cannot substitute for proof of the charged misrepresentation itself or become the operative basis for conviction. *See id.*

Having determined that the submission of reimbursement claims did not itself constitute a false statement within the meaning of Count One, *supra* pp. 43–46, the remaining statements identified by the government cannot be treated as intrinsic evidence of that nonexistent falsity. However, to the extent the government proved the falsity as alleged in the Indictment, I would have had to determine whether these additional statements furthered the defendants' scheme. I note that these statements—such as the recredentialing materials, internal compliance communications, and business relationship

decisions—bear at most an attenuated connection to the alleged object of the conspiracy. As defendants correctly note, it is unclear how participation in particular programs or discrete communications with PBMs furthered a scheme to submit medically unnecessary prescriptions, as opposed to reflecting ordinary regulatory or contractual interactions. (*See* Mov. Br. pp. 75–82.)

Given the government's emphasis on these uncharged statements during summation, and the absence of a viable charged misrepresentation to anchor the jury's deliberations, I cannot determine what weight the jury assigned to the improper theories of guilt. The risk that the jury convicted based on unalleged misrepresentations—or failed to reach unanimity as to any charged misrepresentation—is substantial. Under these circumstances, defendants were prejudiced and are entitled to relief as to Count One.

### 2. Count Two: Conspiracy to Commit Identity Theft

Defendants argue that the evidence was insufficient to support their conviction for conspiracy to commit identity theft because: (1) the test adjudications were not "at the crux" of the healthcare and wire fraud conspiracy; (2) the government's proofs failed to establish a deprivation of property; (3) the government's proofs lacked materiality; and (4) they lacked the requisite intent.

#### a. Crux

Prior to trial, defendants sought dismissal of Count Two for the government's failure to establish a genuine nexus between defendants' alleged use of another person's identifying information to submit false "test claims" for compounded medications and the underlying predicate fraud offense. (*See*

ECF No. 187.)[19] I denied this aspect of the Dismissal Motions. *Johnston*, 2024 WL 4570681, at *2–3. Defendants now ask that I revisit my decision declining to extend the applicability of *Dubin v. United States*, 599 U.S. 110 (2023) to Count Two. (Mov. Br. p. 115.)

"Although there is no [Rule] that explicitly governs [m]otions for [r]econsideration, the Third Circuit has recognized that such motions may be filed in criminal matters." *United States v. Rensing*, 12–00663, 2022 WL 3227131, at *2 (D.N.J. Aug. 10, 2022); *see United States v. Fiorelli*, 337 F.3d 282, 286 (3d Cir. 2003) ("[e]xtending the time constraints imposed by [Federal Rules of Civil Procedure] 59(e) and 60(b) to motions" for reconsideration filed in criminal cases). "Indeed, New Jersey's Local Rules recognize that Local Rule of Civil Procedure 7.1(i), dealing with motions for reconsideration, applies in criminal matters." *Rensing*, 2022 WL 3227131, at *2; *see United States v. Curry*, No. 04–00280, 2006 WL 1320083, at *1 n.2 (D.N.J. May 12, 2006) (noting that "[w]hile the [Rules] do not specifically address motions for reconsideration, our Local Rule of Criminal Procedure 1.1 expressly adopts for use in criminal cases Local Rule of Civil Procedure 7.1(i), which permits a party to move for reconsideration or reargument."). Thus, this aspect of the Motion "will be granted only if the moving party can demonstrate one of the following: (1) an intervening change in the controlling law; (2) the availability of new evidence that was not available previously; or (3) the need to correct a clear error of law or fact to prevent manifest injustice." *United States v. Jackson*, No. 18–00216, 2020 WL 2557339, at *1 (W.D. Pa. May 19, 2020); *see United States v. Bonfilio,* No. 09–00205, 2017 WL 118404, at *2 (W.D. Pa. Jan. 12, 2017) (noting that a motion for reconsideration is not "an opportunity for a litigant, having lost, to

[19] My decision at ECF No. 187 is available at *United States v. Johnston*, No. 20–00800, 2024 WL 4570681 (D.N.J. Oct. 24, 2024). All references to ECF No. 187 will be made to the case citation.

change theories of the case and advance new, often contradictory, evidence in support").

Defendants argue that with trial having concluded, "it is obvious that the test adjudications were not, as the [g]overnment promised pre-trial,[20] at the crux of the fraud theory actually advanced at trial." (Mov. Br. p. 115.) However, defendants' reasons for reconsideration fails to assert why *Dubin*, as applied to 18 U.S.C. §1028A, should be extended to 18 U.S.C. §1028(a)(7). (*See id.* pp. 105–115; Reply Br. pp. 75–78.)

"The United States Code criminalizes the unauthorized transfer or use of identification information in two similarly worded statutes that provide for varying levels of punishment." *United States v. Phanor*, 729 F. App'x 877, 878 (11th Cir. 2018). As charged here, "[t]he first, identity theft, provides that a person who 'knowingly transfers, possesses, or uses, without lawful authority, a means of identification of another person with the intent to commit, or to aid or abet, or in connection with, any unlawful activity that constitutes a violation of Federal law, or that constitutes a felony under any applicable State or local law ... shall be punished as provided in subsection (b).'" *Id.* (second alteration in original) (quoting 18 U.S.C. §1028(a)(7)). "The second, aggravated identity theft, states that '[w]hoever, during *and in relation to any felony violation enumerated in subsection (c)*, knowingly transfers, possesses, or uses, without lawful authority, a means of identification of another person shall, in addition to the punishment provided for such felony, be sentenced to a term of imprisonment of 2 years.'" *Id.* (quoting 18 U.S.C. §1028A(a)(1)). 18 U.S.C. §1028A(c) "lists a number of federal felonies, including 'any provision contained in chapter 63 (relating to mail, bank, and wire fraud).'" *Id.* (quoting 18 U.S.C.

---

[20] The government made this "promise" to the extent I had disagreed with its position concerning the application of *Dubin*. (*See* Dismissal Mots. Tr. pp. 83:21–88:7.)

§ 1028A(c)). As to 18 U.S.C. § 1028A, "'the means of identification specifically must be used in a manner that is fraudulent or deceptive' such that it 'can often be succinctly summarized as going to "who" is involved.'" *Johnston*, 2024 WL 4570681, at *3 (quoting *Dubin*, 599 U.S. at 117).

When deciding the Dismissal Motions, I assessed the differences between these statues and found "that interpreting both provisions identically would render one of them superfluous." *Johnston*, 2024 WL 4570681, at *3. To date, no court has affirmatively extended *Dubin* to 18 U.S.C. § 1028(a)(7). *See United States v. Gallo*, No. 24–00712, 2025 WL 1949198, at *4, 5 (D.N.J. July 16, 2025) (citing the *Johnston* decision in support of denying a motion to dismiss an aggravated identity theft charge); *United States v. Haynes*, No. 24–00232, 2025 WL 2712281, at *2 (D.N.J. Sept. 23, 2025) (same); *but see United States v. Colon-Rios*, No. 24–00242, 2025 WL 3551712 (D.P.R. Dec. 11, 2025) (rejecting the defendant's *Dubin*-based challenges to her conspiracy to commit identity theft and aggravated identity theft charges). Since defendants cannot overcome their hurdle of establishing why the narrow interpretation of 18 U.S.C. § 1028A(a)(1) should apply to 18 U.S.C. § 1028(a)(7), I need not reconsider whether test adjudications were at the crux of the underlying fraud.

**b. <u>Deprivation of Property</u>**

Defendants challenge their convictions on Count Two based on there being "no evidence at all that the individuals whose identifying information was used to run a test claim, or anyone else, was deprived of property as a result of these actions." (Mov. Br. p. 115.) According to defendants, because 18 U.S.C. § 1028 is a fraud statute, without proof of money or property having changed hands, they are entitled to acquittal. (*Id.* pp. 115–121.) In response, the government argues that defendants misstate the elements of a conspiracy to commit identity theft. (Opp. Br. pp. 92, 93.) The government notes that rather than prove that a victim was deprived of property, its burden, which it satisfied, was

limited to establishing an agreement to unlawfully use a means of identification and an overt act in furtherance of that agreement. (*Id.*)

Consistent with the Third Circuit Model Jury Instruction, I instructed the jury that "to find [defendants] guilty of conspiring to commit identity theft by fraudulently using a means of identification," they must find beyond a reasonable doubt that: (1) "two or more persons agreed to commit identity theft by fraudulently using a means of identification in connection with an offense against the United States"; (2) defendants were "a party to or a member of that agreement"; (3) "defendant[s] joined the agreement or conspiracy knowing of its objective to commit an offense against the United States and intending to join together with at least one other alleged conspirator"; and (4) "at some time during the existence of the agreement or conspiracy, at least one of the members performed at least one overt act in furtherance of the objectives of the agreement." (Trial Tr. pp. 3790:8–3791:3.) The jury was instructed that 18 U.S.C. § 1028(a)(7) requires: (1) defendants having "knowingly used a means of identification of another person"; (2) defendants having known "that the means of identification belonged to another"; (3) defendants having "used the means of identification with the intent to commit or to aid or abet or in connection with healthcare fraud, wire fraud or conspiracy to commit healthcare fraud or wire fraud"; (4) defendants having "knowingly acted without lawful authority"; and (5) "the use of the means of identification occurred in or affected interstate or foreign commerce." (*Id.* p. 3792:6–24.) As to the fifth element, I instructed that "[a]ffecting interstate commerce means any action which in any way," however minimal, "interferes with, changes or alters the movement or transportation or flow of goods, merchandise, money or other property in commerce between and among the states." (*Id.* p. 3793:19–25.)

Defendants interpret the phrase "fraudulently using a means of identification" as having imposed an obligation on the government "to show that

the scheme at issue … was intended to deprive the victim of the offense or result in the payment of money or property to the defendants." (Mov. Br. pp. 115, 116.) However, as the government notes, "[f]raud was not an element that the jury was instructed on, so there's simply no way that that can be part of the case." (Mot. Tr. p. 101:11–17; *see* Opp'n Br. p. 93.) "[F]raudulently using a means of identification" was, instead, used as "a shorthand way to refer to the requirement in this case that the identification was used in connection with wire fraud, health care fraud, and conspiracy to commit health care fraud and wire fraud." (Opp'n Br. p. 93.)

18 U.S.C. § 1028 is titled "Fraud and related activity in connection with identification documents, authentication features, and information." *See Flores-Figueroa v. United States*, 556 U.S. 646, 655 (2009) (noting that by implementing 18 U.S.C. § 1028 and 18 U.S.C. § 1028A "Congress separated the fraud crime from the theft crime").[21] While the title of a statute is a useful tool to resolve doubt about a meaning of a statute, the plain meaning of 18 U.S.C. § 1028 is clear. *Dubin*, 599 U.S. at 120–21; *United States v. Pendleton*, 658 F.3d 299, 305 (3d Cir. 2011) (holding that when the text of a statute is clear, the statute's title and section headings cannot limit its plain meaning). Identity theft occurs when a means of identification is used "with the intent to commit, or to aid or abet, or in connection with, any unlawful activity that constitutes a violation of Federal law." 18 U.S.C. § 1028(a)(7). The statute neither limits the "violation of Federal law" to fraud nor requires that the "violation" be committed in of itself. *See id.*

Defendants were charged with having "knowingly and intentionally conspire[d] and agree[d] … to knowingly use means of identification of other

[21] Although Count Two charges defendants under 18 U.S.C. § 1028, the count is labeled as "Conspiracy to Commit Identity Theft." (Indictment p. 13.)

persons … with the intent to commit, and to aid or abet, and in connection with … wire fraud, health care fraud, and conspiracy to commit health care fraud and wire fraud." (Indictment ¶ 45.) Thus, to sustain defendants' conviction on Count Two, the government was required to show that defendants had the requisite intent to submit test adjudications in furtherance of their conspiracies to commit healthcare and wire fraud. (*See id.*; Trial Tr. pp. 3792:6–3793:25.) No dispute exists that conspiracies to commit healthcare fraud and wire fraud require that "money or property … be an *object* of the defendant's fraud." *Kousisis v. United States*, 605 U.S. 114, 122 (2025) (quoting *Kelly v. United States*, 590 U.S. 391, 402 (2020)). But, unlike the healthcare fraud and wire fraud statutes, the identity theft statute does not require there be a showing of fraud. *See* 18 U.S.C. §§ 1028(a)(7), 1341, 1347. Defendants' argument imposing an obligation on the government to prove that defendants' running of test adjudications resulted in a deprivation of property fails.

**c. <u>Materiality</u>**

In line with their theory that fraud is an essential element of Count Two, defendants argue that they are entitled to acquittal because the government failed to prove whether the test adjudications amounted to material misrepresentations. (Mov. Br. pp. 98–105, 121–124.) "[T]he Supreme Court has held that although the term 'material' is not explicitly included in the statutory language, 'materiality of falsehood is an element of the federal ... wire fraud[] and bank fraud statutes.'" *United States v. Rabbitt*, No. 23–00320, 2024 WL 4041912, at *3 (D.N.J. Sept. 4, 2024) (second and third alterations in original) (quoting *Neder v. United States*, 527 U.S. 1, 25 (1999)).[22] Beyond

[22] Defendants also raised a materiality argument as to Count One. (Mov. Br. pp. 98–105.) Since I found that defendants were entitled to acquittal as to Count One for other reasons, I did not formally address this argument. Considering the government failed to present sufficient evidence to sustain defendants' convictions for

citing to a case involving the False Claims Act, defendants cite to no authority in support of their position. *Escobar*, 579 U.S. at 192–95. For the reasons already discussed, *see supra* pp. 52–55, 18 U.S.C. § 1028(a)(7) does not require a showing fraud. Thus, defendants' argument fails.

**d. <u>Intent</u>**

Defendants' conviction on Count Two turns on whether the government can establish their requisite intent. *See supra* p. 7. The government suggests that various email exchanges involving defendants directing Central Rexall employees to run test adjudications supports an inference of their guilt. (*See* Opp'n Br. pp. 95–97 (citing GX 141; GX 148; GX 194; GX 259, GX 321; GX 331; GX 645).) The government also points to Taff and Olsen's testimony that Brockmeier would ask that formulas, which Central Rexall had yet to receive a prescription for, be submitted as test adjudications. (*Id.* p. 95 n. 15 (citing Trial Tr. pp. 175:6–176:6, 864:2–866:4).)[23] While this evidence may satisfy the government's burden of establishing defendants' knowledge as to the use of test adjudications, the inquiry does not end here.

The government must also prove that defendants submitted these test adjudications with the intent to commit or to aid and abet their conspiracy to commit healthcare fraud or wire fraud. *See supra* p. 7. In other words,

---

conspiracy to commit healthcare and wire fraud, the government's proofs lacked materiality.

[23] The government notes that Brockmeier does not contest the "overwhelming evidence" demonstrating his knowledge of test adjudications occurring. (Opp'n Br. p. 95 n. 15.) Instead, only Johnston argues that the evidence did not show that he "was aware of the practice of submitting test claims *without* valid prescription[s]." (Mov Br. p. 125.) Defendants argue that, contrary to the government's position, the email exchange wherein Johnston said "good point" in response to Rolling advising him that tests should not be run without a valid prescription does not support an inference of Johnston's knowledge. (GX331; Mov Br. p. 126.)

defendants had to know that they were violating the law, or conspiring to do so. (*See* Trial Tr. p. 3779:16–20.) At most, the evidence established that Central Rexall believed their submission of test adjudications to be PBM contract violations. (*See* Mov. Br. pp. 127–129.) Indeed, Central Rexall's employees testified that while they may have felt uncomfortable, because they "weren't really hurting anyone," they did not think they were violating a criminal law. (Trial Tr. pp. 173:3–176:6, 527:7–15, 794:5–17, 865:2–10.) Breach of contract, however, does not give rise to criminal liability. *See e.g.*, *Countrywide Home Loans, Inc.*, 822 F.3d at 656–63; *Oakland City Univ.*, 426 F.3d at 917.

Test adjudications were submitted to assess a formula's reimbursement rate. (Trial Tr. pp. 678:21–679:6; 865:2–10.) But the publicly available, listed Average Wholesale Price (AWP) was "usually used to determine how much [the formula's] reimbursement [was] going to be." (*Id.* pp. 907:19–23, 941:19–942:9.) The government's theory revolves around Central Rexall having marketed and developed formulas based upon their reimbursement rate, rather than medical necessity. Yet, the government failed to show how many formulas that were the subject of test adjudications, rather than an AWP assessment, furthered their alleged conspiracy to commit healthcare and wire fraud.

Accordingly, the government did not establish beyond a reasonable doubt that defendants understood those submissions to be unlawful, let alone that they were undertaken with the specific intent to further or to aid and abet a healthcare fraud or wire fraud conspiracy. Absent evidence that the test adjudications meaningfully advanced the charged conspiracy to commit healthcare and wire fraud, or that defendants possessed the requisite criminal intent when directing their submission, no rational jury could find defendants guilty. Defendants must, thus, be acquitted of Count Two.

### 3. Count Four: Conspiracy to Commit Money Laundering

Defendants move for judgment of acquittal on Count Four, arguing that the government failed to establish venue in the District of New Jersey. (Mov. Br. pp. 129–140.)[24] The government asserts that by transferring profits from Central Rexall to themselves using the Fedwire Funds Service system and commission payments to Boardwalk Medical, defendants made sufficient contact with New Jersey to warrant venue here. (Opp'n Br. pp. 97–102.) Defendants, however, argue that their connection to New Jersey was merely incidental, and that the government's evidence was unrelated to the specific conspiracy charged in Count Four.

#### a. Venue

The jury was instructed (Trial Tr. pp. 3794:18–3799:25), "[t]he elements of a conspiracy under 18 U.S.C. § 1956(h) are: (1) that an agreement was formed between two or more persons; and (2) that the defendant knowingly became a member of the conspiracy." *United States v. Greenridge*, 495 F.3d 85, 100 (3d Cir. 2007). Defendants were charged with having conspired to violate 18 U.S.C. § 1957, "which provides that it is against federal law to knowingly engage in or attempt to engage in a monetary transaction in excess of $10,000 involving criminally derived property that is derived from specified unlawful activity." (Trial Tr. p. 3795:17–22.) "Here, the allegation is that the specified unlawful activity is conspiracy to commit healthcare fraud." (*Id.* p. 3796:5–8.)

[24] In addition to challenging venue, defendants argued when moving for a judgment of acquittal at the close of the government's case that the government failed to establish the conspiracy element of Count Four. (Trial Tr. pp. 3653:2–13.) Since this issue was not briefed, I need not address whether the government proved the existence of a conspiracy.

A prosecution for an attempt or conspiracy to commit money laundering may be brought in the: "(1) the district in which venue *would* lie *if* the completed substantive money laundering offense had been accomplished [under 18 U.S.C. §1956(i)(1)], *or* (2) any district in which an overt act in furtherance of the conspiracy was committed." *Whitfield v. United States*, 543 U.S. 209, 217 (2005); 18 U.S.C. §1956(i)(2). Pursuant to 18 U.S.C. §1956(i)(1)(A), venue is proper in the "district in which the financial or monetary transaction is conducted." Unlike the other elements of the offense, which must be established beyond a reasonable doubt, "venue need only be established by a preponderance of the evidence." *United States v. Mitchell*, No. 09–00105, 2013 WL 12202650, at *14 (W.D. Pa. May 6, 2013); *United States v. Perez*, 280 F.3d 318, 330 (3d Cir. 2002); *United States v. Massa,* 686 F.2d 526, 530 (7th Cir. 1982) (noting "although venue is an essential element which the [g]overnment must prove, it is an element more akin to jurisdiction than to the substantive elements of the crime").

### i. **Fedwire Transfers**

Defendants were charged with having conspired to have Central Rexall transfer the funds it received from PBMs to Bluen Medical, LLC and Pharmacy Management Group, LLC (PMG). (Indictment ¶¶55–61.) Bluen Medical and PMG were management companies owned by defendants that in turn, made payments to defendants' personal bank accounts. (*Id.* ¶¶1(b), 1(c), 55–61.) The government does not argue that defendants initiated, received, or directed the charged wire transfers from New Jersey. Rather, the government's venue theory relies upon O'Malley's testimony concerning the mechanics of a wire transfer. (*See* Trial Tr. pp. 3408:10–3432:5; Opp'n Br. pp. 98–100.)

O'Malley explained that every electronic transfer of money that engages the Fedwire Funds Service system involves a wire signal between two Federal Reserve servers. (Trial Tr. pp. 3411:14–3415:8.) The servers are located in

Texas and New Jersey. (*Id.* p. 3414:12–25.) Unless the electronic transfer signal travels through both servers, the wire transfer cannot be effectuated. (*Id.* pp. 3412:13–3415:8.) Thus, until the Texas and New Jersey servers acknowledge receipt of each other's signal, no money is transferred. (*Id.* p. 3413:8–19.)

The government argues that the mere signal through New Jersey is enough to establish venue. (Opp'n Br. pp. 98–100.) I, however, find that the government failed to prove how the signal constitutes a "transaction" having been "conducted" in New Jersey. *See* 18 U.S.C. § 1956(i)(1)(A).

The money laundering statute defines "transaction" as including "a purchase, sale, loan, pledge, gift, transfer, delivery, or other disposition, … a deposit, withdrawal, transfer between accounts, exchange of currency, loan, extension of credit, … or [use of] any other payment, transfer, or delivery by, through, or to a financial institution, by whatever means effected." 18 U.S.C. § 1956(c)(3). "[T]he term 'conducts' includes initiating, concluding, or participating in initiating, or concluding a transaction." 18 U.S.C. § 1956(c)(2). Of note, the statute does not identify a wire signal as a "transaction."

Defendants did not choose to use Fedwire and, thereby, choose to have a signal be sent through New Jersey. *See United States v. Negron,* No. 08–00501, 2008 WL 5272056, at *4 (D.N.J. Dec. 16, 2008) (granting the defendant's motion to transfer because regardless of whether "the conspiracy was conceived and agreed upon outside of New Jersey," there was no evidence placing the "nerve center" of the conspiracy in New Jersey); *United States v. Auernheimer*, 748 F.3d 525, 535–41 (3d Cir. 2014) (vacating the defendant's convictions because there was no evidence beyond some activity under either the "essential conduct elements" or "substantial contacts test" to satisfy venue). It is the banks that have the discretion to choose what system to use. (Trial Tr. pp. 3412:22–3413:2, 3425:16–22.) By arguing that an incidental signal

through New Jersey is sufficient to establish venue, the government suggests that anyone in the world who engaged in a Fedwire transaction can be prosecuted in New Jersey. (*See* Opp'n Br. pp.98–100.)

In support of its position, the government cites to *United States v. Goldberg*, 830 F.2d 459, 465 (3d Cir. 1987), *United States v. Lallande*, No. 23–00057, 2023 WL 5035317, at * 3 (D.N.J. Aug. 8, 2023), *Kluger v. United States*, No. 14–06236, 2018 WL 4145902, at *5 (D.N.J. Aug. 30, 2018), and *Bauer v. United States*, No. 14–04166, 2018 WL 4145901, at *3 (D.N.J. Aug. 30, 2018). These opinions, however, arose at different procedural postures and/or involved transactions executed in New Jersey, not merely routed through it. (*See* Mot. Tr. pp.41:7–23.) *Lallande*, *Kluger*, and *Bauer* all rely on *Goldberg*, which held that venue was proper in Pennsylvania because the wire transfer from New York to Wilmington passed through the Federal Reserve Bank in Philadelphia. *Goldberg*, 830 F.2d at 465. I find *Goldberg* unpersuasive to this matter because it did not involve 18 U.S.C. §1956(i), and the defendant conceded to venue. *Goldberg*, 830 F.2d at 465. Thus, neither *Goldberg* nor the other cases the government seeks support from analyze whether a wire transfer alone can establish venue in New Jersey, regardless of how tenuous the rest of the prosecution's connections to New Jersey was.

Proper venue in criminal trials is a constitutional right, and the Supreme Court has repeatedly emphasized the importance of being tried "by a jury of one's peers." U.S. Const. art. III, §2, cl. 3 (providing that "[t]he Trial of all Crimes … shall be held in the State where the said crimes shall have been committed; but when not committed within any State, the Trial shall be at such Place or Places as the Congress may by Law have directed"); *see e.g., Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 572 (1976); *United States v. Johnson*, 323 U.S. 273, 275 (1944); *United States v. Cores*, 356 U.S. 405, 407 (1958); *Travis v. United States*, 364 U.S. 631, 634 (1961). Certainly, Congress did not envision

such an expansive and untethered conception of venue that would permit jurisdiction in New Jersey merely because an electronic signal in the process to complete a wire transfer passed through a server in New Jersey. Accordingly, the government cannot satisfy venue under this theory.

**ii. <u>Commission Payments</u>**

The government also argues that commission payments from Central Rexall to Boardwalk Medical satisfies the venue requirements. (Opp'n Br. pp. 100–102.) No dispute exists that these payments are sufficiently connected to New Jersey. (Mov. Br. p. 138.) Defendants, however, argue that they have nothing to do with the conspiracy charged in Count Four. (*Id.*) I agree with defendants.

Count Four charged defendants with having "engaged in transactions in amounts exceeding $10,000 with the proceeds of the conspiracy to commit health care fraud and wire fraud." (Indictment ¶ 60.) While this language is broad, the Indictment "set[s] forth" 31 transactions "[a]s part of the conspiracy." (*Id.* ¶¶ 60, 61.) The Indictment, thereby, limits the basis of Count Four to these transactions, which solely involve payments to Bluen Medical, PMG, or defendants' personal bank accounts. (*Id.* ¶ 61(a)–(cc).)

Count Four makes no reference to commissions, Boardwalk Medical, or Hickman. Nonetheless, the government argues that it incorporates by reference the allegation asserted in Count Two that "Hickman, through his company Boardwalk Medical … received in New Jersey a payment from Central Rexall of $2,447,076.19 for his work and the work of people working with him to find patients in New Jersey to receive Central Rexall prescriptions." (Indictment ¶ 49(d); Opp'n Br. p. 101.)

Fundamental fairness requires that an indictment put a defendant on notice of charges he or she faces. *See Russell v. United States*, 369 U.S. 749, 765 (1962) (noting that "[i]t is an elementary principle of criminal pleading, that

where the definition of an offence, whether it be at common law or by statute, 'includes generic terms, it is not sufficient that the indictment shall charge the offence in the same generic terms as in the definition; but it must state the species,—it must descend to particulars'" (quoting *United States v. Cruikshank*, 92 U.S. 542, 558 (1875))). While Rule 7(c)(1) permits incorporation by reference of an allegation made in another count, courts have cautioned that doing so "may not be the best way to give a defendant notice." *United States v. Harra*, 985 F.3d 196, 222 (3d Cir. 2021) (noting that "notice need not be ideal, only fair"). Count Four is clearly confined to the transfers of money from Central Rexall to defendants. To expand the confines of the alleged illegal acts under Count Four to Central Rexall's payment of commissions would be fundamentally unfair to defendants. Defendants are entitled to acquittal on Count Four.

## III. MOTION FOR NEW TRIAL

### A. <u>Legal Standard</u>

"Rule 33 allows the court to 'vacate any judgment and grant a new trial if the interest of justice so requires.'" *Onque*, 169 F. Supp. 3d at 566 (quoting Fed. R. Crim. P. 33(a)). When considering whether to grant a new trial, a court "must exercise its own judgment in assessing the [g]overnment's case, and does not view evidence favorably to the [g]overnment." *Id.* However, a court "'may set aside the verdict and grant a new trial only if' it determines that the verdict constitutes a miscarriage of justice, or that a trial error had a substantial influence on the verdict." *Id.* (quoting *United States v. Stewart,* 325 F. Supp. 2d 474, 485 (D.Del. 2004)). "In general, motions for a new trial 'should be granted sparingly.'" *Id.* (quoting *United States v. D'Amario,* No. 06–00112, 2007 WL 928473, at *5 (D.N.J. Mar. 26, 2007)).

A Rule 33 "motion can be granted on either of two grounds: 'First, the [c]ourt may grant a new trial if, after weighing the evidence, it determines there

has been a substantial miscarriage of justice.'" *United States v. Wright*, 845 F. Supp. 1041, 1063–64 (D.N.J.) (alteration in original) (quoting *Gov't of Virgin Islands v. Commissiong*, 706 F. Supp. 1172, 1184 (D.V.I. 1989)). "Second, the [c]ourt must grant a new trial if error had a substantial impact on the verdict." *Id.* (alteration in original) (quoting *Commissiong*, 706 F. Supp. at 1184). While "a Rule 33 motion lies within the sound discretion of the" court, "a motion for a new trial is not favored and is viewed with great caution." *Id.* (first quoting *United States v. Keyser,* No. 91–000682, 1994 WL 12117 at *4 (E.D.Pa. Jan. 14, 1994)) (second quoting *United States v. Miller,* 987 F.2d 1462, 1466 (10th Cir. 1993)).

"In contrast to motions for judgment of acquittal under Rule 29, a motion for a new trial does not require me to view the evidence in the light most favorable to the [g]overnment." *D'Amario*, 2007 WL 928473, at *5. "Rather, I must weigh the evidence and evaluate the credibility of witnesses." *Id.* However, "[i]n the Third Circuit, a court is not permitted to sit as a thirteenth juror and set aside the verdict simply because it feels some other result would be more reasonable." *Wright*, 845 F. Supp. at 1064 (quoting *United States v. Gonzalez*, No. 92–00517, 1993 WL 364711, at *9 (E.D. Pa. Sept. 13, 1993)).

### B. <u>Discussion</u>

Defendants move for a new trial based largely on the same arguments asserted in the Rule 29 aspect of the Motion. (*See generally* Mov. Br. pp. 143–183.) Defendants argue that a new trial is required because the verdict was against the weight of the evidence and was tainted by the admission of irrelevant and unfairly prejudicial evidence. (*Id.*) Specifically, defendants contend that the government repeatedly introduced evidence and raised arguments concerning industry practices, compensation structures, and alleged "red flags" that were untethered to the Indictment. (*See id.*)

Rule 29 requires that "if [a] court enters a judgment of acquittal after a guilty verdict, the court must also conditionally determine whether any motion for a new trial should be granted if the judgment of acquittal is later vacated or reversed." Fed. R. Crim. P. 29. For the same reasons the Rule 29 aspect of the Motion will be granted, I will conditionally grant the new trial aspect of the Motion. *See United States v. Atl. States Cast Iron Pipe Co.*, No. 03–00852, 2007 WL 2282514, at *135 (D.N.J. Aug. 2, 2007), *aff'd sub nom.*, *United States v. Maury*, 695 F.3d 227 (3d Cir. 2012) (noting that the Rule 33 aspect of the defendant's post-trial motion will be conditionally granted for the same reasons that the Rule 29 aspect of the motion was granted).

## IV. CONCLUSION

For the reasons stated above, the Rule 29 aspect of the Motion is **GRANTED**, and the Rule 33 aspect of the Motion is conditionally **GRANTED.**

*/s/ Edward S. Kiel*
**EDWARD S. KIEL**
**UNITED STATES DISTRICT JUDGE**

Dated: January 16, 2026

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **UNITED STATES OF AMERICA,**<br>**v.**<br>**CHRISTOPHER KYLE JOHNSTON and TRENT BROCKMEIER** | **Case No. 20–cr–00800–ESK**<br>**ORDER** |

**THIS MATTER** having come before the Court on May 22, 2025 on defendants' omnibus motion for judgment of acquittal pursuant to Federal Rule of Criminal Procedure (Rule) 29, or alternatively, new trial pursuant to Rule 33 (Motion) (ECF Nos. 327, 327–1); and the government having filed an opposition to the Motion (ECF No. 342) on July 11, 2025; and defendants having filed a reply (ECF No. 350) on August 18, 2025 in further support of the Motion; and on October 24, 2025, the government having filed a letter to advise the Court of a decision from the Third Circuit that it believed relevant to the Motion (ECF No. 364); and oral argument on the Motion having been heard on October 27, 2025 (ECF No. 367); and at the Court's direction, the parties having filed supplemental letter-briefs on November 10, 2025 (ECF Nos. 368, 369); and on December 8, 2025, defendants having filed a letter citing to new authority in support of their position (ECF No. 371); and the government having filed a response to defendants' letter on December 15, 2025 (ECF No. 372); and for the reasons stated in the accompanying Opinion:

**IT IS** on this **16th** day of **January 2026** **ORDERED** that:

1. The Rule 29 aspect of the Motion is **GRANTED**. A judgment of acquittal shall be entered as to defendants on all counts.

2. The Rule 33 aspect of the Motion is conditionally **GRANTED**.

3. The Clerk of the Court is directed to terminate the Motion at ECF No. 327.

*/s/ Edward S. Kiel*
**EDWARD S. KIEL**
**UNITED STATES DISTRICT JUDGE**

## CERTIFICATION OF FILING AND SERVICE

I hereby certify that on July 16, 2026, I caused the Brief and Appendix for Appellant to be filed with the Clerk of this Court by (a) electronic filing in the PDF form using the Circuit's electronic filing system, and (b) seven paper copies of the Brief and four paper copies of the Appendix using postage-prepaid first-class mail.

I also certify that on July 16, 2026, I caused the Brief and Appendix for Appellant to be served:

[X] by the Notice of Docketing Activity generated by the Third Circuit's electronic filing system, on the following Filing Users:

Lawrence S. Lustberg, Esq.
llustberg@fbtgibbons.com
(counsel for Christopher Kyle Johnston)

Marc A. Agnifilo, Esq.
marc@agilawgroup.com
(counsel for Trent Brockmeier)

John F. Romano
Assistant U.S. Attorney

Dated: July 16, 2026